UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| |
|---|
| In the Matter of the Application of<br><br>Oleg Vladimirovich Deripaska, for an order, pursuant to 28 U.S.C. § 1782, to obtain discovery from Alexandra Kogan and JPMorgan Chase Bank for use in an action pending in the High Court of Justice, Queen's Bench Division, Commercial Court, styled *Michael Cherney v. Oleg Vladimirovich Derispaska.* |

Misc. No. _____

### DECLARATION OF MARC L. GREENWALD IN SUPPORT OF OLEG VLADIMIROVICH DERIPASKA'S APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER COMPELLING DISCOVERY FOR USE IN A FOREIGN LITIGATION

Marc L. Greenwald declares as follows pursuant to 28 U.S.C. § 1746 and Rule 1.4 of the

Local Rule of the United States District Courts for the Southern and Eastern Districts of New

York:

       1.     I am a partner at Quinn Emanuel Urquhart & Sullivan, LLP and am

admitted to practice in this Court. I make this affirmation in support of Oleg Vladimirovich

Deripaska's application pursuant to 28 U.S.C. § 1782 for issuance of an order compelling

Alexandra Kogan and JPMorgan Chase Bank to produce certain documents and provide

deposition testimony for use in a civil proceeding entitled *Michael Cherney v. Oleg*

*Vladimirovich Deripaska*, which was commenced in England in 2006 and is currently pending

before the High Court of Justice, Queen's Bench Division, Commercial Court (the "English

action").

       2.     I am familiar with the facts set forth in this Declaration, either from

personal knowledge or on the basis of documents that have been provided to me.

**The Parties**

3.    Oleg Vladimirovich Deripaska is the defendant in the English action. Quinn Emanuel represents Mr. Deripaska in the English action through attorneys in its London office.

4.    Michael Cherney is the claimant in the English action. I understand that Mr. Cherney is sometimes referred to as "Cherny" and other variants. For the sake of clarity, I refer to him as "Mr. Cherney" throughout this application. Dechert LLP, English solicitors, represent Mr. Cherney in the English action.

**Mr. Cherney Seeks To Avoid Testifying In Person Before the Court In Support Of His Claims In England**

5.    Mr. Cherney brought the English action to enforce what he alleges was an agreement between himself and Mr. Deripaska executed on March 10, 2001 ("the alleged 2001 Agreement"). Mr. Deripaska denies that he entered into the alleged 2001 Agreement. To the contrary, Mr. Deripaska alleges that he was subject to a protection racket run by organized crime groups represented by Mr. Cherney. Attached as Exhibit A hereto is a true and correct copy of the "Case Memorandum" that the parties jointly submitted to the court in the English action. The Case Memorandum describes in greater detail the procedural history of the English action and the issues in dispute.

6.    Despite having brought suit against Mr. Deripaska in England, Mr. Cherney is currently seeking the English court's permission to give testimony in support of his claims by video link from Israel, where he currently resides. Authorities in Spain have issued a warrant for his arrest, and Mr. Cherney has argued that if he were to travel to England to testify,

he would risk being arrested and extradited to Spain.[1]  Trial in the English action is currently scheduled for April 2012.

7.      In support of his request to be allowed to testify from Israel, Mr. Cherney has represented to the English court that he has not left Israel since May 23, 2009.  *See* Seventh Witness Statement of Andrew Elliot Tracey Hearn (the "Hearn Statement"), a true and correct copy of which (without exhibit) is attached as Exhibit B hereto, at ¶ 6 ("The Claimant repeats that he has not left Israel since 23 May 2009 when he returned from a trip to London (as previously described).)"; *see also* Fourth Witness Statement of Michael Cherney, a true and correct copy and translation of which are attached as Exhibit C hereto (stating that Mr. Hearn's statements are true to the best of Mr. Cherney's knowledge and belief).

8.      Mr. Deripaska has presented evidence contradicting Mr. Cherney's claim not to have traveled outside Israel since May 2009.  Specifically, Mr. Deripaska submitted two notarized documents indicating that Mr. Cherney appeared before a notary in New York State on May 26, 2010.  *See* First Witness Statement of Susan Rachel Prevezer QC, a true and correct copy of which (without exhibit) is attached as Exhibit D hereto, at ¶¶ 7-11.  The two notarized documents—a Parking Space Unit Deed ("Parking Space Deed") and an Affidavit of Compliance With Smoke Detector Requirements ("Smoke Detector Affidavit")—are attached as Exhibits E and F hereto, respectively (these documents were previously numbered, in the bottom right-hand corner, for filing in the English action).  Both documents bear the official seal and signature of a New York notary, Alexandra Kogan, and both documents indicate that Mr. Cherney appeared before Ms. Kogan within New York State on May 26, 2010.  The Parking

---

[1]  Mr. Cherney could theoretically be extradited from Israel to Spain, but to date Israeli authorities have declined to extradite him.

Space Deed, for example, states that, "On the 26th day of May, 2010, before me, the undersigned, a Notary Public in and for said State, personally appeared MICHAEL CHERNY personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument . . . ." Ex. E at 3.

9.      Despite Ms. Kogan's notarization of the Parking Space Deed and the Smoke Detector Affidavit, Mr. Cherney denies that he was present in New York on May 26, 2010.  He has represented to the English court that he signed the documents in Israel, and that his nephew Leonid then arranged for Leonid's mother to deliver the signed documents to the New York notary.  *See* Hearn Statement, Ex. B, at ¶¶ 6-9.  Neither Mr. Cherney nor his nephew claims to have been in Ms. Kogan's presence when she notarized the documents.

**The June 20, 2011, Conference Before The English Court**

10.      There was an application in the English action before Mr. Justice Flaux on June 20, 2011.  The primary focus of the hearing was whether the English court would allow Mr. Cherney to give testimony in support of his claims by video link from Israel, rather than appearing in person in England to testify.  Attached as Exhibit G hereto is a true and correct copy of the transcript of the June 20 hearing.  Counsel for Mr. Deripaska argued, among other things, that if Mr. Cherney was willing to travel to America in 2010, when a warrant for his arrest was already outstanding, that would undermine his credibility and his argument that he should, by reason of his alleged fear of arrest, be allowed to avoid traveling to England to testify in support of his claims against Mr. Deripaska.  Ex. G at 22-23.

11.      The hearing transcript indicates that Mr. Justice Flaux took seriously the evidence that Mr. Cherney was present in New York State in May 2010.  As he framed the issue to counsel for Mr. Deripaska: "If you are right and if Miss [Kogan] comes forward and says in

the course of argument, 'Actually Mr. Cherney did appear before me on 26 May 2010,' then Mr.

Cherney has some fairly difficult questions to answer." *Id.* at 25. And further:

> MR. JUSTICE FLAUX: I could say I suppose at that stage I am simply not
> satisfied that Mr. Cherney is someone who is not prepared to travel. The
> difficulty is that you say for example, that a New York notary may simply be
> prepared to, as it were, sign some statement that says that he was there, but if a
> Notary Public goes on affidavit and actually says that, it seems to me that is pretty
> compelling evidence that she is telling the truth. **We are into some fairly serious
> allegations here.** . . . If the court concluded that on the evidence that it was fairly
> clear he had been to New York, that would have, as I see it, a very serious effect,
> which is that I do not see how, in those circumstances, I could say therefore he
> should be entitled to give his evidence by video link.

*Id.* at 35-36 (emphasis added).

   12. Given the centrality of this issue to the question of whether Mr. Cherney

should be allowed to testify in the English court by video, Mr. Justice Flaux adjourned the

hearing to give Mr. Deripaska additional time to investigate the circumstances surrounding Ms.

Kogan's notarization of the Parking Space Deed and Smoke Detector Affidavit. *Id.* at 36. Mr.

Justice Flaux specifically held that Mr. Deripaska's attorneys "should have the opportunity to get

evidence from the Notary Public in New York." *Id.* In his words, "I think it would be quite

wrong to [make a decision], because I have a distinct feeling that I do not have a complete

picture." *Id.* He ordered the parties to serve any new evidence on each other seven days before

the hearing resumes in July. *Id.* at 37. The hearing is now scheduled to resume on July 26,

2011.

**Quinn Emanuel Attempts To Contact Ms. Kogan**

   13. On June 20, 2011, shortly after the adjournment of the English status

conference, Quinn Emanuel attempted to speak with Ms. Kogan. With the help of a private

investigator, Robert Manchak, we determined that Ms. Kogan works for JPMorgan Chase Bank

("Chase") in Brighton Beach, Brooklyn. Mr. Manchak and a summer associate at my firm,

Marina Olevsky, who is a fluent Russian speaker, went to visit the Brighton Beach Branch where Ms. Kogan works. A true and correct copy of Ms. Olevsky's description of her visit to the Chase branch is attached as Exhibit H hereto. Ms. Olevsky states that Ms. Kogan would not speak to Mr. Manchak and her about the notarizations for Mr. Cherney, and that Ms. Kogan's supervisor, Bill Bozza, told Mr. Manchak and her to direct any questions to Ms. Kogan in writing. *See* Ex. H. Ms. Olevsky further states that Ms. Kogan made a comment indicating that she had already been contacted that same day by someone in connection with the English action. *Id.* Prior to my colleagues' visit to Brighton Beach, no one had contacted Ms. Kogan on behalf of Mr. Deripaska.

14.    In keeping with Mr. Bozza's instructions, I sent a letter to Ms. Kogan by email and U.S. mail on June 23, 2011. A true and correct copy of my June 23 letter is attached as Exhibit I hereto. In the letter, I posed a number of questions to Ms. Kogan. My primary purpose was to determine whether Mr. Cherney had in fact appeared before Ms. Kogan in New York State on or about May 26, 2010.

**Quinn Emanuel Communicates Through Counsel for Chase**

15.    Neither Ms. Kogan nor Mr. Bozza responded to my letter. Instead, one of my colleagues was contacted by Jenni B. Spiritis, Vice President and Assistant General Counsel of JPMorgan Chase Bank, on June 24, 2011. After my colleague put me in touch with Ms. Spiritis and I forwarded her my June 23 letter, she asked that Quinn Emanuel direct future communications in this matter to her. I told Ms. Spiritis that I would direct communications to her if she represented Ms. Kogan, and I asked Ms. Spiritis to provide a response to my June 23 letter. Ms. Sprititis wrote back on June 27, 2011, to confirm that I should direct communications to her. A true and correct copy our email correspondence is attached as Exhibit J hereto.

16.     Instead of providing answers to the questions I posed to Ms. Kogan, Ms. Spiritis informed me by telephone on June 27, 2011, that Ms. Kogan was on vacation in Spain and would be unreachable until July 11.  Ms. Spiritis claimed not to have contact information for Ms. Kogan in Spain.  She did not make any representations as to when JPMorgan Chase Bank would respond to my June 23 letter, other than to say that she could not even begin to respond until Ms. Kogan returned to the U.S. on July 11.

17.     On June 28, 2011, my colleague Judd Spray and I spoke to Ms. Spiritis by telephone and asked (1) whether Chase would look for documents concerning the notarizations while Ms. Kogan was on vacation; and (2) when Chase first learned that Kogan would be on vacation.  Ms. Spiritis wrote back later that afternoon to say that Chase would not look for documents and that Ms. Kogan's vacation plans do not concern us.  A true and correct copy of Ms. Spiritis's email is attached as Exhibit K hereto.

18.     On July 1, 2001, I sent another letter to Ms. Spiritis, summarizing our contacts with Chase up that point and asking Ms. Spiritis to make Ms. Kogan available to speak with us as soon as she returned to the U.S.  A true and correct copy of my letter to Ms. Spiritis is attached as Exhibit L hereto.

19.     On July 6, 2011, Ms. Spiritis emailed me to say that Chase would not produce Ms. Kogan for examination absent a subpoena or court order.  A true and correct copy of Ms. Spiritis's email is attached as Exhibit M hereto.

20.     On July 12, 2011, I again spoke to Ms. Spiritis by telephone.  Ms. Spiritis informed me that she had interviewed Ms. Kogan, and that Ms. Kogan's regular practice is to ask for picture identification from someone who wants a document notarized.  Ms. Spiritis also said that Ms. Kogan could not recall notarizations that took place more than a year ago.  Ms. Spiritis

would not answer my questions as to whether Ms. Kogan knew Mr. Cherney or his family, or whether this notarization was done as part of Ms. Kogan's work at Chase or done for someone with whom she had an outside relationship.  Ms. Spiritis agreed to talk to people at Chase about (1) whether Chase would provide information about the circumstances of Mr. Cherney's (or his family's) relationship with Ms. Kogan, if any; and (2) whether Ms. Kogan would provide an affidavit with the information about her regular practice and her lack of memory.

21.     On July 13, 2011, I exchanged emails with Ms. Spiritis.  Ms. Spiritis wrote that "it is Kogan's practice to only notarize documents for persons present before her upon the presentation of photo identification and that she cannot recall every particular prior notarization from over one year ago or otherwise."  This response was phrased in such a way that it did not answer the question whether Ms. Kogan could recall notarizing Mr. Cherney's documents in particular, so I responded to Ms. Spiritis to ask whether her email had been purposefully nonresponsive to my prior inquiries.  Ms. Spiritis responded that, "[w]ith respect to anything further, as indicated, we will not be producing additional information via correspondence or otherwise without a subpoena."  A true and correct copy of our email exchange is attached as Exhibit N hereto.

**Mr. Cherney Produces Witness Statements In the English Action**

22.     By letter dated July 15, 2011, my Quinn Emanuel colleagues in London informed Mr. Cherney's English solicitors, Dechert LLP, that we intended to seek Ms. Kogan's deposition in the U.S. on an expedited basis, but that it was unlikely the deposition would be completed in time for the hearing on July 26, 2011.  Andrew Hearn of Dechert LLP replied, among other things, that his client would be producing evidence in the English action that would make Ms. Kogan's deposition unnecessary.  Mr. Hearn specifically asked that his email be

8

brought to the attention of this Court.  A true and correct copy of this email exchange is attached as Exhibit O hereto.

23.    On July 19, 2011, Dechert LLP produced nine witness statements to my London colleagues.  True and correct copies of these witness statements (without attachments) are attached as Exhibits P (Michael Cherney), Q (Evgeny Traspov), R (Georgi Georgiev), S (Adella Chernoy), T (David Chernoy), U (Leonid Chernoy), V (Anna Latkovskaia), W (Brian Edward Maas), and X (Joaquin Matias Burkhalter Thiebaut) hereto.  Dechert LLP did not produce witness statements from Ms. Kogan or anyone affiliated with Chase.

**Mr. Deripaska Moves By Order To Show Cause Because Of The Impending Hearing In the English Action**

24.    As is described in detail above, Mr. Deripaska has made numerous attempts to gather information from Ms. Kogan and/or Chase without resorting to legal process. Ms. Spiritis explicitly stated in her July 13, 2011, email, however, that Chase will not produce any additional information unless served with a subpoena.  Because the next hearing in the English action is scheduled for July 26, 2011, Mr. Deripaska moves this Court by Order To Show Cause so that even if Ms. Kogan's deposition cannot take place before July 26, Mr. Deripaska may inform the English Court at the July 26 hearing that discovery is underway in the U.S. on an expedited basis and that Ms. Kogan and Chase will produce documents and information concerning these issues in a timely manner.

25.    Mr. Deripaska has made no previous application for similar relief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 20, 2011.

Marc L. Greenwald

# EXHIBIT A

IN THE HIGH COURT OF JUSTICE         Claim No. 2006 Folio 1218

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N:-

## MICHAEL CHERNEY

<u>Claimant</u>

- and -

## OLEG VLADIMIROVICH DERIPASKA

<u>Defendant</u>

---

## CASE MEMORANDUM

---

### <u>Case Summary</u>

1.      This is a contractual claim brought by the Claimant to enforce what he alleges was an agreement concluded between the Claimant and the Defendant in London on 10 March 2001 ("the 2001 Agreement").

2.      The Defendant admits that he met the Claimant in London on 10 March 2001, at which time he and the Claimant signed a document in Russian headed "Agreement No. 1", but denies that he entered into the 2001 Agreement alleged by the Claimant at that meeting or at all.

### <u>Background</u>

3.      The Claimant alleges that prior to, and at the time of, the alleged 2001 Agreement, the Claimant was in a business partnership with the Defendant and that at the time of the 2001 Agreement, the Claimant and the Defendant each held a 40% interest in OJSC United Company Sibirskiy Aluminium ("Sibal"), a Russian aluminium company.

4.      The Claimant alleges that he held that interest through a Liechtenstein Foundation called the Radom Foundation ("Radom"), or by virtue of rights enjoyed by the Radom Foundation in relation to Sibal.

5.   The Defendant denies both that he ever had any form of business relationship with the Claimant and that the Claimant had any interest in Sibal. He also denies the Claimant had any interest in the assets of Radom, or that Radom had any interest in Sibal.

6.   The Defendant alleges that from 1995 at the latest, he was subject to a *"krysha"* (protection racket) at the hands of organised crime groups ("OCGs") represented by the Claimant (amongst others) under which he had been forced to pay them substantial sums as *"dolya"*.

7.   Agreements reached in March and May 2000 provided that certain aluminium assets that were owned or controlled respectively by (i) the ultimate owners of Sibal and (ii) the ultimate owners of an entity known as "Sibneft", were to be the subject of joint administration. Later in 2000, a vehicle for the joint ownership of some of the aluminium smelter assets which were the subject of joint administration was incorporated in Russia as OJSC Russky Alyuminiy. It was ultimately owned as to 50% by the ultimate owners of Sibal. At the time when the Claimant alleges that the 2001 Agreement was concluded, steps were being taken to transfer smelter assets into the ownership of OJSC Russky Alyuminiy.

8.   It is the Claimant's case that he had an entitlement to a 40% interest in Sibal, thereby entitling him to a 20% interest in OJSC Russky Alyuminiy. The Defendant denies that the Claimant had any interest in Sibal or OJSC Russky Alyuminiy.

The alleged 2001 Agreement

10.   It is common ground that the Claimant and the Defendant met at the Lanesborough Hotel in London on 10 March 2001 and that, at that meeting, the Claimant and the Defendant both signed a document in Russian headed "Agreement No. 1", drafted by the Defendant, which stated that in consideration for the "First Party" (the Claimant) selling 17.5% of his shares in Sibal, the "Second Party" (the Defendant) would pay a "preliminary price" of US$100,000,000 and would repay a debt in the sum of US$150,000,000 for the benefit of the Claimant. There is no agreed English translation of Agreement No. 1.

11.   The Claimant alleges that:

(a)   At the meeting on 10 March 2001, he and the Defendant also signed a further document headed "Supplement No.1" which was also drafted by the Defendant. It was in Russian. According to the translation put forward by the Claimant (with which the Defendant does not agree), it stated that "in fulfilment of the Agreement No. 1 of

2

10 March 2001" the Second Party to Supplement No. 1 was to sell shares in OJSC Russky Alyuminiy to third parties which process was to be completed within 5 years of "the complete fulfilment of this Agreement" and that following the sale of shares in OJSC Russky Alyuminiy, the Second Party was to pay the First Party to Supplement No.1 a sum equal to the cost of 20% of OJSC Russky Alyuminiy less US$250,000,000 (being the amount to be paid pursuant to Agreement No 1).

(b)    Together the document headed "Agreement No. 1" and the document headed "Supplement No. 1" constituted the 2001 Agreement, which was intended to be binding on the parties.

(c)    The Claimant and the Defendant further orally agreed at the meeting on 10 March 2001 that the 2001 Agreement would be governed by English law and be subject to the jurisdiction of the English courts.

12.    The Defendant contends that:

(a)    At the 10 March 2001 meeting, the Claimant agreed to accept a US$250 million payment from the Defendant to end the alleged "krysha" arrangement.

(b)    The document entitled "Agreement No. 1" was a mock transaction which was never intended to give rise to legal relations and/or was a sham transaction designed to conceal the final payment under the *krysha* arrangement.

(c)    The document entitled Supplement No.1 was not an agreement (or part of an agreement) with the Claimant, and was not shown to the Claimant by the Defendant at the meeting on 10 March 2001. Rather, it was a separate mock or sham transaction signed by the Defendant in Moscow and given to a Mr. Anton Malevsky, and designed to conceal another final payment under the *krysha* arrangement (references hereafter to the Defendant's contentions concerning Supplement No.1 are all subject, so far as the Defendant is concerned, to the Defendant's contention that Supplement No.1 is not an agreement with the Claimant, or part of such an agreement).

(d)    There was no agreement on English law and/or jurisdiction at the 10 March 2001 meeting.

There is no agreed translation of Supplement No. 1.

3

3

Governing Law

13.    As noted above, the Claimant contends that, at a meeting on 10 March 2001, it was orally agreed between the parties that English law would govern the 2001 Agreement (both Agreement No.1 and Supplement No.1, if, contrary to the Defendant's case, it is or forms part of an agreement with the Claimant). Further, the Claimant contends that in any event English law is the applicable law of the 2001 Agreement. Alternatively, the Claimant contends that the applicable law of the 2001 Agreement is Liechtenstein law.

14.    As also noted above, the Defendant denies that any agreement was reached as to applicable law at the 10 March 2001 Agreement. The Defendant contends that the putative applicable law of the alleged 2001 Agreement and/or the document headed Agreement No. 1 and/or the document headed Supplement No. 1 is Russian law.

Enforceability of the 2001 Agreement

15.    The Defendant denies that the Claimant has any rights under the alleged 2001 Agreement and/or the documents headed Agreement No. 1 and Supplement No 1 for a series of reasons, each of which the Claimant denies:

(a)    on the basis that the same are unenforceable or void as illegal transactions and/or transactions made with a purpose knowingly contrary to the bases of the legal order by reason of Articles 168 and 169 of the Russian Civil Code; and/or

(b)    on the basis that the same are void ab initio, not binding and/or have no legal effect as mock or sham transactions under Articles 170(1) and 170(2) of the Russian Civil Code; and/or

(c)    on the basis that whether the documents headed Agreement No. 1 and Supplement No. 1 are taken separately or as part of a single agreement, they lack essential terms required by Articles 421, 429, 432, 454. 455 and/or 465 of the Russian Civil Code; and/or

(d)    because any agreement has been automatically rescinded under Articles 450(3) and 463(1) of the Russian Civil Code and the general Russian law of obligations by reason of the alleged non-performance of both parties; and/or

(e)     because the Claimant has no rights until he has transferred 17.5% of shares in Sibal to the Defendant which has not happened (and it is now too late for any such rights to come into effect);

(f)     because any claim by the Claimant constitutes an abuse of rights under Article 1 of the Russian Civil Code.

16.     If, contrary to the Defendant's case, it is found that the alleged 2001 Agreement and/or the documents headed Agreement No. 1 and Supplement No. 1 are governed by English law, the Defendant contends that the Claimant has no enforceable rights under English law for the following reasons, each of which the Claimant denies:

(a)     because there was no genuine intention to contract in the terms of those documents; and/or

(b)     due to lack of consideration from the Claimant; and/or

(c)     because any agreements were procured by duress and have been avoided by the Defendant; and/or

(d)     because any agreement is unenforceable and/or void on grounds of illegality, public policy and/or the principle of *ex turpi causa*; and/or

(e)     because the Claimant is in repudiatory breach of any agreements by failing to deliver shares in Sibal to the Defendant which breach the Defendant has accepted; and/or

(f)     because no obligations have yet arisen (and can now arise) under the alleged agreement(s).

Alleged performance of the 2001 Agreement

17.     It is common ground that the amount which the document headed Agreement No.1 stated would be paid by the Defendant has been paid by the Defendant and received by, or on behalf of, or for the benefit of the Claimant.

18.     The Claimant alleges that, subsequent to the 2001 Agreement, the parties have had discussions concerning the Defendant's further performance of the 2001 Agreement during which it is alleged that the Defendant told the Claimant that he would be making payment of the amounts allegedly due under the "second stage" of the 2001 Agreement. The Defendant says that in such discussions as have taken place he has consistently made it clear that he does not regard himself as having any obligations to the Claimant.

### The merger between Rusal Holding Limited, Sual and Glencore

19.     Rusal Holding Limited was incorporated in the BVI on 7 May 2003. Various assets (including the aluminium assets of OJSC Russky Alyuminiy) were transferred to Rusal Holding Limited during 2003. Rusal Holding Limited was redomiciled to Jersey in 2005[1]. It is common ground that in around March/April 2007 a further merger took place between Rusal Holding Limited on the one hand and, Sual and Glencore on the other. The merged entity was United Company Rusal Limited ("UCR"), the world's largest aluminium producer. Following the merger, the former owners of Rusal Holding Limited obtained ownership of 66% of UCR.

20.     It is the Claimant's case that his original entitlement to a 20% interest in OJSC Russky Alyuminiy thereby entitled him to 20% of the 66% interest in UCR. The Defendant denies that the Claimant had any interest in either OJSC Russky Alyuminiy or Rusal Holding Limited or UCR (and denies that the Claimant has any claim in relation to UCR, even if there was a 2001 Agreement).

### Repudiation

21.     The Claimant alleges that the Defendant has repudiated the 2001 Agreement and that he has accepted the repudiation. The Defendant denies that there was any agreement to repudiate.

### Relief sought

22.     The Claimant claims damages for breach of the 2001 Agreement.

---

[1] The Claimant does not put forward any case in relation to the matters stated in the first three sentences of this paragraph and pending review of the Defendant's disclosure makes no admissions as to the accuracy of the information stated therein.

6

6

23.     The Claimant also claims a declaration that the Defendant holds 20/% of the shares in OJSC Russky Alyuminiy and/or 20% of the 66% shares in UCR (and all monies and benefits deriving therefrom) on trust for the Claimant or to his order.

24.     The Defendant denies that the Claimant is entitled to any relief. The Defendant contends that under both Russian and English law, the Claimant is not entitled to a proprietary remedy.

25.     Further, the Defendant contends that no relief may be granted to the Claimant by reference to the value of shareholdings in UCR.

### **Procedural History**

| | |
|---|---|
| 24 November 2006: | Claim Form and Particulars of Claim issued. |
| 3 May 2007: | Langley J ordered that the purported service of the Claim Form on the Defendant in England be set aside. |
| 2 December 2007: | Amended Claim Form and Particulars of Claim issued. |
| 3 July 2008: | Permission for service out of the jurisdiction granted by Christopher Clarke J. |
| 31 July 2009: | Appeal against the order of 3 July 2008 dismissed by the Court of Appeal. |
| 9 December 2009 | Permission to appeal against the order of the Court of Appeal refused by the Supreme Court |
| 22 March 2010: | Defence served |
| 21 May 2010: | Claimant's CPR Part 18 Request for Further Information served |
| 9 June 2010: | Reply served |
| 23 July 2010: | Defendant's CPR Part 18 Request for Further Information served |
| 16 August 2010: | Defendant's First Part Response to Claimant's CPR Part 18 Request for Further Information served |

7

| 15 September 2010 | Claimant's supplemental CPR Part 18 Request for Further Information served. |
| [TBC] | [Claimant's Response to Defendant's CPR Part 18 Request for Further Information served] |

8

# EXHIBIT B

1. Claimant
2. A.E.T. Hearn
3. Seventh
4 "AETH 7"
5.    June 2011

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

**2006 FOLIO 1218**

**MICHAEL CHERNEY**

**Claimant**

v.

**OLEG DERIPASKA**

**Defendant**

---

**SEVENTH WITNESS STATEMENT OF
ANDREW ELLIOT TRACEY HEARN**

---

I, **ANDREW ELLIOT TRACEY HEARN**, Solicitor Advocate (Higher Courts – Civil) of 160
Queen Victoria Street, London EC4V 4QQ say as follows:

1.     I am a partner in the London Office of Dechert LLP, the Claimant's solicitors. I have the care
and conduct of this action on behalf of the Claimant, Mr. Michael Cherney.

2.     I am authorised to make this witness statement on behalf of the Claimant and do so from facts
within my own knowledge or derived from my firm's files and records, save where otherwise
indicated. The matters to which I refer as being within my own knowledge are true, and those
in respect of which I rely on information that is not within my own knowledge are true to the
best of my knowledge and belief. As necessary, I describe the sources of such information in
the course of this witness statement.

1

3.     I make this statement in response to paragraphs 6-18 of the first witness statement of Susan Prevezer QC dated 17 June 2011 ("Ms Prevezer's statement") which was sent to my firm by email at 7.10pm on that date.

4.     The thrust of Ms Prevezer's statement is that, contrary to the evidence provided by the Claimant, he has in fact left Israel on at least one occasion since May 2009; that the document that she exhibits demonstrates, as she would have it, that the Claimant visited the USA on at least one occasion since May 2009; and that this undermines his evidence that he has not left Israel for fear of arrest under the extant arrest warrants.  With respect to Ms Prevezer, and based on the instructions which I have received and describe below, her assumptions are simply incorrect and are in fact belied by a document Ms Prevezer's firm has had for some months but which she has chosen to ignore, namely a copy of the Claimant's passport.  This was disclosed to the Defendant some time ago (again contrary to the remarks made in the Defendant's skeleton argument at paragraph 14.6 (2)) and an up to date copy of it is now produced as "AETH 7".

5.     As "AETH 7" shows, there is no evidence of the Claimant having travelled to the USA or anywhere else outside Israel since 23 May 2009.   Nevertheless, I have sought urgent instructions from both the Claimant and from his nephew, Leonid Chernoy ("Leonid"), on the matters raised in Ms Prevezer's statement (which has been summarised for the Claimant in Russian by Mr Traspov, his Israeli lawyer; Mr Traspov has then relayed to me the Claimant's instructions).  What follows below reflects what I have been told respectively by the Claimant and by Leonid.

6.     The Claimant repeats that he has not left Israel since 23 May 2009 when he returned from a trip to London (as previously described).  Contrary to Ms Prevezer's assumption, he did not travel to the USA at any time after May 2009.  Indeed he would have needed (but after 23 May 2009 he neither sought nor obtained) a visa to do so.  The Claimant's passport of course supports this and was produced to the Defendant some time ago. The Claimant also confirms that he has not had any other passport since May 2009.

7.     Both the Claimant and Leonid have told me the Claimant did indeed sign the documents referred to in Ms Prevezer's statement but he did not sign them in New York.  He signed them in Israel at the request of Leonid who explained their general nature and purpose to the Claimant but who did not read the documents to the Claimant (who of course does not read or speak English).  The purpose of the documents was to formalise legally a transaction which had been implemented more than 15 years before in the nature of an intra-family transfer of

2

interests in two apartments in which the Claimants held an interest.  It had emerged that the parking space for one of the apartments was a separately registered plot of land and that therefore it had not been made the subject of a legally effective transfer when the apartments were transferred.

8.     Leonid and the Claimant have also told me that Leonid visited the Claimant in Israel (Leonid also lives in Israel) to ask the Claimant to sign the documents exhibited by Ms Prevezer in pages 1-5 SRP1.  Leonid did not discuss with the Claimant whether and how the documents needed to be witnessed or notarised (and the Claimant in any event had no knowledge of what rules attach to the witnessing or notarisation of signatures in the USA).  Leonid recollects that when the Claimant was asked to sign the documents, Leonid had in fact already signed them himself and that the manuscript within the notarisation sections remained blank. Leonid also confirms that the Claimant was perfectly happy to sign the documents, and did so, since they merely reflected arrangements which had been entered into over 15 years before.

9.     Leonid tells me that he then arranged for his mother to deliver the signed documents to the notary. The notary proceeded to notarise the documents after they had been signed and outside the presence of both the Claimant and Leonid Cherney.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed:   ……………………………………………………………..
          **Andrew Elliot Tracey Hearn**

Date:   ……………………………………………………………..

3

1. Claimant
2. A.E.T. Hearn
3. Seventh
4. Exhibit "AETH7"
5.  June 2011

**2006 FOLIO 1218**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

### MICHAEL CHERNEY

**Claimant**

v.

### OLEG DERIPASKA

**Defendant**

---

### SEVENTH WITNESS STATEMENT OF
### ANDREW ELLIOT TRACEY HEARN

---

**Dechert LLP**
**160 Queen Victoria Street**
**London**
**EC4V 4QQ**

**Tel:020 7184 7000**
**Fax:020 7184 7001**
**Ref:L94/388368**
**Solicitors for the Claimant**

1. Claimant
2. A.E.T. Hearn
3. Seventh
4. Exhibit "AETH7"
5.   June 2011

**IN THE HIGH COURT OF JUSTICE**                    **2006 FOLIO 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

B E T W E E N:

### MICHAEL CHERNEY

**Claimant**

v.

### OLEG DERIPASKA

**Defendant**

---

### EXHIBT "AETH7"

---

This is the exhibit marked "AETH7" referred to in the seventh witness statement of Andrew Elliot Tracey Hearn.

Signed: ...................................................................

**Andrew Elliot Tracy Hearn**

Dated: ..................................................................

# EXHIBIT C

1. **М. Черной**
2. **Истец**
3. **Четвертый**
4. **18 июнь 2011**

**В Верховный суд справедливости**

**Отделение королевской скамьи**       Дело 2006 – 1218

**Коммерческий суд**

**Между:**

**Михаилом Черным**

<u>**Истцом**</u>

**И**

**Олегом Дерипаской**

<u>**Ответчиком**</u>

---

### Четвертые свидетельские показания
### Михаила Черного

---

Я, Михаил Черной, проживающий по ул. Ха-Гива 52, Савьон, Израиль, заявляю следующее:

1. Я являюсь истцом в указанном выше деле и даю данные четвертые свидетельские показания на основании фактов и событий, известных мне лично, кроме случаев, когда указано иное.

2. Я еще раз дал показания моим английским адвокатам через переводчика (ввиду нехватки времени, эту роль выполнил г-н Траспов из конторы моих израильских адвокатов Dr. J. Weinroth & Co), которые затем подготовили эти свидетельские показания на английском языке. Эти свидетельские показания были затем переведены для меня на русский язык, чтобы я смог одобрить и подписать их.

3.  Я подтверждаю, что следующие документы были прочитаны мне на русском языке моим израильским адвокатом Евгением Трасповым:

    а.  Параграфы 6-14 включительно свидетельских показаний г-жи Превизер и подписанные мной документы, которые она приложила к этим показаниям на стр. 1-5 приложения SRP1; и

    б.  Утвержденный черновой вариант седьмых свидетельских показаний Эндрю Элиота Трейси Херна.

4.  Я подтверждаю, что настолько, насколько события и факты, изложенные в седьмых свидетельских показаний г-на Херна известны мне лично, они являются подлинными настолько, насколько я знаю и полагаю.

**Подтверждение подлинности**

Я полагаю, что факты, изложенные в данных свидетельских показаниях, являются подлинными.

Подпись: _____

Михаил Черной

Дата: 18.06.2011

1. M Cherney
2. Claimant
3. Fourth
4. 18 June 2011

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**Claim No. 2006 Folio 1218**

**B E T W E EN:**

**MICHAEL CHERNEY**

**Claimant**

- and -

**OLEG DERIPASKA**

**Defendant**

---

**FOURTH WITNESS STATEMENT OF
MICHAEL CHERNEY**

---

I, **MICHAEL CHERNEY**, of Hagiva 52, Savyon, Israel will say as follows:

1       I am the Claimant in the above proceedings and make this fourth witness statement from facts and matters within my own knowledge, save where otherwise indicated.

2       Once again, I have provided my evidence via an interpreter (due to the shortness of time Mr Traspov from Dr. J. Weinroth & Co, my Israeli lawyers, playing that role) to my English lawyers who then prepared this witness statement in English.   This witness statement was then translated into Russian for me to approve and sign.

3       I confirm that the following documents have been read to me in Russian by my Israeli lawyer Evgeny Traspov:

1

    a.   Paragraphs 6-14 inclusive of the witness statement of Ms Prevezer and the documents signed by me that she exhibits on pages 1-5 of exhibit SRP1; and

    b.   An approved draft of the seventh witness statement of Andrew Elliot Tracey Hearn.

4      I confirm that, so far as the facts and matters set out in Mr Hearn's seventh witness statement are within my own knowledge, they are true to the best of my knowledge and belief.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ……………………………………………………………..

    **Michael Cherney**

Date:   18 June 2011……………………………………………………………..

2

1.  M Cherney
2.  Claimant
3.  Fourth
4.  18 June 2011

<u>Claim No. 2006 Folio 1218</u>

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

**MICHAEL CHERNEY**

<u>Claimant</u>

- and -

**OLEG DERIPASKA**

<u>Defendant</u>

---

**FOURTH WITNESS STATEMENT
OF MICHAEL CHERNEY**

---

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Tel:   020 7184 7000
Fax:   020 7184 7001
Ref:   L94/388368
<u>Solicitors for the Claimant</u>

# EXHIBIT D

Defendant
Susan Rachel Prevezer QC
First
SRP 1
17 June 2011

<u>**Claim No 2006 Folio 1218**</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>QUEEN'S BENCH DIVISION</u>
<u>COMMERCIAL COURT</u>

**BETWEEN:**

**MICHAEL CHERNEY**

<u>**Claimant**</u>

**-and-**

**OLEG VLADIMIROVICH DERIPASKA**

<u>**Defendant**</u>

---

**FIRST WITNESS STATEMENT
OF SUSAN RACHEL PREVEZER QC**

---

I, **SUSAN RACHEL PREVEZER QC**, of 16 Old Bailey, London EC4M 7EG **WILL SAY AS FOLLOWS:**

<u>Introduction</u>

1. I am a partner in the firm of Quinn Emanuel Urquhart & Sullivan UK LLP ("**Quinn Emanuel**"), the Defendant's solicitors. I am one of the partners at Quinn Emanuel who, with Alex Gerbi, has the conduct of these proceedings on behalf of the Defendant. This is the First Witness Statement that I have made in these proceedings on behalf of the Defendant.

2. I am authorised by the Defendant to make this Witness Statement on his behalf in response to the application made by the Claimant ("**Mr Cherney**") in an Application Notice issued on 18 April 2011. I make this witness statement from facts and matters within my own knowledge and on the basis of documents and information provided to

1

me by others. Where the facts and matters are within my own knowledge, I confirm that they are true. Where the facts and matters are derived from information provided to me by others, I confirm that they are true to the best of my knowledge and belief. During the course of this statement I refer to various documents, copies of which are attached hereto marked Exhibit "SRP1". Page references in this statement are to pages of that exhibit unless otherwise stated.

3.     I make this Statement to deal mainly with one point which arises from the Third Witness Statement of Michael Cherney dated 16 June 2011 received by my firm by email from Dechert LLP at 9:28 a.m. today (17 June 2011).

4.     At paragraphs 3(a) and 3(b) of Mr Cherney's Third Witness Statement, Mr Cherney confirms that he has had read to him in Russian by English/Russian interpreters, paragraphs 5 to 20 of the Fourth Witness Statement of Andrew Hearn dated 15 April 2011, and Dechert's letter of 7 June 2011 responding to my firm's letter of 27 May 2011. At paragraph 4, Mr Cherney confirms that the facts and matters set out therein are within his own knowledge and are true to the best of his knowledge and belief.

5.     At page 4 of the letter of the 7 June 2011 (paragraph 2), Dechert LLP states that it is *"instructed that Mr Cherney has not left Israel since returning from London in May 2009."* By reason of paragraphs 3(b) and 4 of his Third Witness Statement, Mr Cherney confirms that this statement is true.

6.     There is evidence which contradicts the statement that Mr Cherney has not left Israel since May 2009 and which raises doubts about Mr Cherney's claim to fear arrest. Mr Cherney has visited the United States since May 2009, on at least one occasion.

7.     I exhibit at **[SRP1, page 1]** a copy of a Parking Space Unit Deed, dated 26 May 2010 (**"the Deed"**), made between Mr Cherney (as Grantor) and a Limited Liability Company, 501B 5K4K LLC (as Grantee), relating to a parking space unit at 501 Surf Avenue, Brooklyn, New York. By the Deed, Mr Cherney assigned the Parking Space Unit to the Limited Liability Company. I also exhibit at **[SRP1, page 5]** a separate Affidavit dated 26 May 2010 sworn by Mr Cherney in relation to compliance with smoke detector requirements for one- and two- family dwellings ("**the Affidavit**").

8.    At page 3 of the Deed, there appears the signature of Mr Cherny and the signature of Alexandra Kogan, a Notary Public in the State of New York, who verified on 26 May 2010 that Mr Cherny appeared before her in New York on that date and was either personally known to Ms Kogan or proved to her on the basis of satisfactory evidence that he was the same Mr Cherny who had signed the Deed. Mr Cherny executed the Affidavit on the same date, also before Ms Kogan.

9.    Copies of the Deed and the Affidavit were obtained yesterday afternoon from a public search at the offices of the City Registrar of New York, Manhattan Business Center, 66 John Street, New York, NY 10038. My firm received these copies earlier today.

10.   The Deed recites that Michael Cherny was residing at 320 Shore Boulevard, Brooklyn, New York. This is the same address for the Claimant as appears on various promissory notes which he signed for the benefit of one of his companies, Consul Consult Trade Establishment, and which have been disclosed in this matter **[SRP1, pages 6-17]**.

11.   The signatures on the Deed and on the Affidavit are similar to the signature on Mr Cherney's Third Witness Statement of 16 June 2011. They are also similar to the signatures on Mr Cherney's previous witness statements filed in this matter.

12.   I am informed by an attorney in my firm's London office who is admitted to the New York Bar (Gillian Sinnott) that, as a matter of New York law, a New York notary has jurisdiction to notarise a deed or an affidavit only in the State of New York and only where the parties to the document are present before him or her. I exhibit at **[SRP1, page 18]** a copy of the New York Notary Public Law, which includes Executive Laws §130 that the jurisdiction of a New York notary is coextensive with the boundaries of the state, and §135 that a New York notary is authorised and empowered *"within and throughout the State"*. I am also informed by Ms Sinnott that the extent of a New York notary's jurisdiction was settled at the end of the 19th century, in a case called *Turtle v. Turtle* (24 June 1898), 52 N.Y.S. 857, where it was held that an affidavit taken outside of the state before a New York notary public cannot be received in an action in New York **[SRP1, page 33]**. The New York practice guide, New York Jurisprudence, Second Edition, also confirms this. I attach a relevant section of that guide at **[SRP1, page 35]**.

13.   It follows that a New York notary cannot notarise a deed or an affidavit, for example, while present in Israel, nor can such a notary, while in New York, notarise the signature

3

of an absent person. Under New York law, were Mr Cherney to have signed the Deed and the Affidavit in Israel, he would have had to have done so before an Israeli notary or similar person. These documents would then have been legalised for use in New York State pursuant to the Hague Convention Abolishing the Requirement for Legalisation for Foreign Public Documents, to which the United States and Israel are both parties.

14.     As a result, it is reasonable to conclude that it was Mr Cherney who signed the Deed and the Affidavit that were executed on 26 May 2010, and that Mr Cherney was physically present in New York when he did so. Accordingly, it could not be the case, as Mr Cherney has informed his solicitors Dechert LLP and confirmed to the Court in his Third Witness Statement, that he has not left Israel since May 2009; he was in the United States a year later.

15.     In addition, as reported on the US State Department official website (the relevant link is at http://travel.state.gov/law/judicial/judicial_684.html; I attach a hard copy print out of that page at **[SRP1, page 37]**), there is an extradition treaty between the United States and Spain (which has been in force since before May 2009 and continues in force). I exhibit at **[SRP1, page 43]** a copy of the Treaty on Extradition Between the United States of America and Spain signed on 29 May 1970, which came into force on 16 June 1971 ("**the Treaty**"), as amended by Supplementary Treaty on Extradition between the United States of America and Spain signed on 25 January 1975 **[SRP1, page 57]**, Second Supplementary Treaty on Extradition between the United States of America and the Kingdom of Spain signed on 9 February 1988 **[SRP1, page 60]**, and Third Supplementary Treaty on Extradition between the United States of America and the Kingdom of Spain signed on 12 March 1996 **[SRP1, page 67]**. The Treaty provides for the extradition for *"prosecution"* of persons *"charged with"* a number of specified offences. The specified offenses include *"[r]eceiving or transporting any money, valuable securities or other property knowing the same to have been obtained pursuant to a criminal act"*, provided that the offense is punishable by more than a year's imprisonment.

16.     I am advised by Mr Jose Bonilla that the charge against Mr Cherney specified in the international arrest warrant falls within the category of extraditable offenses under the Treaty. The charge against Mr Cherney, were the alleged offenses committed n the United States, would be subject to maximum penalties in that country in excess of the

one year required by the Treaty pursuant to 18 U.S.C. §1956 (laundering of funds, property and monetary instruments) (20 years maximum imprisonment) and 18 U.S.C. §1957 (engaging in monetary transactions) (10 years maximum imprisonment).

17.    It therefore appears that Mr Cherney is equally at risk of being arrested and extradited from the United States to Spain, as he would be if he came to Europe. Nevertheless, he apparently was prepared to expose himself to that risk in May 2010. This must raise doubt about whether, and the extent to which, Mr Cherney has reasonable fears of arrest.

18.    The Deed and Affidavit are of course evidence of only one occasion on which Mr Cherney left Israel. It may be that he made other trips as well in which he was prepared to risk arrest. Given the evidence obtained to date, Mr Cherney's assurances that he made no such trips should not be assumed to be true.

19.    Although I do not propose to deal in this witness statement in any detail with other points raised in Mr Hearn's Sixth Witness Statement, I should clarify that:

a.    As to paragraph 11.28 of Mr Hearn's statement, my firm was not aware at the time that Mr Gerbi's statement was made that Mr Aschenbrenner was the subject of an arrest warrant issued in February this year.

b.    In paragraphs 33-48 of his witness statement, Mr Hearn makes a number of points with regard to alleged deficiencies in the Defendant's disclosure. Whilst no useful purpose would be served in addressing these issues at present, there is much to be said about the quality of the disclosure given by Mr Cherney in these proceedings. In particular, it needs to be noted that:

i.    Mr Cherney's disclosure was completed only on 1 April 2011, long after the original deadline ordered by Teare J. (and even then, Mr Cherney's solicitors stated that further requests for documents from Mr Cherney's associates remain outstanding);

ii.    There is a huge difference in the scale of disclosure exercises undertaken by Mr Cherney and the Defendant. The Defendant had to review, and then disclose, a substantially larger number of documents. Ultimately, the Defendant disclosed approximately 122,000 documents, as compared

5

to Mr Cherney's disclosure of approximately 11,000 documents – roughly ten times the number of documents disclosed by Mr Cherney;

iii.    There are significant deficiencies in Mr Cherney's disclosure, although the full review of the documents disclosed by Mr Cherney is still ongoing.  Some of the problems with Mr Cherney's disclosure have been already addressed in a letter from my firm to Dechert LLP dated 10 June 2011 [**SRP1, page 71**], and will continue to be addressed in further correspondence.

iv.    However, as I stated above, I do not believe that this is an appropriate time to deal with these issues.

20.    Finally, by making this statement and not commenting on all of the recently served evidence of Mr Hearn (in his Sixth Witness Statement) and Mr Cherney (in his Third Witness Statement), I should not be taken as agreeing with any of that new evidence.

Statement of truth

I believe that the facts stated in this witness statement are true

Susan Rachel Prevezer QC

Dated: 17 June 2011

Claim No 2006 Folio 1218

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN:**

**MICHAEL CHERNEY**

**Claimant**

-and-

**OLEG DERIPASKA**

**Defendant**

---

**FIRST WITNESS STATEMENT**
**OF SUSAN RACHEL PREVEZER QC**

---

**Quinn Emanuel Urquhart & Sullivan UK**
**LLP**
**16 Old Bailey**
**London EC4M 7EG**

**Tel: +44 (0) 207 653 2000**
**Fax: +44 (0) 207 653 2100**
**Ref: SP/AG/80109**

**Solicitors for the Defendant**

7

Defendant
Susan Rachel Prevezer QC
First
SRP1
17 June 2011

**Claim No 2006 Folio 1218**

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

MICHAEL CHERNEY

**Claimant**

-and-

OLEG VLADIMIROVICH DERIPASKA

**Defendant**

EXHIBIT SRP1

This is the Exhibit marked SRP1 referred to in the First Witness Statement of Susan Rachel Prevezer QC made in this claim on 17 June 2011.

Susan Rachel Prevezer QC

# EXHIBIT E

## PARKING SPACE UNIT DEED

THIS INDENTURE, made the 26ᵗʰ day of  May,  2010, between MICHAEL CHERNY, residing at 320 Shore Boulevard, Brooklyn, New York 11235 (the "Grantor") and 501B 5K4K LLC, Limited Liability Company, having its principal place of business at 275 Coleridge Street, Brooklyn, New York 11235 (the "Grantee"), party of the second part,

### WITNESSETH:

That the Grantor, in consideration of Ten and 00/100 ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant, release and quitclaim unto the Grantee, the heirs or successors and assigns of the Grantee, forever:

The Parking Space Unit (the "Unit") known as Unit No. 202 in the premises known as 501 Surf Avenue, Brooklyn New York, Parking Unit 202, Borough of Brooklyn, County of Kings, City and State of New York, said Parking Space Unit being designated and described as Unit No. 202 in the Declaration. This Parking Space Unit is also designated as Tax Lot 1204 in Block 7279, of Section 21 of the Borough of Brooklyn on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of the Building, certified by Vincent Stramandinoli & Associates, on January 27, 1992, and filed with the Real Property Assessment Department of the City of New York on April 7, 1992, as Condominium Plan No. 407, together with an undivided 0.00665% interest in common elements.

The Land upon which the Building is situated and within which the Parking Space Unit is located is more particularly described as follows:

ALL that certain lot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of West 8th Street with the northerly side of Surf Avenue;

RUNNING THEHCE easterly along the northerly side of Surf Avenue on an arc whose radius is 8060.00 feet and whose chord line lies south of said arc 800.75 feet to the westerly side of West 5ᵗʰ, as widened

THEHCE northerly along the westerly side of West 5th street, as widened, 200.41 feet to an angle therein:

THEHCE still northerly along the westerly side of West 5th street, as widened, 419.45 feet to the land now or formerly of New York Rapid Transit Corporation:

THENCE southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the westerly side of West 5th street, as widened, of 83 degrees 55 minutes 49 seconds, 33.16 feet to an angle therein:

THENCE still southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein, of 171 degrees 07 minutes 49.7 seconds, 256.89 feet to an angle therein:

THENCE still southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein, of 165 degrees 34 minutes 07 seconds, 57.99 feet to an angle therein:

THENCE still southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein of 173 degrees 18 minutes 01 second, 416.83 feet to an angle therein,

THENCE southerly forming an interior angle with the preceding course of premises described herein of 116 degrees 31 minutes 07 seconds 35.69 feet:

THENCE northwesterly forming an interior angle with the preceding course of premises described herein of 315 degrees 20 minutes 54 seconds, 33.60 feet to land now or formerly of New York Rapid Transit Corporation:

THENCE southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein, of 108 degrees 07 minutes 59 seconds, 198.69 feet to the easterly side of West 8th street;

THENCE southerly along the easterly side of West 8th street forming an interior angle with the preceding course of premises described herein, of 116 degrees 31 minutes 07 seconds, 167.30 feet to the corner, the point or place of BEGINNING.

TOGETHER WITH AND SUBJECT to the terms, conditions, covenants, easements and provisions of the Declaration and of the By-Laws of the Condominium recorded simultaneously with and as part of the Declaration, as the same may be amended or modified in accordance therewith, from time to time by instruments recorded in the Office of the Register of the City of New York, Kings County, which terms, conditions, covenants, reservations and provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit as though such provisions were recited and stipulated at length herein; and

SUBJECT FURTHER to all exceptions to title set forth in the Offering Plan.
TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost for improvement and will apply the same first to the payment of the cost of improvement before using any part of the total same for any other purpose.

The party of the second part, by accepting delivery of this deed hereby accepts and ratifies the provisions of the Declaration and the By-Laws or the Condominium recorded simultaneously with and as part of the Declaration and agrees to comply with all the terms and provisions thereof as the same may be amended from time to time by instruments recorded in the Kings County Office of the New York City Register, and to comply with the rules and regulations of the Condominium.

The use for which the Parking Space Unit is intended is for parking vehicles as approved by the Board of Managers, subject to applicable governmental regulations and the restrictions contained in the Declaration and the By-Laws.

This conveyance is made in the regular course of business actually conducted by the party of the first part.
The word "party" shall be construed as if it means "parties" whenever the sense of this indenture so requires.
The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.
This conveyance is made in the regular course of business actually conducted by the Grantor.
The terms "Grantor" and "Grantee" shall be read as "Grantors" and "Grantees" whenever the sense of the deed so requires.

IN WITNESS WHEREOF, the Grantor and the Grantee have duly executed this deed the day and year first above written.

_____
MICHAEL CHERNY

_____
501B 5K4K LLC, BY LEONID CHERNOY

STATE OF NEW YORK ) SS:
COUNTY OF KINGS )

On the 26 day of MAY 2010, before me, the undersigned, a Notary Public in and for said State, personally appeared MICHAEL CHERNY personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

ALEXANDRA KOGAN
Notary Public, State of New York
Qualified in Kings County
Reg. No. 01KO6132001
My Comm. Expires Aug. 22, 20 13

_____
NOTARY PUBLIC

STATE OF NEW YORK ) SS:
COUNTY OF KINGS )

On the 26 day of MAY 2010, before me, the undersigned, a Notary Public in and for said State, personally appeared LEONID CHERNOY personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

ALEXANDRA KOGAN
Notary Public, State of New York
Qualified in Kings County
Reg. No. 01KO6132001
My Comm. Expires Aug. 22, 20 13

_____
NOTARY PUBLIC

3

**PARKING UNIT DEED**
501 Surf Avenue, 202 PK
Brooklyn, New York 11224


County of Kings
Block 7279, Lot 1204


RECORD AND RETURN TO:
Anna Latkovskaia, Esq.
3820 Nostrand Avenue, Suite 101
Brooklyn, New York 11235

4

# EXHIBIT F

Affidavit of Compliance with Smoke Detector Requirement for One and Two Family Dwellings

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
## FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York   )
                    ) SS.:
County of *Kings*   )

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

| 501 SURF AVENUE | | | | 202 |
|---|---|---|---|---|
| Street Address | | | | Unit/Apt. |
| BROOKLYN | New York, | 7279 | 1204 | (the "Premises"); |
| Borough | | Block | Lot | |

That the Premises is a one or two family dwelling or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

| MICHAEL CHERNY | 501B 5K4K LLC |
|---|---|
| Name of Grantor (Type or Print) | Name of Grantee (Type or Print) |
| Signature of Grantor | Signature of Grantee |

Sworn to before me                          Sworn to before me
this 26 day of May 16 2010               this 26 day of May 16 2010
ALEXANDRA KOGAN                          ALEXANDRA KOGAN
Notary Public, State of New York         Notary Public, State of New York
Qualified in Kings County                Qualified in Kings County
Reg. No. 01KO6132001                     Reg. No. 01KO6132001
My Comm. Expires Aug. 22, 2013           My Comm. Expires Aug. 22, 2013

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.

1

2010052800078101

EXHIBIT G

No: 2006 Folio 1218

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

A

Royal Courts of Justice
Strand, London, WC2A 2LL

B

Monday, 20 June 2011

BEFORE:

**MR JUSTICE FLAUX**

C

- - - - - -

BETWEEN:

**MICHAEL CHERNEY**

Claimant

- and -

**OLEG DERIPASKA**

D

Defendant

- - - - - -

DAVID FOXTON QC and FIONA PILBROW (Instructed by Messrs Dechert LLP)
appeared on behalf of the Claimant

E

TOM BEAZLEY QC and TOM WEISSELBURG (Instructed by Messrs Quinn
Emanuel Urquhart & Sullivan LLP) appeared on behalf of the Defendant

- - - - -

F

**Proceedings**

- - - - - -

Digital Transcript of Wordwave International, a Merrill Communications Company
165 Fleet Street, 8th Floor, London EC4A 2DY
Tel No: 020 7422 6131  Fax No: 020 7422 6134

G

Web: www.merrillcorp.com/mls    Email: mlstape@merrillcorp.com
(Official Shorthand Writers to the Court)

No of Folios: 304
No of Words: 21908

H

1

Monday, 20 June 2011

**A**

**NB:  Due to the poor quality of the recording, it has not been possible to produce a full and accurate transcript of this hearing.**

MR FOXTON:  As your Lordship will know, I appear with Miss Pilbrow for the claimant and my learned friends Mr Beazley and Mr Weisselberg on behalf of the defendant.  There are five matters on the agenda, three, subject to your Lordship, agreed, and two that unfortunately remain ---

**B**

MR JUSTICE FLAUX:  Two which -- to say "not agreed" would be a euphemism really, would it not?

MR FOXTON:  It would.  So far as the agreed matters first, I do not know if your Lordship received a copy of a draft order attached to our skeleton argument?

**C**

MR JUSTICE FLAUX:  Yes, I did, yes.

MR FOXTON:  It is my understanding that first of all the directions in relation to the evidence of Mr Domenjoz, paragraphs 2 and 3 of that draft order are agreed, that he give evidence by video link with the obligations to be placed on the claimant under the protocol.

**D**

MR JUSTICE FLAUX:  Yes.

MR FOXTON:  My Lord, the directions on translation evidence at paragraphs 4 to 9 are agreed.

**E**

MR JUSTICE FLAUX:  So 2 is agreed…?

MR FOXTON:  2 and 3 are agreed.

MR JUSTICE FLAUX:  2 and 3 are agreed.

MR FOXTON:  4 to 9 are agreed and 11 and 12, which involve a variation to the timetable, which both parties agree does not in any way interfere with the dates.

**F**

MR JUSTICE FLAUX:  Yes.

MR FOXTON:  My Lord, so far as the two matters not agreed are concerned, the first is obviously the issue of the claimant's evidence and how that should be taken at the trial and further information.  My Lord, I am conscious that we have until 12 o'clock when your Lordship has another matter.

**G**

MR JUSTICE FLAUX:  No, I have put it back until 2 o'clock.

MR FOXTON:  My Lord.

**H**

MR JUSTICE FLAUX:  Because I had a look at this and I had a horrible feeling this was going to last longer than it was …

2

MR FOXTON: My Lord, that may well be right and it has obviously been one of those cases where a fair amount has happened, even since skeletons were lodged.

MR JUSTICE FLAUX: Yes. It seems the energy that will have been expended in interlocutory skirmishing by the time this case gets to trial, will put most other cases to shame, Mr Foxton.

MR FOXTON: My Lord, it is fair to say a similar observation was made in the Court of Appeal.

MR JUSTICE FLAUX: I read what Waller LJ said, and of course it has made absolutely no difference whatsoever, but having said that, to the extent the court can control how people conduct themselves in litigation, certainly, speaking for myself, I will. But there we are.

MR FOXTON: My Lord, so far as the first application, the issue about how the claimant's evidence should proceed at trial, my Lord, it is fair to say that the position that the defendants have taken on this application has changed somewhat over a period of time. The issue of an arrest warrant was first raised by the defendant's solicitors with the claimant before the last CMC. It is not some recent development as far as they are concerned. From that point, until 4pm on 14 June, the defendant's consistent position was the deponent's evidence be adduced by video link. My Lord, at the CMC before Teare J, the defendant raised the matter of taking evidence by some other means, some evidence on commission was mentioned and that was Mr Malek who was then instructed, raised with me outside court as well and the defendant stressed that it was a matter that needed to be resolved in good time before the trial.

My Lord, we have had correspondence with the defendants. They have asked us, for example, to ascertain the position under Israeli law, which we have done, and on 24 March they confirmed the agreement in principle to the application for evidence to be taken on commission. We issued that application on 18 April. There appears to have been a change in position brewing at that point in time. We received a letter on 27 May asking a series of questions about the Spanish proceedings and the claimant's travelling arrangements, but nothing which indicated that the agreement in principle previously stated no longer existed, nor that there had been a conversion on the Road to Damascus type, of the merits of video link over evidence on commission. That was only revealed at 4 o'clock on 14 June, and your Lordship will note that we served further evidence on the morning of 17 June. That has been criticised. I understand personally that no-one likes to receive evidence when they are about to file their skeleton, and I have been on the receiving end as well as on the other end, so I hope your Lordship will view the timing of that evidence in the context of the timing at which the defendant's *volte face* came about.

My Lord, the question is where does that leave us? We have previously said that we believe video evidence is satisfactory. That is how we began these exchanges, and we take the view that one *volte face* per application is probably more than sufficient for the court, we are not looking to revisit that. On an

3

A  issue which I am certainly conscious is far from the only issue, or the most important issue, but on the issue of evidence by video link versus evidence on commission, we have not come to court to seek to persuade the court that it should be evidence on commission over video link. To an extent, that falls away. What remains are the *a priori* questions of, first of all, whether the court should refuse to allow Mr Cherney to give evidence other than in person at the trial.

B  MR JUSTICE FLAUX: Yes, I think Mr Beazley's fallback position is probably that this is premature, is it not, or that the court ought not to decide this question now for a variety of reasons.

C  MR FOXTON: That is the fallback position and perhaps I could just say something abut that briefly. Plainly any order that the court made at this stage would be capable of being revisited and could be conditional on the arrest warrant being in place. Your Lordship may feel, but it is a matter for your Lordship, that to come back and have a further application at some further point in time, with a whole series of statements and counter-statements on whether people went to New York to sign Deeds to do with the transfer of parking rights and matters of that nature, is simply going to encourage wasted and misdirected energy in this action. My Lord, if one stands back and says, realistically, where are we going to be on the first day of the trial ---

D  MR JUSTICE FLAUX: That is a point that I have in mind, and also, in a sense, it is quite an interesting area, if I can put it that way, because I think one's instinctive reaction would be to say, "Why on earth should somebody be entitled to say 'I am not going to come and give evidence in London. I want to give evidence by video link because I do not want to find myself in a situation where I am arrested and extradited to Spain'." But when you actually read Lord Nicholls' analysis in the Roman Polanski case, it seemed to me very compelling, because he makes the point that somebody who is a fugitive from justice, which Mr Polanski certainly is or was, or is I think because he is still alive, and it may be said your client is not in the same category, because at least he has not been convicted of anything ---

E

F  MR FOXTON: He has not been charged.

MR JUSTICE FLAUX: Quite, and he makes the point there is not some status of outlaw in English law which precludes people from commencing proceedings to bring valid claims. Once you recognise that principle, it would be quite wrong, he says, to say that there was some general rule which excluded somebody from giving his evidence by video link. If it were the case, as it was there, that he would not otherwise actually be able to give evidence at all. I think that seems to me to be quite a compelling analysis. Of course, then the issue is: is it really the case that your client would never come to London to give evidence, and we have had the suggestion that he has been in New York, which you have refuted, and I could not resolve that issue of fact today anyway, and also I think a point taken that he knew about this warrant and did not disclose that to the Court of Appeal, although whether it would in fact have made any difference to the judgment I rather doubt having read the ---

G

H

4

MR FOXTON:  My Lord, the other matter I will come on to this, but the Court of Appeal hearing a challenge against an order for permission to serve out, indeed going back to the old Rules of the Supreme Court procedure, with *inter partes* challenge to the *ex parte* orders, is a challenge as to whether it was rightly made on the day that it was made.

MR JUSTICE FLAUX:  Precisely, and not only that, Mr Foxton, but also the whole thrust of what Christopher Clarke J was saying, was that it was not to do with your client giving evidence live in London, that really is a sideshow, it was really to do with, in the particular circumstances of this case, there was a serious risk that he would not get a fair trial in Russia.

MR FOXTON:  It is striking that the one paragraph that is (inaudible) in Christopher Clarke J's judgment is the paragraph summarising the submissions.

MR JUSTICE FLAUX:  It might be said your client should have told the Court of Appeal whether … I am not sure that necessarily leads to visiting on him an inability to give evidence at all.

MR FOXTON:  My Lord, there are various issues, one of which is, if that is a complaint, to whom could that complaint be made, because it is, we would submit, not appropriate, effectively, to be asking your Lordship to decide whether the Court of Appeal should have been told something, work out the consequences and apply a sanction, is what it amounts to in the form of how evidence should be taken at trial.

MR JUSTICE FLAUX:  I think the suggestion is it is somehow an abuse of the process, but anyway, I will see how Mr Beazley puts it.  You would urge me to decide the point today, albeit that it would obviously be capable of being revisited?

MR FOXTON:  My Lord, conscious that there is inherently something provisional in an order of that nature in the circumstances, but I suspect it would save an awful lot of wasted energy for the matter to be decided in principle now, and energy that perhaps might be better directed to providing further information on matters more directly germane to the (inaudible).

Can I say something about the Spanish proceedings?

MR JUSTICE FLAUX:  Yes.

MR FOXTON:  The first point is obviously the claimant has not been charged with a criminal offence, let alone convicted of one.  He, like Mr Deripaska, who is in exactly the same position in terms of status in those proceedings, is an *imputados* or a suspect in an ongoing criminal investigation.  My Lord, in allegations so far as the claimant is concerned, are allegations of which he has already been exonerated by the Swiss Federal Supreme Court.  My Lord, there is reference to that in the judgment of Christopher Clarke J, at paragraph 159 to 171.  It is not necessary to turn it up.  The arrest warrant was issued before

5

Mr Cherney was aware of the Spanish criminal investigation on 20 May 2009, and there is criticism that the claimant should tell this court why it is that he is one of only two *imputados* to have been arrested, as though we are sitting on some secret. My Lord, the best information we have is in the documents, if your Lordship will take up application bundle 1, tab 5.

MR JUSTICE FLAUX: This is the exhibit to Mr Herne's fourth witness statement.

MR FOXTON: At page 71, there is the beginning of a ruling. If one goes forward to page 75, there is a paragraph (near the first hole punch) headed "2", and four lines up from the end:

> "Given his address and domicile in Spain are not known, the appropriate European international address warrant is issued and that ... read to the words ... ordered to be issued in this respect."

I am conscious that this court is not a court in any way of appeal from Spanish procedure, and it is not appropriate for me to vent any criticism of that procedure to your Lordship, but I simply state that Mr Cherney's position is that his address and residence in Israel were not secret. They appeared on the claim forms in the English proceedings he has commenced. At all events, nothing in that that suggests that there is something unrevealed and untoward in the arrest warrant.

My Lord, an order was made that he attend before a Spanish Magistrate within ten days or be declared a "rebel" (as it has been translated). That is not, as the defendant alleges, a finding of contempt. It is a consequence which follows as a standard practice when you are ordered to attend before a Magistrate in Spain within the requisite period and you do not do so. Your Lordship has seen that the defendant has offered himself for interview in Israel or by video link. Those offers to provide information and be interviewed have not been accepted, even though we know that similar arrangements have been entered into for Mr Deripaska and Mr Makhmoudov, who are the claimant's fellow *imputados*, amongst others, in the Spanish investigation. The claimant's lawyers have attempted to appear in Spain but have been told that until he puts in a personal appearance, they cannot do so. All the avenues of appeal within Spain by the claimant personally are now exhausted. My Lord, the last matter which, if nothing else provides an interesting contrast with the <u>Polanski</u> case, where obviously a French national has an absolute right not to be extradited, Mr Cherney can be extradited from Israel and the Spanish have attempted to extradite him and the Israeli Ministry of Justice have said the materials presented do not establish the requisite *prima facie* case.

My Lord, that is where we are and, although a number of criticisms are made of things but in general terms, it is said we should have done more, or it is possible for us to arrange to give our story, not possible for us to do what implicitly Mr Deripaska and Mr Makhmoudov have done, there has been no identification of a process open to the claimant of which he has not sought to avail himself. Perhaps more importantly looking forward, no-one suggests that the claimant has another avenue of appeal within Spain which he has yet

A    to exercise.  Given that, the argument that we "wait and see" perhaps as long as the first day of the trial, I do not know in some game of chicken to see whether the claimant comes or not, is, with respect, unreal.

B    Your Lordship made the reference to the <u>Polanski</u> case which sets out the general position in the judgment of Lord Nicholls.  I was not proposing to go to the decision, simply because your Lordship has read it and those paragraphs are clear.  It is relevant, perhaps, when looking at attempts to distinguish that case by the suggestion that the public conscience would be affronted by Mr Cherney giving evidence by video link, in a way, apparently, it was able to cope with Mr Polanski giving evidence by video link, to note that Mr Polanski had been convicted, on his own admission, of a child sex offence and had fled the United States of America in the period between conviction and sentence.  My Lord, we do not accept the claimant is a fugitive from justice at all.  To apply that term to someone who has not been convicted or charged, as is done frequently in Mr Beazley's skeleton, is, I am afraid, advocate's licence and he is ahead of himself.

C    Mr Cherney can be extradited from Israel if a *prima facie* case is made out.

MR JUSTICE FLAUX:  It rather proceeds on the assumption that the defendant's case against the claimant is the right way of looking at it, because of course the defendant's case against your client is that he is indeed a criminal and that this agreement was a sham agreement effectively ending a protection racket.  But that, of course, is one of the prime issues at trial.

MR FOXTON:  It is.

MR JUSTICE FLAUX:  So the court cannot proceed on that basis.  So it is difficult to see what he is … I tend to agree with you, he does not seem to me to be a fugitive from justice.

MR FOXTON:  My Lord, what is said in response by way of summary, I think first of all there is the point that I have addressed to your Lordship already, which is that Mr Cherney and his legal team misled the Court of Appeal by not disclosing the existence of the arrest warrant and that that is, as (inaudible) says, somehow brings the case close to an abuse of process of the court.  My Lord, as to that, two reasons why it was misconceived.  It was conceived in fact, because it was Mr Cherney, as he is going to make clear in evidence, fully intended to cooperate with the Spanish authorities, make himself available for interview in the way we know others have been able to without going to Spain, and on that basis did not see the Spanish proceedings as something which would prevent him attending a trial two or three years down the line.  My Lord, given that Mr Deripaska and Mr Makhmoudov's arrangements, it would be difficult to suggest that that was an irrational position.

My Lord, secondly because, of course, permission to serve out had been given long before there was any Spanish arrest warrant by Christopher Clarke J.  The reasons he gave, your Lordship has seen, that the principal matter is if the case

7

A    was not brought in England, it would not be brought anywhere, because Russia and England are the only forum in play. There was a well-founded fear of assassination and arrest on trumped up charges in Russia and a significant risk of there being no fair trial there. I make the point to your Lordship that, whilst attempting to suggest the order for permission to serve out rests upon the premise of the claimant giving evidence in person in London, the only passage relied upon is the passage in which Christopher Clarke J summarises Mr Vos's submissions.

B    The Court of Appeal were not engaged in a re-hearing.

MR JUSTICE FLAUX: The whole point about it was this, was it not. If you look at this point and think how this point might have impacted on the discretion that was exercised by the court, it is difficult to see how it would have impacted on the discretion at all, because Christopher Clarke J recognised that London was not the natural forum. The natural forum was Russia. But what he was dealing with was whether England was the appropriate forum, which was a different question altogether. So questions of inconvenience of witnesses do not really come into it, because really what it was was, if there is ever going to be a trial of these issues, the only place where it can fairly take place is London.

C

D    MR FOXTON: That is absolutely right. When it got to the Court of Appeal, recognising realistically the limitations on persuading an appellate court to interfere with an exercise of a discretion on that point, particularly, if I may respectfully say, having regard to the nature of Christopher Clarke J's judgment, which your Lordship will see is immensely thorough and (inaudible), what had to be said is, in fact Spiliada does not permit you, if you decide that England is not the natural forum, to nonetheless give permission to serve out, a point of law on which there was a failure, or that there was no evidence, as it was put, for various of the matters, because it was recognised that, if you said there was evidence but you were simply weighing it up, you are not in the territory where an appellate court is going to ---

E

F    MR JUSTICE FLAUX: It was a fairly bold appeal to say the least.

MR FOXTON: My Lord, for those reasons, we say there is nothing in those criticisms, but in any event, if that is their complaint or was their complaint, asking your Lordship to make an order that requires Mr Cherney to risk arrest or not give evidence at trial, is not the appropriate context in which to raise it.

G    It has been open to them to bring an application for a stay themselves in contrast to permission to serve out when you make a stay application and the circumstances are considered at the date of the application, but of course, realistically, it is recognised that the reason this case could not be tried in Russia in 2008 and 2009 have not gone away.

MR JUSTICE FLAUX: They have not gone away, I see.

H

8

A

MR FOXTON: My Lord, so far as the suggested abuse of process, or something akin thereto, that is, with respect, without any substance at all.

The second principal basis is to say, "Don't worry, he will come anyway." That is the gist of it. The case is an important one. It involves a lot of money and so you should just be confident, or at least he has not done enough to persuade you that he will not come anyway. He will somehow arrange things so that the arrest warrant goes away by cooperating with the Spanish authorities or he will run the risk of being arrested. My Lord, there are practical difficulties with arguments of that nature, because, whoever ends up trying this case really needs to know where they are by the time we get close to the start of the trial, because if Mr Beazley's argument that the court should call Mr Cherney's bluff results in a position where Mr Cherney says, "I am not prepared to come and risk arrest", then the court is going to have to grapple at that point, in a much more inconvenient stage of the process, with the issue of how his evidence should be taken.

B

C

MR JUSTICE FLAUX: Once you get over, as it were, the Polanski point about is there an issue of principle which has been decided by the majority of the House of Lords and therefore is binding on this court, once you get beyond that stage, it seems to me, in a sense, it is a point that Eady J (or certainly somebody made) in that case that actually the person who is more likely to suffer by virtue of giving evidence by video link is the claimant because, to the extent there are any imperfections left in not having the claimant in the witness box so you can, as it were, see the whites of his eyes when he is giving his evidence and sense whether or not he is telling the truth, which is a valid point, certainly speaking for myself, I think that something is lost is translation, if I can put it that way, but the person who loses from that really is the claimant and not the defendant, because it leaves the defendant's counsel able to say to the trial judge, "Well, you know, Mr Cherney did not come and give evidence so you are going to have to discount a lot of that evidence, because there he was, comfortably sitting there in Israel giving his evidence by video link".

D

E

MR FOXTON: And certainly if Mr Deripaska comes live, I suppose it is fair to say there is some scepticism on our part as to whether the current application is simply that the conversation to video link may presage some future application in relation to Mr Deripaska's evidence, but if he comes live and Mr Cherney is by video link, it is open to Mr Beazley to make submissions to your Lordship about that, equally to cross-examine Mr Cherney as to ---

F

MR JUSTICE FLAUX: Why he will not come.

G

MR FOXTON: "You are fugitive from justice", if he remains wedded to that particular phrasing.

MR JUSTICE FLAUX: Yes.

MR FOXTON: My Lord, I have made the point but beyond a generalised assertion, nothing has been asserted as to what we can do for the claimant, we have offered to be interviewed by video link or on commission in Israel. We have

H

9

**A**

appealed, we have tried to take the appeal to the Spanish Constitutional Court who said it does not raise an issue of public importance. On the European Court of Human Rights, your Lordship knows that that is not a speedy process.

MR JUSTICE FLAUX:  That will not take place until after the trial has been and gone, will it?

**B**

MR FOXTON:  Realistically it may take three years to rule on whether delay in a national system is a denial of justice.

MR BEAZLEY:  I am not arguing that that appeal is going to come on before the trial.

**C**

MR FOXTON:  My Lord, we accept that any order can be revisited and will be conditional on the arrest warrants being in place at the time of the trial.

My Lord, there are two other matters relied upon.  First is that, because a Spanish newspaper has reported that the claimant was interviewed in the UK in May 2009 without being arrested that shows that he does not run a risk of arrest if he comes here for a trial to give evidence at trial.  Your Lordship will know that the claimant has denied that he was ever in London.  The response is rather touching, which is, "Why would the paper report it if it was not true?" "Freddie Starr did eat my hamster..."

**D**

MR JUSTICE FLAUX:  I should think that Mr Polanski might be able to provide the answer to that question.  No, I do not need much help on that, Mr Foxton.

**E**

MR FOXTON:  My Lord, secondly ---

MR JUSTICE FLAUX:  The reality is that, if he had been interviewed by the police in this jurisdiction, then that would be easily capable of being confirmed by the relevant police force.  I cannot imagine that there would be any difficulty in them saying yea or nay.

**F**

MR FOXTON:  Your Lordship may see in the evidence that Mr Herne was contacted by the police later on, who basically said, "Will you go over to Bow Street and we will ..." There were some nice words they understand that sometimes there is a political background to applications of this kind, the gist of which was much better for him to make contact with us and deal with it all in an efficient way.

**G**

MR JUSTICE FLAUX:  Which does not suggest that he had, at that stage, been interviewed already.

MR FOXTON:  No, and making it pretty clear that they were aware of the warrant and intended to act upon it.  My Lord, which brings us to the suggestion raised at 7 o'clock on Friday night as part of a weekend ---

**H**

MR JUSTICE FLAUX:  This is the second matter relied on?

10

A

MR FOXTON:  The second matter, even if he was not interviewed in May 2009 and therefore was able to come to the UK and not be (inaudible), he is prepared to risk extradition by going to the US.  I am reluctantly, frankly, to waste a huge amount of time on this point.  I do not know whether your Lordship has had a chance to see the evidence.  What is said on Miss Prevezer's part in that witness statement is, "Look, there are documents that are notarised, said to be in the presence of a notary in May 2010 which show that he must have been there..." ---

B

MR JUSTICE FLAUX:  She says, quite rightly, that New York law requires that a notary should not notarise a document other than in the presence of the person whose signature is being notarised.

MR FOXTON:  My Lord, based upon what I have read by way of exhibits ---

C

MR JUSTICE FLAUX:  And then Mr Leon Cherney says, "Actually my uncle stayed in Israel" and the lady who was the attorney in question effectively says, "Actually I did notarise it even though he was not in New York."

MR FOXTON:  No, my Lord.

D

MR JUSTICE FLAUX:  Is that wrong?

MR FOXTON:  We do not have a witness statement from the notary; we have a witness statement from the lawyer who drafted the document.

MR JUSTICE FLAUX:  From the lawyer who drafted the document, okay.

E

MR FOXTON:  Who said that her understanding was they were to be executed in Israel.  My Lord, we had the passport.  It is one of those things where often what you are most looking for you find close to home and you realise it was there all along, and we have the skeleton from Mr Beazley saying, "Where is the passport."  The passport has been disclosed.  We produced an up to date copy, there is no visa, there is no entry or exit stamp and I suspect all of us know from those queues in and out when you arrive at airports in the US, that the ---

F

MR JUSTICE FLAUX:  It may be that Mr Cherney would not have to stand in the queue like we mere mortals, but certainly you do not get into the United States without a stamp being put on your passport, that is for sure.

G

MR FOXTON:  No, so far as a visa is concerned, I think it is fair to say ---

MR JUSTICE FLAUX:  I do not know what the position is with visa waiver between Israel and the United States.

MR FOXTON:  I do not know either.  I do know that visa issues have been waived (inaudible), both parties in this case, but I do not know the status.

H

11

My Lord, there we are.  We say that there is nothing in there that ---

**A**

MR JUSTICE FLAUX:  Also I suppose, just thinking about that last point, that Mr Cherney clearly at some stage has been in the United States and, it may be he had a visa in an old passport, and they remain valid, because it certainly used to be the case that, provided you kept the old passport with the visa in it, you could use that.

**B**

MR FOXTON:  I am more than happy to allow for that possibility.

MR JUSTICE FLAUX:  The real point is that, unless your client is so devious that he has two passports and he is not disclosing the other one, you say the evidence points to his not having been in the United States.

**C**

MR FOXTON:  My Lord, I do.  Pulling everything together, where does that leave us?  It leaves us in a scenario where there is nothing at this stage which requires or it would be just postponing the decision on video link evidence, nothing which takes the case outside the general principle in <u>Polanski</u>, recognising, of course, that the court retains the ability to revisit that order in circumstances in which information becomes available or circumstances change.

**D**

MR JUSTICE FLAUX:  Yes.

MR FOXTON:  My Lord, unless I can assist further, that is all I was proposing to say on that that particular part of the matter before your Lordship.

MR JUSTICE FLAUX:  Would it be sensible to deal with that first then and ---

**E**

MR FOXTON:  I am in your Lordship's hands.

MR JUSTICE FLAUX:  I would have thought so, yes.  Yes, Mr Beazley?

MR BEAZLEY:  Your Lordship has had my skeleton argument, which sets out in slightly more detail (<u>inaudible</u>) Mr Foxton the outline of my submissions, but obviously that came before the statement on Friday, which I do not object to, but we had only just discovered the point about travelling to New York, and I will mention that in a moment.  Can I start with this, the so-called *volte face*. It is undoubtedly correct that, at an earlier phase in these proceedings, Mr Deripaska's then counsel suggested that evidence on commission would be preferable and cast some doubt on the video link evidence and that that debate continued and questions were asked in correspondence.  We say that, only after the application was actually made, we asked to be shown a draft of the application in correspondence, but no draft.  We asked for a draft but it was not provided.  Then a really serious analysis took place, as I hope you have seen from Mr Gerbe's second witness statement as to what was actually involved in this and what the problems, if any, would be with video link.

**H**

MR JUSTICE FLAUX:  You need not address me on this, because clearly the costs of taking evidence on commission are absolutely … even allowing for the

12

amount of money at stake in this case. To go down that route when modern technology is such that video link is, I think Eady J says, perfectly satisfactory.

MR BEAZLEY: We have looked and there are many comments from the Bench about this and Mr Gerbe looked carefully at what can actually be done by RTS.

MR JUSTICE FLAUX: It has not been done, I do not think, very often in the recent past. I think Lindsey J went to Cuba, did he not?

MR BEAZLEY: Sitting on commission, that is very rare.

MR JUSTICE FLAUX: Sitting on commission is very rare these days.

MR BEAZLEY: Lindsey J sat in Cuba.

MR JUSTICE FLAUX: He sat in Cuba and ---

MR BEAZLEY: There may be one or two others.

MR JUSTICE FLAUX: But I would have thought it is, as it were, a dying breed precisely because video conferencing is more possible.

MR BEAZLEY: So all that has happened is that, when the current legal team looked at it and analysed it, we came to a different decision. We should not be penalised or made to feel very bad.

MR JUSTICE FLAUX: No, the real issue for me, Mr Beazley, is whether I should order evidence by video link today or whether I should say no, you cannot give your evidence by video link for whatever reason, or I should say, "Go away, and we will look at it again in March 2012."

MR BEAZLEY: I would not suggest it was left anything like as late as March 2012, but there are a number of outstanding matters and matters which could be relevant to which further attention needs to be paid, which we simply have not got to the bottom of. One of the critical ones is Mr Cherney's travel out of Israel. I will come to that in a moment. Could I just set the way I am going to do this briefly and then do it.

MR JUSTICE FLAUX: Yes.

MR BEAZLEY: You have probably seen from my skeleton argument that our first submission distinguishes this case from Polanski. Of course Polanski is an important case, but when you look at it carefully, it does not address this case. Either it does not address the question of whether or not what Mr Cherney is asking for is a valid reason in the circumstances, or my alternative point is that, even if you could consider it could be valid, then it is not sufficient.

The reasoning for that is in part set out in our skeleton argument. We identify in paragraph 8 that critical matters of Polanski, now my friend has not shown

13

**A**  you Polanski, I would be very happy to do that. It is in our bundle of authorities, tab 5. Your Lordship has no doubt looked at carefully, but when you look through the judgment of Lord Nicholls, which is the principal judgment, he is very clear about what he is not dealing with. We have flagged this in paragraph 8 of our skeleton argument. I will come to the holding at the end, but at 8.3, I draw the court's attention that the court was not considering a case in which it could be said there was an abuse of the process of the court. This is in paragraph 12. Top of 641A:

**B**  "Despite the facts just mentioned Conde Nast does not suggest Mr Polanski's choice of England as the forum for his proceedings is improper. He is entitled to bring this action in this country in respect of the publication of the offending article which took place here. Thus the question is not *whether* the action should be tried here. The question is *how* it should be tried."

**C**  As we observe, this is not a case where we would accept either that there was no abuse of process, or that there was not an argument about whether the forum was proper. In Polanski v Conde Nast, the claimant had the benefit the defendant had the disadvantage of the cases like Shevill v Presse Alliance and Beresovsky (inaudible) which is where a libel is published in this jurisdiction under the then applicable Brussels Regulation. The court had jurisdiction come what may. That was the approach that the court took. So there was not a forum challenge, whereas here, we are in a very, very different and ---

**D**

MR JUSTICE FLAUX: There was not a forum challenge, but if you read the dissenting speeches, there was the suggestion that Mr Polanski could have brought a perfectly adequate claim in France, which is not quite the same thing as a forum challenge, but it is essentially dealing with the issue would he have an alternative forum.

**E**

MR BEAZLEY: There is nothing here in fact to show there could not have been some alternative forum in this case.

MR JUSTICE FLAUX: Where?

**F**  MR BEAZLEY: The issue … well Mr Deripaska happened to be caught here. He might have, because he travels all over ---

MR JUSTICE FLAUX: But where is it suggested that this claim could be tried, other than in England or in Russia?

**G**  MR BEAZLEY: My Lord, that would depend on the jurisdiction rules of the countries where he ---

MR JUSTICE FLAUX: If you are going to make that submission, Mr Beazley, you are going to have to put some flesh on the bones, because at the moment, the only two jurisdictions which were suggested at first instance in the Court of Appeal were England and Russia. Nobody volunteered, for example, to have a trial in Israel.

**H**

14

A    MR BEAZLEY:  It is not a matter of volunteering, nor was Mr Polanski volunteering
to bring this case to France, but my Lord, the issue is that there was in the
present case, a full jurisdictional challenge; in <u>Polanski</u> there was no
jurisdictional challenge.

MR JUSTICE FLAUX:  But the difficulty is with that submission is that the Court of
Appeal have held that England is the proper forum, the appropriate forum.

B    MR BEAZLEY:  Yes, I am going to come to that.  Your Lordship will decide what
you think of the submissions and I am going to come to it.

MR JUSTICE FLAUX:  I am sorry, Mr Beazley, I do not want to make life difficult
for you.

C    MR BEAZLEY:  I was just observing that there are serious and material differences
and what the court was not concerned with in <u>Polanski</u> was a case where there
had been a prior jurisdictional challenge.

MR JUSTICE FLAUX:  Okay.

D    MR BEAZLEY:  That is a very important matter which the court was not considering
in <u>Polanski</u>, is set out in 8.5, that is that the refusal of the order would not
affect the claimant in its longstanding evasion of justice and would do nothing
and would do everything to assist in the normal process of law would deny the
claimants access to justice.  That appears in the majority judgment at 15, 28,
65, and 66.  The point about that is that it was common ground that, whatever
the English court did, Mr Polanski would not come to England.  I do not know
whether that was by way of concession or how it arose, but we do not make
E    any such concessions.  Your Lordship will have seen, and we have relied
particularly on the evidence that we have just managed to obtain about his
going to America.  There is no evidence suggesting Mr Polanski ran the risk of
moving around within places where he might be extradited.  Of course,
ironically, as we all know later, he did have an ill-advised to Switzerland and
got caught, although subsequently got released due to a mess up by the US
F    authorities.

MR JUSTICE FLAUX:  He is under some from of sophisticated house arrest still, is
he not?

MR BEAZLEY:  I think he was to begin with and then ---

G    MR JUSTICE FLAUX:  Which I think meant that he could only move within his
2,000 acre estate and could not go anywhere else or whatever.  From
recollection, it was not a particularly effective form of house arrest.

MR BEAZLEY:  I think in the end the whole extradition application failed.

H    MR JUSTICE FLAUX:  I think it did fail.

15

MR BEAZLEY: That may be just a bit of interest rather than (inaudible).

MR JUSTICE FLAUX: Quite.

MR BEAZLEY: But there is nothing in Polanski to suggest that Mr Polanski was known by the court to be taking a risk on extradition in other jurisdictions. That is what we say is happening here.

With those points in mind, and of course this is a European arrest warrant for another EU State, we have mentioned in passing in our skeleton argument the duty that the court has with regard to other countries, not to assist people to avoid the process of justice. He is not a fugitive from justice in the sense that he is a convicted criminal in Spain, but he is a sufficient fugitive from the processes of justice that there is an international arrest warrant for him and a European arrest warrant issued by courts of a friendly State.

MR JUSTICE FLAUX: But Mr Polanski was somebody who had actually been convicted in his absence.

MR BEAZLEY: Absolutely, my Lord. But that brings me to another point, which I will come to when I deal with the specifics of this. Once one sees that this is outside either the basic rule I Polanski, then you would needing to consider whether this was a valid reason, given the differences to the case. But in Polanski itself, and my friend has referred to it, when you come to the end of Lord Nicholls' judgment, you have the stated general rule which he has referred to at 645:

"No doubt special cases will arise, but the general rule should be…"

That is the passage at 645A-B, which we are familiar with. But that acknowledges a number of things. It acknowledges that special cases may arise and that this is a general rule and that general rule is that the claimant's unwillingness to come to this country is a valid reason and can be a sufficient reason. So the special cases are where it would not even be a valid reason, but we say that that is you are into that territory because you are in the areas that you are with regard to the forum challenge and his unwillingness to come to this jurisdiction. But if you were against me on that, the general rule falls into place, that is a valid reason and it can be a sufficient reason, but that has to be considered in all the circumstances.

My Lord, if one looks a little bit back in Lord Nicholls' speech to paragraph 27, your Lordship has obviously read this, the proposition in 26:

"… a direction that a fugitive such as Mr Polanski may give his evidence by use of video conferencing is a departure from the normal way a claimant gives evidence in this type of case."

So you are being asked to depart from the normal rule and one of the things we say that flows from that, just by way of introduction, is that it is particularly important that a fugitive (if I can call him that) or somebody who

16

A   is not complying with what the Spanish criminal authorities want, should be particularly careful with the court as to why he should be allowed to give his evidence by video link. You are, after all, going to be assisting Mr Cherney, if we allow in evidence by video link, to minimise the problems that he faces by reason of the Spanish warrant. We are, therefore, to that extent, obstructing or going some way to obstructing the Spanish system, because if the Spanish want to interview him, then we are assisting him to overcome one of the obstacles which might -- I put it no higher than that -- cause him to go to the Spanish authorities to give his evidence.

B   MR JUSTICE FLAUX: That submission has to be predicated on his having left Israel at some stage to go to the United States, does it not, because that is the point that was addressed by Lord Hope, who says that the critical point, he thought at paragraph 65:

C       "…that the granting or refusing of the order will have no effect whatever on the claimant's continued status as a fugitive. The granting of the order will not help him to escape from the normal processes of the law, nor will declining to grant the order do anything to assist them."

D   MR BEAZLEY: That is why I have flagged in paragraph 8.5 of my skeleton, that paragraph in Lord Hope's judgment. But this case is different. America is one part of that.

    MR JUSTICE FLAUX: But why is this case different, because you do not accept that he will not?

E   MR BEAZLEY: We do not accept that he will not. Firstly, we will see him travelling to America ---

    MR JUSTICE FLAUX: Assuming that he did travel to America.

    MR BEAZLEY: Secondly, even ignoring that, all he is being asked for at the moment is to give his account to the Spanish authorities. He is not ---

F   MR JUSTICE FLAUX: What he says, Mr Beazley, "I have offered to give my account to the Spanish authorities from Israel but for some unknown reason they will not accept that, even though they have accepted taking a statement from your client in Russia."

G   MR BEAZLEY: Yes. My Lord, that raises the question: what is it which we do not know and are not in a position to say that has passed between Mr Cherney and the Spanish authorities, that has led them to act in this way against him, whereas for other important *imputados* they have been allowed to give their evidence either in Russia or by video link or, in the case of Mr Batkov, have come to Spain and given their evidence and not been arrested. What is it that we do not know, because we have not been shown a full run of correspondence between Mr Cherney's lawyers in Spain and the prosecutor. That is not available to us.

H

17

Your Lordship is obviously clear about the law. What I would like to do, if I may, is to move into the specific points that I wanted to make. The first of those starts at the passage in the skeleton argument at 11, and runs from 11 to 13, which is the point about jurisdiction. This was a most unusual jurisdiction case. There are actually very few cases where England has been found not to be the appropriate jurisdiction but the foreign court has been found, for various reasons, not to be suitable, and that has overridden the inappropriateness of the English court. A significant element in that case was the section of the court, both at first instance and, it must be said, on appeal, that Mr Cherney could come to England to give evidence. At the time of the first instance judgment, there was no warrant in place. By the time the Court of Appeal came to consider this, there was. In the judgment, which we have put in the bundle of authorities, your Lordship may have glanced at this (or perhaps more than glanced). Your Lordship will appreciate there were really three strands to the argument about the inappropriateness of Russia. One of those three strands was that, if Cherney went to Russia, he would face "trumped up" charges and be subject to arrest, so fear of arrest was one of his three grounds on trumped up charges. By the time he came to the Court of Appeal, the same, in his eyes, would or could have been said in respect of the English jurisdiction, namely that, if he comes to England to trial, he would face what he regards as trumped up charges which could lead to his arrest. I am not asking your Lordship to revisit the jurisdiction hearing and challenge, but you are, I submit, entitled to a full and frank explanation from Mr Cherney, which you have not had, as to why he did not tell the Court of Appeal that very material fact. He said, "I did not believe that it would not continue", or something of that sort, (several inaudible words) he acknowledges that he had the warrant and knew of them in June 2009 before the Court of Appeal hearing in late July 2009 and yet he does not tell the court. Yet Clarke J at tab 7 of our authorities bundle (your Lordship does not need to turn this up) at 390, it is perfectly correct as my learned friend says, that this is part of Mr Vos's submissions, but this is the basis on which the judge acts and then he ---

MR JUSTICE FLAUX: No, it is not though, because this is Mr Vos submitting why England was the natural forum and in the very next paragraph the learned judge says, "In my opinion, the natural forum for this litigation is Russia." So he is actually discounting all that.

MR BEAZLEY: My Lord, with respect ---

MR JUSTICE FLAUX: You may very well be right. I certainly accept that Mr Cherney, if he knew there was a risk of arrest, and I think Mr Foxton says that is a moot point because at that stage he was proposing to cooperate with the Spanish authorities and no reason to suppose they would not come and interview him in Israel, but I certainly accept that it is something he should have told the Court of Appeal, but the difficulty is, would it in fact have made any difference to what the Court of Appeal decided, because the Court of Appeal were deciding whether Clarke J had got it right or wrong. On the basis that he had decided, and that was the whole thrust of Mr Malek's argument,

Wordwave International, a Merrill Corporation Company

"If you decide that the natural forum for the dispute is somewhere else, then", said Mr Malek, "you do not get to the second stage of Spiliada at all."

MR BEAZLEY:  That I think was his ---

MR JUSTICE FLAUX:  The more extreme argument and then he said the alternative is that he did not have any evidence on which he could conclude that England was the appropriate forum.

MR BEAZLEY:  One only needs to imagine the position of the Court of Appeal then being told, "Actually, England is in very much the same position as Russia so far as Mr Cherney is concerned.  He may not be assassinated here, or have (inaudible), but one of the three major players of fear of going to Russia was arrest."

MR JUSTICE FLAUX:  He might said, "Mr Cherney may have to give his evidence in England by video link."

MR BEAZLEY:  Yes, but he did not choose to bring that to the attention of the court.

MR JUSTICE FLAUX:  I follow that.  Whether he chose or not, I understand the point.

MR BEAZLEY:  Going on a little bit further at 261 in Clarke J, if I could ask your Lordship just to think back what you said to me a moment ago:

"So far as general discretionary considerations are concerned..."

So this is not submission this is part of the judgment:

"...parties are not strangers to England..."

Then the judge sets that out:

"It was somewhere readily accessible to both parties and may properly be regarded as neutral ground.  Both parties have ... [262] The two most important witnesses are the parties themselves."

What I am suggesting to you is Clarke J was envisaging that both main witnesses could be present in person.  A different argument might have been, "Oh well, he might have to be taking evidence by video link", but come the Court of Appeal, which is in the next tab, Mr Cherney did not tell them.  Your Lordship says, "Would it have made a difference?"  The answer that I would suggest at the present time is, your Lordship should be requiring from Mr Cherney a further statement made by him, setting out when he told his English lawyers, without waivers of privilege, of the arrest warrant and the fact that, if they remained in place, he would not come to England to give evidence.  If the Court of Appeal had been told that and that there was a fear of arrest here, they may well have regarded the exercise of discretion by Clarke J in a different

19

light and that there had been a change of circumstances between the first instance hearing and the appeal hearing.

My learned friend makes a technical point that they were judging service out and (inaudible) permission to serve out. But even if that was a good point, and I do not accept that it was, the Court of Appeal are well within its capacity to say there has been such a change in circumstances that the main witness cannot come here that we will either stay the proceedings or not allow these proceedings to continue.

The point I make, this is blowing hot and cold. When he wants to persuade the English Court of Appeal to suspend Clarke J's judgment, he does not disclose a highly material fact, but when he wishes to persuade this court to allow him to give video link evidence, he says he does not come here through fear of arrest.

That is my first. This is nothing like that in Polanski. There was no element of blowing hot and cold and there had been no jurisdiction challenge. So we are in the extraordinary, to say the least, position of having jurisdiction here not in the natural forum under circumstances where it was assumed that the claimant could come here to give his evidence, when he knew that there was, at the very least, a serious chance he could not went he went before the Court of Appeal. So there are two serious differences to Polanski, in respect that there is nothing like that in Polanski.

It is important, in my submission, because the blowing hot and cold, playing games with the court. On the one hand we do not mention it, but when it comes to give evidence, you do. This is, in my submission, something the court should certainly not lightly accept and he should require a full and proper explanation of how that came not to be mentioned to the Court of Appeal.

MR JUSTICE FLAUX: I understand that submission, but where does it get me? That is simply going to lead to the incurring of yet more unnecessary costs at an interlocutory stage. Assume that Mr Cherney, which I am sure you would like him to, says, "Actually, I did know that there was a risk that I would be arrested and I decided I would not tell my lawyers that because I knew they would have to spill the beans to the Court of Appeal. Terribly sorry, judge, but that is the position." What is this court dealing with a case where, for better or worse, there is jurisdiction and at this stage now there undoubtedly is jurisdiction because your clients submitted to it by serving a Defence, what is this court supposed to make of all of that in terms of conduct of the trial? Am I suppose to say at that point, "I am terribly sorry, Mr Cherney, you have behaved in such an abominable way, I am not going to allow your application. You either come and give evidence live or your claim for many, many millions of dollars will simply fail." It does not seem to me to be a proportionate reaction really.

Wordwave International, a Merrill Corporation Company

MR BEAZLEY:  My Lord, it is why it may be one amongst the number of features, but in the proper analysis of <u>Polanski</u>, this may be a special case.  If your Lordship does not accept that ---

MR JUSTICE FLAUX:  No, I am just trying to explore the point, Mr Beazley.  I am not saying whether I accept it or not, but appellate courts often say, because they do not want to lay down a general rule that is, as it were, an immutable general rule, they often say, "There may be exceptions, or there may be special cases" and leave us hapless judges at first instance to decide what they mean by that.

MR BEAZLEY:  Sadly that is your Lordship's function rather than mine.  But when they do say, "There may be special cases" and they have also in the judgment, as I have indicated, says, "This is not a case of that abuse, it is not a case that lacks proper jurisdiction, the general rule then does not apply."

MR JUSTICE FLAUX:  Because in one sense it might be said that <u>Polanski</u> was about as extreme a case as you could conceivably get, because, unlike the earlier case, which was the one that Lord Nicholls said was rightly decided, <u>Rowland v Bock</u>, that was a case where somebody risked arrest and extradition to the US on charges of fraud, but here was a case, in <u>Polanski</u>, where he had actually been convicted of child sex abuse.

MR BEAZLEY:  There cannot be any coincidence that there was a 3-0 majority the other way in the Court of Appeal and two dissenters in the House of Lords.  So it is one of those cases where actually at the appellate level, there are five against and three in favour.  But that does not get me ---

MR JUSTICE FLAUX:  It does not get you anywhere and does not really help me.

MR BEAZLEY:  It does suggest ---

MR JUSTICE FLAUX:  But it does leave me wondering -- that is why I raised the point -- how extreme does a case have to be to be a special case, not that leads to the court saying to a claimant, "Tut, tut, tut, you behaved in a rather abominable way", et cetera, but leads the court to saying, "This is such a different case, that it is an affront to public conscience that you should be able to give your evidence by video link.  That is what it comes to.

MR BEAZLEY:  The first thing is the claimant has managed to obtain jurisdiction here without disclosing what I respectfully submit is a highly material fact to the Court of Appeal.  I of course understand that may not have made a difference to the outcome in the Court of Appeal, but we will not know that because the claimant, by his own decision and election has not told the Court of Appeal.  Having not told the Court of Appeal when it would have been relevant on the jurisdiction application, he now does rely on exactly the same fact that he did not tell the court at the jurisdiction phase to get the court to depart from the normal rule.  That is completely different, in my submission, to <u>Polanski</u> and is the sort of factor that could justify a departure from the <u>Polanski</u> approach, either because it is a special case, namely a special case

21

A    because that blowing hot and cold and not telling the court at the Court of Appeal stage. If it does not get into that and is in the general rule, then one has to look at all the factors. Is it a sufficient reason in this case, and that would be one of the factors, it was not sufficiently material for Mr Cherney to trouble the Court of Appeal by even risking them taking a different decision when he told them.

B    The next matter which I would ask your Lordship to take into account which is very different to Polanski is this issue over leaving Israel. This is a serious matter, and it is a serious matter for two reasons. One we say, if we are right, and Mr Cherney has left Israel and gone to America for his own purposes, that is relevant to you in two ways. One is that he is telling untruths to this court in his evidence to the court and attempting to obtain the order of the court, the video link evidence without telling the truth. That in itself, my Lord, would, I respectfully suggest, be a very powerful factor against departing from the normal rule. The court should not act if that is a real concern and I would

C    again here say that this is something which needs further investigation, and I will come to the detail of that in a moment. The second factor is, if it is right that he travels, and this is why we would say he would deny it, if it is right that he has travelled to the USA, as Miss Prevezer's witness statement makes clear, it would be clear in any case it is not contested, he has taken the risk of extradition to Spain pursuant to the international arrest warrant or under the extradition treaty between the US and Spain, for his own purposes. He is

D    therefore not in the position of Polanski, who at the time sat in France not able to be extradited and entitled to rely on his position as a French citizen, but a man who, for his own purposes, will go abroad if he thinks that is a sufficient priority to him and risk extradition. That again, in my respectful submission, is very different from Polanski, and the court should not say, "If you are willing to risk extradition for one reason, you should not be willing to risk it

E    for another."

MR JUSTICE FLAUX:  It does seem a very odd situation, just assuming that you are right that he did leave Israel, that he goes to New York to complete some formal documents in relation to a land deal, as I understand it, which is of some 15 years' standing, and yet, on this hypothesis, faced with both, no doubt his legal advisers and a judge saying to him, "Very well, if you choose to give

F    evidence by video link, that is all very well, but your evidence will not have the same impact as it would do if you came to London to give evidence. So you run a risk in terms of the success or otherwise of your litigation that giving evidence by video link will have a deleterious effect on your ultimate prospects." You are effectively inviting me to assume that Mr Cherney says to himself, "Never mind all that, I am so worried about going to England, I am

G    prepared to risk losing my $250 million claim, even though I was quite happy to the States and sign some formal document." It just does not make sense.

MR BEAZLEY:  No, my Lord, the logical follow on from that is that he is in fact not particularly concerned about this. He can come to England ... he was willing to go to America, he may very well be willing to come to England to give evidence, but if you allow him not to by video link evidence, then obviously

H

22

he will not.  But if he comes to England and is willing to come to England, then that takes it out of the <u>Polanski</u> case.

There are a number of points in relation to the passports and going to America, there is no suggestion, we are not suggesting that he went to America only to create those documents.  We do not know because he has not told us, but what we, just at the end of last week, were able to get evidence produced to this court, that he had been in America.  What he was there for and why he went, there may have been overwhelming matters, very important matters, but he does not tell us and there is, as a minimum, in my respectful submission, sufficient evidence before you that you should require, or that it should not be appropriate to have further investigations.

MR JUSTICE FLAUX:  What further investigation are you suggesting?

MR BEAZLEY:  I am suggesting two things, minimum.  One is that we actually have time and ability to contact the notary, and I am going to come to that in a minute, to find out what actually happened, because what you have here is a notary of the State of New York, whose legal duty, and in fact virtually sole function, or a very important part of their function is to notarise what happens when and provide the legal system, including worldwide, with a clear independent picture of what happened.  The notary's certificate, which is before you, on two documents, and I do want to show you these, absolutely clear that Mr Cherney was present at the time.  These may have crept into volume 3.

MR JUSTICE FLAUX:  Yes.  I have them attachment to ---

MR BEAZLEY:  An attachment to Miss Prevezer's witness statement.

MR JUSTICE FLAUX:  They are …

MR BEAZLEY:  Can I deal with them.

MR JUSTICE FLAUX:  The Parking Space Unit Deed:

> "Before me the undersigned and notary public personally appeared Michael Cherney, personally known to me or proved to me on the basis of …"

MR BEAZLEY:  Does your Lordship have that in a numbered volume?

MR JUSTICE FLAUX:  I have it as page 3 of the exhibit.

MR BEAZLEY:  Can I deal with it in that way.  My Lord, this is my learned friend's submission is that some of the evidence seems to suggest this is just relating to parking unit.  There are two documents here.  The first is a parking unit and the second, which I will come to, was a formal affidavit, required, presumably by the State of New York, in relation to family dwellings.  So it is wrong to regard it as a single simple thing.  We have a parking space unit, the indenture

23

A    is dated 26 May 2010.  It is signed by Mr Cherney.  He does not suggest it is not his signature.  You have the formal certificate of a Notary Public, that he personally appeared, "personally known to me or proved to me on the basis of evidence to be him", before her in New York.

MR JUSTICE FLAUX:  Sorry, where is that?

MR BEAZLEY:  That is the certificate.  Of course ---

B    MR JUSTICE FLAUX:  Where does it say that on the certificate?  I have it on the Deed.

MR BEAZLEY:  If you go forward to the affidavit.

MR JUSTICE FLAUX:  Affidavit of compliance.

C    MR BEAZLEY:  Bottom left, "Sworn to before me ...", then you have the stamp of Alexander Atoga, Notary Public, qualified in...", "These statements are made in the knowledge wilful representation, false representation is unconscionable."  So it is not only certified that the signature before him personally on that Deed, but that he, Cherney, swore it before her.  She would have administered the oath.  That is the purpose of notaries.  It is not, of D    course, absolutely impossible and in the natures of things in life that it does not happen like that ---

MR JUSTICE FLAUX:  But what you say is it requires at the very least her to come forward and say, "Actually, hands up, he was not there.  His nephew was, but I was assured that this was his signature."  Which would be something completely different.

E    MR BEAZLEY:  Or something happened, it is a very serious allegation against a Notary Public.  We have put in the bundle the duties, and I am sure your Lordship does not really need to ---

MR JUSTICE FLAUX:  I know from having, on occasions, had to swear affidavits in F    front of an English Notary Public for the purposes of expert evidence, mainly in the United States actually.

MR BEAZLEY:  And even we have to prove to the notary who we are.

MR JUSTICE FLAUX:  Yes, you have to take a copy of your passport.

G    MR BEAZLEY:  You have to produce your passport.

MR JUSTICE FLAUX:  Unless it is somebody you know.

MR BEAZLEY:  Unless it is happening so many times and they already know you.

H    MR JUSTICE FLAUX:  Yes.

24

**A**

MR BEAZLEY:  At page 21 of this exhibit is set out the professional conduct
provisions.  At the top on the left-hand side:

"The practice of taking acknowledgments in affidavits over the
telephone or otherwise without the actual personal appearance of the
individual making the ... read to the words ... or affidavit will be before
the officiating notary is illegal."

**B**

That is then set out.  Then at 130 on the right-hand side, that does not matter,
because it is acknowledged.  We at one time thought it might be said the
notary had gone to Israel, but that is not alleged.  What is alleged in effect is,
the fact is Mr Cherney must be alleging that the notary entirely breached her
duty and put herself in grave risk, I would have thought, of losing her licence,
if not be guilty of various offences.  Issuing a false certificate at page ---

**C**

MR JUSTICE FLAUX:  That will not work, because the Deed on 27 May 2010,
"Before me the undersigned and Notary Public in and for the said State...", so
she is actually saying that she is in the State.

MR BEAZLEY:  In fact the evidence, and Miss Prevezer mentions it, (inaudible)
notary only has jurisdiction within the State.  But the interesting thing is,
(inaudible) answer to this is not that at all, it is that the Notary, you have to be
being asked to accept the notary absolutely breached her duty, permitted a

**D**

serious offence as a notary, probably criminal and certainly misconduct which
could lead to removal from office, and that is a very serious allegation which
cannot be accepted without more, against a public official.  It is not a matter of
your Lordship determining it on the evidence, we need to get to the bottom of
it, because otherwise your Lordship has been misled.

**E**

MR JUSTICE FLAUX:  If you are right and if Miss Cogan (or Mrs Cogan) comes
forward and says, "Actually Mr Cherney did appear before me on 26 May
2010", then Mr Cherney has some fairly difficult questions to answer.

MR BEAZLEY:  Does your Lordship have the responsive evidence to this.

**F**

MR JUSTICE FLAUX:  I do somewhere.  It arrived rather late in the day.

MR BEAZLEY:  If you have a bundle 3 ---

MR JUSTICE FLAUX:  Are they all in bundle 3?

MR BEAZLEY:  Yes, they are.

**G**

MR JUSTICE FLAUX:  Maybe I should be looking in there.

MR BEAZLEY:  That would make it easier.  Bundle 3, tab 20.  I am going to come
back to the passports point.  Paragraph 5, "As ATH7 [the passport] shows
there is no evidence of the claimant having travelled to the USA or anywhere
outside Israel since 23 May 2009."  I have gone a little bit quickly.  Your

**H**

Lordship has in mind that we asked specifically whether Cherney travelled

25

outside Israel. We got a letter back saying on instructions that he has not and Mr Cherney has now put in a witness statement saying that letter is correct.

MR JUSTICE FLAUX:  Yes.

MR BEAZLEY:  There is a clear representation to the court by Cherney that he has not left Israel since May 2009.  But when Mr Herne at paragraph 5 says:

> "I have sought urgent instructions from the claimant and from his nephew Leon Cherney ... read to the words ... relayed to me the claimant's instructions and what follows reflects what I have been told by the claimant and by Leon."

So what you do not have, this may be a matter of time, but again imprematurity is important, you do not have Mr Michael Cherney himself setting out in his own words in his own statement what happened.  Mr Cherney chooses frequently just to confirm what he has been told orally other documents state, have translated to him because he (inaudible), so you do not have that.  You have this second-hand material and it is second hand through Mr Transbor who has relayed the claimant's instructions.

> "The claimant says he has not left Israel since May 2009 when he returned from his trip.  He did not travel to the USA.  He would have needed ..."

Has your Lordship read that, through 7.  I do not need to read it out, 6, 7 ---

MR JUSTICE FLAUX:  He would have needed a visa.

MR BEAZLEY:  Yes, I am going to come to passports in a moment.  Mr Cherney has a track record of using false passports, and I will show your Lordship the material in Clarke J's judgment.  The claimant's passports (inaudible) was produced.  The complaint was that the relevant passports had not been considered.  There is one passport produced.

> "The claimant and Leon told me the claimant did indeed sign the documents but he did not sign them in New York.  He signed them in Israel at the request of Leon, who explained their general purpose and nature.  Did not read the documents to the claimant.  He does not read English or speak English.  The purpose was to formalise legally a transaction which had been implemented more than 15 years before I the nature of an intra-family ... read to the words ... two apartments in which the claimant had an interest.  It has emerged that the parking space for one of the apartment was a separately registered plot of land and therefore it had not been made the subject of a legally effective transfer when the apartment was transferred."

What that fails to observe is that the affidavit has nothing to do with the transfer of a unit, it is an affidavit relating to proper smoke(?) provisions in a dwelling house.  Paragraph 8:

26

A     "Leon and the claimant have also told me that Leon had visited the claimant in Israel to ask him to sign the documents himself. Leon had in fact already signed them himself and the manuscript within the notarisation sections remained blank."

So it is not only suggest that Michael Cherney did not sign, but Leon did himself, so it is a double (inaudible) of the notary according to them. Then 9:

B     "Leon told me he then arranged for his mother to deliver the signed documents to the notary."

There is no evidence from the mother or when she arrived, what the notary said to her or anything of that sort.

C     "The notary proceeded to notarise the documents after they had been signed ... read to the words ... the presence of both the claimant and Leon Cherney."

Mr Herne does not actually have the capacity to know that. He can say what he has been told. He was not present and he has not spoken to the mother, the person who delivered.

D     We then have another witness statement from Michael Cherney, which is at tab 22.

MR JUSTICE FLAUX: Is that the one from Mr Cherney or is that from ---

E     MR BEAZLEY: 22 is from Mr Cherney and then I am going to show you Ben Cherney. Michael Cherney, adopting his practice says, he confirms in paragraph 3:

"The following documents have been read to me in Russian by my Israeli lawyer."

F     Paragraphs 6 to 14 are the witness statement of Miss Prevezer and the two drafts, we do not know what drafts, but an approved draft:

"... and confirm, that so far as the matters set out in ... read to the words ... are within my knowledge they are true."

G     He does not explain how this came to be or how, if the notary block was already there, how they came to sign it. It may be there is an explanation that can be given.

MR JUSTICE FLAUX: It is the other way around, is it not? If what Mr Herne says on instructions is right, both the Cherneys sign it in Israel. It is then taken by the mother, who is presumably Mr Cherney's sister-in-law, to the notary in New York, who then stamps it, despite the fact that it is in the presence of neither of the people who ---

27

MR BEAZLEY:  Neither of the persons (inaudible), yes.

MR JUSTICE FLAUX:  So it is a double whammy, you say, from her point of view?

MR BEAZLEY:  It is.

MR JUSTICE FLAUX:  She runs the risk of being struck off twice.

MR BEAZLEY:  Actually four time, because you also have ---

MR JUSTICE FLAUX:  Okay.

MR BEAZLEY:  Tab 23, it is stated the Lenid Cherney, the nephew, I suppose it might be by the sister-in-law…"

MR JUSTICE FLAUX:  I think if you work it out, it is obvious.

MR BEAZLEY:  Then he just says Mr Herne's statement is true.  Then there is a very peculiar witness statement indeed at 24, which we have just very recently received that on Sunday, we have a Lakosh Styer.  He is a US Attorney, born in Latvia and came to live in the USA.  She says:

> "In 2010 I acted on behalf of Lenid Cherney.  I have known him for five years and knew he lived in Israel.  In 2010 I was consulted by Lenid in connection with the need to formalise a transfer from his uncle of a plot of land which he described as parking unit 202."

She again does not refer to the affidavit.  She is only dealing with that.

> "I say "formalise" because it appeared that this transfer had, in effect, happened some 15 years before and there had never been a formal transfer.  Lenid wanted to achieve the formal transfer and I drafted the necessary documents at his request."

These are the documents which appear at 1 to 5 of Miss Prevezer's statement.

> "In the course of my communications with Lenid about the proposed transfer in May 2010, Lenid explained to me that the claimant also lives in Israel and would be executing the transfer documents there.  Although I was not present when the documents were executed, I know … read to the words … the documents in fact executed in Israel … read to the words … I understand … that they were."

My Lord, a US attorney advising Lenid in relation to this transaction would, I would respectfully suggest, have advised him that, if the documents were to be signed and they needed to be notarised, if they were to be notarised, they needed to be notarised in New York before a New York notary.  If they were to be signed abroad, some other procedure sufficient for New York law

28

equivalent to notarisation, would need to be adopted and yet she does not say anything about giving that sort of advice.

MR JUSTICE FLAUX:  Presumably, I do not know, but presumably there is a procedure, I am sure there is a procedure, whereby you can have a Deed that is valid in the State of New York which has been notarised in the State of Israel.

MR BEAZLEY:  And some arrangements would have to be ---

MR JUSTICE FLAUX:  So if it had been notarised in front of an Israeli notary, and then presumably some statement from the Israeli notary would be satisfactory to the US Land Registry, or whatever it is.

MR BEAZLEY:  But the US lawyer advising on the transaction, told the signature was (inaudible), would immediately, in my submission, would have been on to that point and said, "Either you need to come to New York to get hem notarised, or you will need to go through some equivalent sufficient procedure for the purposes of a New York transfer and a New York affidavit" and you get none of that.  She does not say anything about that, she just says, "I was not present.  I have no reason to doubt the documents were executed."  So she was not present with the notary, there is nothing she can say about that.  What it raises is a glaring omission as to what advice she gave in relation to these matters.  I think Miss Prevezer in paragraph 13 of her statement actually says that under New York law, were Cherney to have signed the Deed and the affidavit in Israel, he would have had to have done so before an Israeli notary, a similar person ---

MR JUSTICE FLAUX:  I knew I had seen it somewhere.

MR BEAZLEY:  The point is this statement is extremely unsatisfactory for the reasons that I have just described to your Lordship.

As to the passport issue, it is said Mr Cherney just has one passport.  My Lord, there is a lot of underlying evidence that I could show you, but actually I can just show you Clarke J's judgment in tab 7 in my authorities bundle, paragraphs 154 and following, so to be borne in mind that Mr Cherney is a man who says, "I only have one passport", at 154, your Lordship can read this:

"On 21st May 1994 Mr Cherney flew from Geneva to Heathrow with his future wife.  They were both detained by immigration officers who discovered that they had attempted entry on false Polish passports.  They were refused entry and deported back to Switzerland.  The following day they were arrested and imprisoned by the Swiss police, inter alia on the grounds that they had made use of false identities."

Then Mr Cherney explained he had met a man called Dimitri in a bar in Florida who told him that it was possible to obtain a different nationality from the former Republics of the Soviet Union and offered and then provided them with a Polish passport.  Footnote 22:

29

**A**

> "In a subsequent interview his future wife admitted that he had bought false Polish passports for US $1,000 in order to travel to Great Britain."

Then at 155:

**B**

> "Cherney was detained for further questioning. By now the police had learnt of the arrest of two Belarusians who had entered Switzerland via Basle illegally from Germany in a rented Mercedes which contained (i) six Polish passports, one in the name of "*Mikhail Czernyi*", bearing Mr Cherney's date of birth; (ii) 7 Polish driving licences; (iii) a loaded firearm; and (iv) two silencers. Mr Cherney claimed to have no idea how these individuals happened to have passports and driving licences in his name…"

**C**

And I should add with his date of birth

> "…Eventually Mr Cherney was released from police custody."

He was prohibited from entering Switzerland because of his use of the false passport and so on. There is a lot of underlying evidence about that, my Lord, in Mr Hauser's evidence in CMC bundle 2. Your Lordship has sufficient of the flavour for me to submit to you that the defendant has a real concern ---

**D**

MR JUSTICE FLAUX: At 157, at the time he was detained in Switzerland he had two passports, neither of which were actually the Polish passports, because they were in the possession of the UK authorities.

**E**

MR BEAZLEY: He also denied that they were Russian.

MR JUSTICE FLAUX: None of which appeared to be Russian, one which clearly was Russian with a UK visa.

**F**

MR BEAZLEY: Yes. On different matters he was acquitted and my friend has referred to in relation to other claims in Switzerland but that is his *modus operandi*. He is a man who has had a whole series of false passports, and he has been caught, been caught in Switzerland, there have been linked passports caught at the Polish border and he has had two passports, one a Russian one and one Russian with a UK visa. So my Lord, the bald assertion that Mr Cherney has one passport and he has put it into his disclosure relevant for this period, I would ask your Lordship to treat with a degree of suspicion and at least require a very clear statement from Mr Cherney as to what, if any, other passport he has. This also undermines the argument about the visa. Of course, one does not know, but as your Lordship has said, in paragraph 157, one of the passports had a UK visa.

**G**

**H**

MR JUSTICE FLAUX: The passport that has been disclosed, the one that is exhibited, I have not looked at it.

30

A

MR BEAZLEY:  It is right behind where we were in volume 3 actually, an exhibit to Herne, after where, "Lenid agreed for his mother to deliver the documents", and then the passport is produced.  The passport has an entry stamp into Israel.  I am not proposing to give extensive evidence on the stamp ---

MR JUSTICE FLAUX:  I have it, 694.

B

MR BEAZLEY:  23 May 2009 is the Israeli entry stamp.  There is no exit stamp.  I am not suggesting there necessarily would have been.  I am not in a position to say that.  But what one can say is that on Mr Cherney's own account of this, he did not leave this country in May 2009 in what, to most people, would be a normal way, he left it on Mr Boris Berezovsky's private plane.

MR JUSTICE FLAUX:  When he went back to Israel?

C

MR BEAZLEY:  When he went back to Israel.  Does your Lordship have that 23 May stamp?

MR JUSTICE FLAUX:  I have seen that, yes.

MR BEAZLEY:  I could not see any … there is an immigration stamp ---

D

MR JUSTICE FLAUX:  This passport, it says, is an Israel passport that in fact expired on 30 April 2011 and was extended.

MR BEAZLEY:  I think I have read in the papers that perhaps he has been given a new passport.

E

MR JUSTICE FLAUX:  Extended -- if you have page 690 (top right) -- on 12 June so extended last Sunday effectively.

MR BEAZLEY:  Yes, very recently got a new passport.

MR JUSTICE FLAUX:  A new extension to the old passport.

F

MR BEAZLEY:  My Lord, these are matters which need to be explored.

MR JUSTICE FLAUX:  The obvious question why has he bothered to get an extension to his old passport, which apparently expired a month and a half ago?

G

MR BEAZLEY:  My Lord, he is no doubt planning to travel.  You normally get a passport ... he may say that getting an Israeli passport ... I do not want to make a false point.

MR JUSTICE FLAUX:  One does not know.  You could say it is just another loose end that needs tying up.

H

MR BEAZLEY:  My Lord, I am conscious of that.  In relation to the passport, I would respectfully suggest that your Lordship should not accept either that you are

31

A    being told the truth at the moment, or that you have had a full account in order to enable you to be satisfied that he has not travelled to another country, taking the risk of extradition. Both of those would be grounds for not deciding the matter right now. There are ten months before trial. A fuller account will be produced from the notary. One can find out what the position is. Imagine the position if the notary says, "Hang on, I took a photocopy of Mr Cherney's passport." Who knows which passport it is, "and he appeared in front of me and signed it." If that is the case, then that will be a very serious matter,

B    because you are being asked to make an order on the basis of a false statement both made to us and to the court, and in respect of a man who is willing to travel.

     Can I just touch on the Spanish warrant position. Since my skeleton argument, of course a much fuller explanation has been given by Mr Herne, and one has something clear about it. As I have already submitted, we do not have a full and clear picture to explain why the Spanish court differentiates between Mr Cherney and Mr Deripaska and Mr Makhmoudov and Mr Baktov,

C    so three others. There is one other person who we gather was unbeknown to Mr Gerbe at the time he made his statement, he is an *imputados* and has an arrest warrant made against him, but we do not know the circumstances of that. What we do know and what is admitted, is that Mr Deripaska was allowed to give his evidence in Russia, Mr Makhmoudov was allowed to give his evidence by video link. Both of them are alleged to be important

D    *imputados* and Mr Baktov, who is Mr Cherney's right-hand man, the Bulgarian lawyer, he appears to do a great deal more than normal lawyers do, he has actually travelled to Spain to give his evidence and has not been arrested and has departed from Spain. Important central players like that, whereas Mr Cherney, says, "I wrote and said I was wiling to give my ...", and he did write saying, "I am willing to give my evidence ...", that is the only communication in these proceedings between him and the (inaudible). There

E    must surely have been more to it than that. Mr Baktov still has an extant appeal in which he raises this matter as a matter of unfairness. It seems likely to come on well before Christmas, at the very least it has been approved in the Court of Appeal for hearing in which this matter will apparently be raised. My Lord, again I would ask your Lordship to await the outcome. I am not saying wait until March, of course not. We will have to look at this again in the

F    autumn, but we are talking not about evidence on commission which requires a great deal of (inaudible), we are talking about ---

MR JUSTICE FLAUX: No, the point about giving evidence by video link, although normally it is dealt with before trial, does not even necessarily have to be dealt with before trial because, certainly in my experience in cases where, for example, it is common ground and the parties arrange an appropriate location,

G    all the court is effectively doing is rubber stamping that, if the court chooses to, unless there is some reason not to.

MR BEAZLEY: I can well understand when it was evidence on commission all the (several inaudible words), we are not in that territory. There is time for this to be looked at properly, a proper account, we can go and talk to the notary.

H

**MR JUSTICE FLAUX:**  You may not know the answer to this, but are your instructions that your intention, in the light of what you have received over the weekend, is to contact the notary in New York and get a statement from her?

**MR BEAZLEY:**  Absolutely.

**MR JUSTICE FLAUX:**  Ought not at the very least that should or should not happen is that this application should not be decided today until you have had the opportunity to take those steps?

**MR BEAZLEY:**  Yes.  No doubt the other side would wish … it may take a little time.  We are not in very tight timescale territory.

**MR JUSTICE FLAUX:**  No, but I am just thinking that what one does not want is to have the whole thing, as it were, maundering on with yet more … I suppose there is no reason you would say why it needs to be decided before the end of term?

**MR BEAZLEY:**  Yes, by the end of term.  Then it could be reserved to your Lordship.  A joyous prospect that that no doubt that is ---

**MR JUSTICE FLAUX:**  It seems to me that, if that is what I decide to do, that I ought to reserve it to myself.

**MR BEAZLEY:**  I would say in passing, my Lord, there is no need to allocate a judge at this stage, that is a matter for the court, there is no need to allocate a judge at this stage.

The position on the Spanish warrant, really our point is we have not been given a full run of the correspondence of what actually has happened with regard to the Spanish prosecutor so as to know why this has been treated in this way.  We are very keen to speak to the notary for obvious reasons, as no doubt are the other side, and matters are in hand.  In the nature of things, I imagine the notary will take a little time to respond.  The allegation against the notary made by my friend is a very serious one, and it would not surprise me that New York being what it is, that she thought she might take advice.  All sorts of things could happen, but within a reasonable timeframe, to make the order and then have to come back and say, "The order was made on a false basis because of this, that and the other", we will go on pursuing it come what may, and respectfully suggest that it is better to allow a period of time for it to be properly resolved.

I am conscious of time, and unless your Lordship wants me to say anything further at this stage, those are my submissions.

**MR JUSTICE FLAUX:**  Thank you, Mr Beazley.

**MR FOXTON:**  My Lord, I am conscious (inaudible) on this court about Ecuadorian bananas which require a degree of notoriety at one stage in the past.

33

MR JUSTICE FLAUX:  I know all about Ecuadorian bananas, Mr Foxton.

MR FOXTON:  You made (several inaudible words) for the reasons for an adjournment.  It was an important lesson in attempting to keep the parties on track on the issues.

MR JUSTICE FLAUX:  Having said that, let us say for the sake of argument that the notary comes back with a statement saying that "Mr Michael Cherney did appear in front of me.  Here is a copy of the passport that he produced" and it turns out it is a different passport from the one that Mr Herne has exhibited to his witness statement.  I am not saying that that is what will happen, it is just a possibility that I have to contemplate.  Then I am faced, it seems to me, with Mr Beazley's argument that actually the reality is that Mr Cherney, if he chooses to, is quite happy to leave Israel on occasions and, at the very least it seems to me at that stage I would need a very comprehensive explanation from Mr Cherney himself and not through is lawyers, as to why I should grant him the indulgence of giving evidence by video link when he could actually come.  That, I think, is where we get to as a result of all that.

MR FOXTON:  My Lord, can I just explain the position as we see it.  Plainly if some form of unimpeachable evidence comes forth that shows that Mr Cherney has been to the USA in 2010, as well as having handed Mr Beazley the first hour of his cross-examination, in whatever form it takes place at any trial, I can well see one is in the realms where the court, whether it be by way of considering for the first time or reviewing a video evidence order, one would want to take that into account.  I am not seeking to exclude that possibility.  What is the likely outcome?  There are various possibilities.  What if a New York notary, who is anxious to retain their New York notarisation, if she has not complied with the rules, simply says, "He did come."  Mr Cherney says he did not.  Apparently with Lenid's mother, Lenid the lawyer, are they all to be cross-examined, perhaps by video link, I do not know, before your Lordship, to resolve the question of who is right and who is wrong?

MR JUSTICE FLAUX:  No, I think it goes further than that, because the reality is that what that shows, Mr Beazley would say, that leave aside the video link order, we are in to territory where this particular little incident, if I can put it that way, impacts on the credibility of Mr Cherney generally, because it will be said by Mr Beazley, this is all matter … if he is right, the extent to which your client was prepared to suborn other people into telling untruths to the court in order to secure what he wanted, would have some considerable impact on how, in due course, a trial judge might view his evidence.  So it is not, as it were … I understand your line is, as I indicated myself at the outset, that what the court wants to avoid is unnecessary interlocutory skirmishes and to discourage those so far as possible, but I think we are probably in slightly different territory here.

MR FOXTON:  My Lord, the question I put to your Lordship or the hypothesis, is how does the court resolve that issue?  That is the question which we are going to have to look at and consider, because it may well be where you end up where the court is faced, either no evidence comes forth, or there is a conflict

A
of evidence. For the court to be able to reach a decision that Mr Cherney did go to America and has lied and suborned witnesses, those are conclusions that are not only very severe (inaudible) but as your Lordship points out, would be significant conclusions in the context of the case, it would have to be decided upon evidence following a proper procedure, a fair procedure, for the determination of those questions.

B
The issue is how (inaudible) and what is the process that we are now potentially ---

MR JUSTICE FLAUX:  I could say I suppose at that stage I am simply not satisfied that Mr Cherney is someone who is not prepared to travel.  The difficulty is that you say for example, that a New York notary may simply be prepared to, as it were, sign some statement that says that he was there, but if a Notary Public goes on affidavit and actually says that, it seems to me that is pretty compelling evidence that she is telling the truth.  We are into some fairly serious allegations here.  This lady is going to be approached, presumably by Mr Beazley's instructing solicitors, who are American attorneys by origin and they have a New York office, they are going to go and see her presumably in the next few days, put to her what these allegations are they are very serious from her point of view.  I find it very difficult to conceive that she will, as it were, tell an untruth simply to protect her own reputation.

C

D
MR FOXTON:  My Lord, plainly that is an issue that arises not now but at some later stage.

MR JUSTICE FLAUX:  It may be that is right, but at that point it may be that I have to make a decision one way or the other or it may be that the lady has to be brought to England to give evidence.  It would not be the first time ... or has to give her evidence by video link I suppose.  It would not be the first time the court had to resolve evidential issues at an interlocutory stage.

E

MR FOXTON:  My Lord, it would not, but if nothing else, I hope what these exchanges have revealed is that the central process that this involves is going to ---

F
MR JUSTICE FLAUX:  But the difficulty is that what is said against you is that Polanski proceeded on the basis that, whether it was common ground or not it does not matter, but the court proceeded on the basis that, whatever the court did or did not do, Mr Polanski was going to stay in France, so therefore, he could not have ... his claim would simply have ... whether it would have failed or not, I think there was some suggestion it might have been dealt with on his witness statement as hearsay, but leaving that to one side, effectively his claim would have failed.  You invite me to say, "Unless you, judge, order video link today, my client's claim will fail because he cannot give evidence in England because he cannot come here because he is worried about being arrested."  What is said to that is, "Hang on a moment, actually he has been to New York, at least arguably he has been to New York."  If the court concluded that on the evidence that it was fairly clear he had been to New York, that would have, as I see it, a very serious effect, which is that I do not see how, in

G

H

35

those circumstances, I could say therefore he should be entitled to give his evidence by video link.

MR FOXTON:  My Lord, what I am not in a position to do now is give in advance my submissions on a range of ---

MR JUSTICE FLAUX:  I know, that is what ---

MR FOXTON:  I am equally assuming your Lordship is not giving a decision on it.

MR JUSTICE FLAUX:  What I was going to say, Mr Foxton, is that I think, subject to anything anybody else wants to say, that I am going to adjourn this application, but I am not going to adjourn it as it were, *sine die*, I am going to adjourn it on the basis that it be refixed before me for, at some stage between now and 28 July, which is a Thursday at the end of term (I cannot sit on the Friday) and ---

MR FOXTON:  I have no ---

MR JUSTICE FLAUX:  And in the meantime whatever additional evidence is to be … I suggest the sensible course would be to look to fix it towards the end of that period, so that you have some weeks in which to get whatever additional evidence you require.  But it does seem to me that, first of all, Mr Beazley should have the opportunity to get evidence from the Notary Public in New York.  Secondly, if your client wishes to, he should have the opportunity to give his own explanation of this whole issue about multiple passports which I had not spotted because, to be honest, I had not read all of Christopher Clarke J's judgment, it is rather lengthy, and thirdly, again if your client wants to, he should give a fuller explanation of the precise dealings with the Spanish authorities.  Therefore we will see where we are in four weeks' time.  That still will not be, as it were, leaving the whole issue open until next March; it will be dealing with it now rather than then.

MR FOXTON:  My Lord, we hear what your Lordship says.

MR JUSTICE FLAUX:  In other words, I am not going to make a decision, I am not going to deliver any sort of judgment of any kind.  I think it would be quite wrong to do so, because I have a distinct feeling that I do not have a complete picture.

MR FOXTON:  My Lord, in due course, when that material can be provided, I am confident your Lordship will see that the picture that you have been given is not.

MR JUSTICE FLAUX:  In that case we will see what we see when we see it.

MR FOXTON:  The other matter is this.  The way in which aspects of this have developed ---

36

MR JUSTICE FLAUX: I understand, Mr Foxton. I understand there are all sorts of points that can be taken. Really what I am saying, I think, is that it seems to me ... obviously if this material had come in a week ago, then we could probably have dealt with it whatever the totality of the evidence is, but I am conscious of bits and pieces of things coming in at the last minute.

MR FOXTON: What I am anxious to do is that we do not find ourselves in a similar position when the matter comes back.

MR JUSTICE FLAUX: When the matter comes back, I am going to have to make a decision, right or wrong, as to what the answer is.

MR FOXTON: My Lord, there is one way of avoiding a last minute rush, it might be as well if your Lordship fixes a date and that some directions be given for service of evidence, because plainly we had a late flurry here.

MR JUSTICE FLAUX: What I am going to say is that what I suggest we do is, listing probably will not thank me for this, but this matter be relisted in either the week of 18 July or the week of 25 July. It may have to be listed first thing in the morning on the basis that I am in the middle of something else, but I am happy to sit at 8.30 and my clerk will get you into the building without too much difficulty at 8.30 in the morning, and I am going to say that that further hearing should be fixed, if not today certainly by 4pm tomorrow and that any evidence, how you sort out who serves what does not seem to me capable of agreement between these parties, but that any further evidence that is to be relied upon, is to be served seven days before that hearing at the latest. So everybody knows where they stand. Does that sound all right, Mr Beazley?

MR BEAZLEY: That is very sensible.

MR JUSTICE FLAUX: That, on any view, gives everybody the best part of a month.

MR BEAZLEY: Yes, and we have a proper chance to look at it (inaudible). Thank you.

MR JUSTICE FLAUX: That is what I propose to do about that.

MR FOXTON: My Lord, that hearing, we will deal with the further information much more efficiently at that hearing, because your Lordship mentioned it might be listed early morning, do you have a sense of how long you want us to seek?

MR JUSTICE FLAUX: I would have thought two hours is probably ... I have heard all the argument to date and I am not sure ... what I will indicate is that at least as matters stand I am not over-impressed by the point about the jurisdictional challenge. It is really this point that troubles me, because I think this goes to the heart of the issue as to whether this is somehow to be distinguished from Polanski.

37

A

MR FOXTON:  Your Lordship said that if he received affidavit evidence from a Notary Public, that would be powerful evidence.  Of course, it would not, and it is not expressing any views until you have seen the ---

MR JUSTICE FLAUX:  None whatsoever, because you will make whatever submissions you make about whatever evidence there is.  I cannot anticipate what evidence there will be.

B

MR FOXTON:  I anticipate there will be further evidence from both sides.

MR JUSTICE FLAUX:  I imagine there will be.

MR FOXTON:  My Lord, that brings us then to the question of the further information.

C

MR JUSTICE FLAUX:  I thought there was, at least something in the Commercial Court Guide, that said that requests for further information were to be discouraged?

MR FOXTON:  There is also something about ---

D

MR JUSTICE FLAUX:  I have a distinct sense in this case of the old days of the requests for further and better particulars, and endless fun in front of Staughton J (as he then was) arguing up hill and down dale about 42 separate requests.

MR FOXTON:  My Lord, in fairness I think this is the first occasion in which the court has been troubled by these parties, because we have always been able to agree everything by way of further information before.

E

MR JUSTICE FLAUX:  Fine.  Where are we, Mr Foxton, is it not the case that this is capable of being sorted out?

MR FOXTON:  My Lord, there are two issues in play, first of all, there is the question about what date should be provided for the service of the requests for further information we have served on the defendant, when what we are being given is what I would describe as encouraging words but not a commitment that they hope to be able to produce an interim response by the end of July.  Then we are nearly in a position to serve ours.  Mr Herne is in Israel hoping to finalise those matters, when being sidetracked on ---

F

G

MR JUSTICE FLAUX:  Then there is an issue about whether it should effectively be an exchange of further information.

MR FOXTON:  My Lord, there is.  Just very briefly by way of background on both of those.  Your Lordship has seen it is a case in which, if I can steal a phrase from Mr Stanley, who was one of Mr Deripaska's other leading counsel, the parties in cases are buy-out or buy-on.

H

MR JUSTICE FLAUX:  Say that again.

38

**A**

MR FOXTON:  Buy-out or buy-on.  Mr Cherney's case is he had a partnership with Mr Deripaska.  There were assets that were jointly owned in Rusal and an agreement was reached in London for the acquisition of his shares.

MR JUSTICE FLAUX:  And Mr Deripaska's case is that he was buying off some crooks.

**B**

MR FOXTON:  Exactly.  As part of our case, we have served further information of money which we say went from Mr Cherney entities to entities where Mr Deripaska was able to get hold of it and use it to acquire assets.  Plainly cash flows in that direction would not ordinarily be expected in the context of the relationship between extorter and victim.  My Lord, we served that further information in January of this year.  We received a very long request in response which asked I think about 40 odd requests for further information of the further information.  We have been working on that.  A fairly substantial document has been produced.  Efforts are being taken to finalise that.  But we ourselves have served a further response which your Lordship will find it application bundle 1, tab 11, page 241.  My Lord, it falls into three parts.  The first part looks at those entities that we say paid money and asks what the defendant's understanding at the relevant time was as to who owned them.  Did he understand that the claimant was someone who was an owner of or in control of that paying entity.  Those are questions A and B which ask about his contemporaneous understanding and C asks for his cases now.  My Lord, certainly so far as A and B are concerned, those are not matters that require some extensive forensic investigation involving accountants to answer, but they remain highly material because, for someone who says, "I was a victim paying extortion", what the defendant says his own understanding was as to what payments were being made, we say by entities associated with the claimant, is highly material.

**C**

**D**

**E**

MR JUSTICE FLAUX:  You say if he was receiving money from these entities, there must have been some consideration of who was behind the entities.

MR FOXTON:  Either he has a very good story about how this is still consistent with the extortion theory, in which case ---

**F**

MR JUSTICE FLAUX:  Or it is said this extortion has become so sophisticated by the end of the 1990s, that it involves people, as it were, divvying up the money first and then clawing it back.

MR FOXTON:  And indeed advancing funds.

**G**

MR JUSTICE FLAUX:  Yes.

MR FOXTON:  So there is that issue.  Request number 2 looks at the receiving entities.

**H**

MR JUSTICE FLAUX:  That is the other side of the ---

39

MR FOXTON:  The other side of the coin, and the same questions.  Again, he must know what his own understanding was and indeed, must know whether (several inaudible words) did he own or have access to funds.

MR JUSTICE FLAUX:  What is said, it is not said that you are not entitled to this, what is said is we need until 29 July.

MR FOXTON:  My Lord, because, it is said, Ernst & Young are beavering away … and what is happening very briefly is that the defendant is not addressing perhaps certain of these requests going to his personal understanding, what did he know at the time about the paying entities, what did he know at the time about the receiving entities, what did he know at the time about the payments. I am afraid I can understand forensically his desire to interpose an Ernst & Young analysis between the questions and his answers to that, but those are crucial questions in the case of someone alleging that he is the victim of a criminal conspiracy.  I am afraid that it is appropriate for the court to require the defendant himself to answer those questions and produce, say, within a tight timetable when we are told an interim response based on Ernst & Young work by the end of July, that gives us no confidence at all that that is (inaudible).

Indeed, that is why we seek that request.  So far as exchange is concerned, two obvious points, the first of which is we want the defendant's explanation as far as possible uncontaminated by yet further information from us showing the information we rely upon.  Secondly, to provide a further incentive for this matter to be dealt with promptly rather than what, with respect, has been in a dilatory fashion so far.

My Lord, for those reasons, we invite the court to order responses to be served in relation to those matters seeking the defendant's own understanding by 11 July and our further information be served by way of exchange with that.

MR JUSTICE FLAUX:  Yes.

MR FOXTON:  In a nutshell, that is it.

MR JUSTICE FLAUX:  So you say 11 July for all of it, basically?

MR FOXTON:  I do, my Lord.

MR BEAZLEY:  My Lord, Mr Foxton has always, very charmingly, (several inaudible words) an application.  But the chronology is relevant and significant.

MR JUSTICE FLAUX:  He said the chronology is the other way around.

MR BEAZLEY:  The chronology is the exact opposite.  We are being asked questions about Mr Foxton's case, which he did not plead in the Particulars of Claim or in the first round of further information he supplied, but only pleaded in the

40

answer to our next lot of requests on 11 January 2011. I am sorry, but I am going to show your Lordship what it is. It is a very large document.

**A**

MR JUSTICE FLAUX: Where is it?

MR BEAZLEY: It is bundle 1, tab 18. My Lord, we are trying to get this case on for trial (several inaudible words) want to ask for the time to do so properly.

**B**

MR JUSTICE FLAUX: This is 11 January?

MR BEAZLEY: This is the further information served. It is served as a development of the claimant's own case. So we have asked, "Look, if you say you have put up financing, what is that financing?" That is our first request, for the acquisition of interests in (inaudible) of our interest and full particulars of alleged joint venture investment for (inaudible). There are a lot of excuses as to why it cannot be done (several inaudible words) in the following paragraph and so on, and why Mr Cherney describes literally giving us over $400 million he seems to have no idea about most of it. But at section B on page 167BA and following, one sees the beginning of huge lists of payments between various entities, all through the 1990s. I do not know whether your Lordship has any recollection of Russia in the early 1990s, it was a time of tremendous disruption, collapse of ---

**C**

**D**

MR JUSTICE FLAUX: I do actually, because ---

MR BEAZLEY: (inaudible) Perestroika, there were very sophisticated protection rackets ---

**E**

MR JUSTICE FLAUX: In the early 1990s it was like the wild west, I think it is described.

MR BEAZLEY: My client struggled through all of that and his case is he has been subjected to a very sophisticated, long-standing (inaudible) by organised crime. He now has to dredge back into various payments between companies, many of whom … who can remember 1994? You obviously have to do work with accountants to try and run through the relevant documents. If your Lordship just flicks through and see page after page of payments. The idea that Mr Deripaska could have a clear recollection of a payment on 5 May 1996 of $250,000 is just laughable. But we will do our best in the context of a whole, if we are allowed proper time to do so and with accountants to assist us. You just need to flick through because it runs right the way through hundreds and hundreds of big payments, small payments, little payments and so on, up to 400 million plus. What we need to do and what we are doing, with the assistance of Ernst & Young, is trying to drag the relevant documents together, put them in some sort of schedule and then give what Mr Deripaska can remember (inaudible) and an appropriate answer. I would invite your Lordship not to make an order at all and to allow us to do it with best endeavour that we properly can. I will come to the timing if I may. If you were going to make an order, I would ask you to make it to the end of July. My learned friend has not suggested any possible reason why he should have

**F**

**G**

**H**

41

A   10 July rather than the end of July. The additional 20 odd days simply does not arise at all. We have serious evidence from Mr Gerbe saying Ernst & Young hope to be able to do it by the end of July. Perhaps that will enable us to do at least at least an answer. We will do it if we can.

We are being asked that, and then, although the actual request that you were shown by my friend can perhaps be regarded as relatively innocuous, because of the very shrewd drafting they managed to make it all look as though it is only three pages long, but ---

B   MR JUSTICE FLAUX: It is an extremely odd request for further information. I did not just make the comment I made about what the Commercial Court Guide says, as it were, to elicit a response from both of you by way of excuse, but the point I had in mind is this is not really a request for further information at all; it is actually a request for evidence from your client as to what his understanding was about the matters that he alleges in his own further information, which is not actually a request for further information of your pleaded case.

C   MR BEAZLEY: No, it is request (inaudible) under the current rule you do not have to ask it of ---

D   MR JUSTICE FLAUX: You do not have to ask it, but it is slightly unusual.

MR BEAZLEY: My Lord, we are working away. We are obviously also working ---

MR JUSTICE FLAUX: But it is not said in principle that you will not answer. It is just you need time.

E   MR BEAZLEY: No, but we will not want to be tied to an unrealistic date. As your Lordship said, it could equally well be in a witness statement, but if we can do it, and we are trying to do it, I am not suggesting we are not trying to do it. Witness statements are now to be 4 November. There is no urgency from the claimant's point of view. We will work on it as best we can and I would ask you not to set a date but we will do the best we can, but if you were to do a

F   date, then not before the end of July and even then, my Lord, I cannot promise. We will have to do the best we could. Ernst & Young can produce an interim report perhaps by the end of July. We are talking about a trial in April and witness statements in November. My Lord, what actually happened when we got that further information is that we served the request. This is of their case of 11 January 2011, we served our request, which is longer in form.

G   MR JUSTICE FLAUX: Where is that?

MR BEAZLEY: That is also in that same exhibit, 209, the beginning of that exhibit. We served that on 11 February. This is, in the old sense, nearer to a request for further and better particulars of the claimant's case. It is dated 11 February, which just to note, my Lord, is a month before the request my learned friend says we should answer and how we are being dilatory and we should have exchange. Then our request tries to work out what the purpose is,

42

A   what we think the case is and how they should respond to it and then, as I understand it, going to work to that. It is longer because it is a very long further information we looked at on 11 January. We are trying to find out what their case is and that, in my respectful submission, is much more acceptable and they are not saying we are not entitled, and if they were, they would have said so by now. What they say is they are ready. They said in early June that they were "ready shortly". But, rather peculiarly, they do not want to serve this further information until we serve ours in some sort of
B   schoolboy, "I'm not giving you mind if you don't give me yours", which is not appropriate ---

MR JUSTICE FLAUX:  Not only that but it is said by Mr Foxton it would somehow contaminate your response if you knew what his answer was in relation to these matters which are actually particulars of his own case.

C   MR BEAZLEY:  These should have been pleaded, if we are being technical, why was it not in the Particulars of Claim that were delivered first time around when we would then have had a month or eight weeks or ten weeks, to plead to it in the Defence?

MR JUSTICE FLAUX:  What often happens, as you know, is that somebody in your position is saying, "Until I have an answer to this lot, I should not be required
D   to answer anything he asks, because I still do not know exactly what his case is."

MR BEAZLEY:  That is part of it. You will have seen we put that, and this is request of their case. We are not trying to be obstructive, but we should get this material before we put in our response. It is their case (inaudible) they cannot
E   have exchange and they were asked a month before. The key thing is I would ask your Lordship no exchange, the claimant says it is ready to explain its case, which is about time given how long ago it was pleaded.

MR JUSTICE FLAUX:  It is 20 June now.

MR BEAZLEY:  We ask for 27 June for their response to be served and we have
F   issued an application to that effect. We have said that if you fix a date for us, could it be to the end of July. We would rather we did not have a date at all in the circumstances. We are doing the best we can. We will give it when we can. My Lord, I do not know that I can help you much further on this.

There are various points made which my friend has not elaborated on, how the deficient our disclosure is and so on, I take issue with all of that, but I
G   anticipate you will be bored to tears and would not assist you. Those are my submissions.

MR JUSTICE FLAUX:  Thank you.

MR FOXTON:  My Lord, I have not opened those in opening this point and I do not
H   propose to go through those points in reply.

43

MR JUSTICE FLAUX:  No.

**A**

MR FOXTON:  So far as service of ours is concerned, we can have those served by 11 July.  We have been close to finalising them.  The last week, I am afraid, activity otherwise diverted to those has been diverted elsewhere, plainly we are concerned about it.

**B**

So far as the particulars we have served on the defendant, as I understand it, the court is being told that we will get what the defendant's understanding was and awareness was of these payments at the time, so we are not simply going to get some depersonalised Ernst & Young analysis.  The extent to which the defendant says he remembers or has knowledge of any of these things, that will come.  If that is right, then that certainly meets one of our concerns.  This has to happen in advance of witness statements and well in advance because, if what is said is, "None of these payments are anything to do with the claimant or the defendant" or "they were all part of some other scheme", those are matters the witnesses will need to address in their statements.  I think both sides recognise that explanations for these cash flows, to the extent to which they are established, will be very important evidence when judging the buy-off, (inaudible) buy-out dispute at the time.

**C**

**D**

MR JUSTICE FLAUX:  The further information that was served on 11 January, is that signed by your client?  Has he actually personally signed that?  The version I have in the bundle is not signed, page 167CA.

MR FOXTON:  There is a Russian version of it, which is signed ---

MR JUSTICE FLAUX:  There is a Russian version that is signed, is there, by Mr Cherney?

**E**

MR FOXTON:  Yes.  One of the reasons I have to say that these things do take quite long is it does all have to get translated.

MR JUSTICE FLAUX:  I can imagine, yes.

**F**

MR FOXTON:  My Lord, I am going to ask your Lordships not to order us before 11 July on any view and, please, earlier the better for the defendant's and we invite the court to make it clear that it must engage with the defendant's own understanding of the matters.

MR JUSTICE FLAUX:  I think Mr Beazley understands that.  It is an answer to requests for further information of pleaded case, albeit somebody else's pleaded case, but it is a pleading it is not an expert report or a witness statement.  What I am going to do is I will order that the claimant serve his further information by 11 July, that the defendant serve his further information by 29 July and in each case the further information is to be personally signed by the relevant party.  What that means is that, if there is some further glitch, if I can put it that way, Mr Beazley, on the assumption we are going to be having a hearing in the second half of July ---

**G**

**H**

44

**A**

MR BEAZLEY:  If we need more time ---

MR JUSTICE FLAUX:  If you need more time, you can ask for it at that stage.

MR BEAZLEY:  I have mentioned just in passing at the end of my skeleton various things.  I understood your Lordship to be content with the variation of the timetable.

**B**

MR JUSTICE FLAUX:  I do not think there is any problem with that because it is not going to impact on the trial, is it?

MR BEAZLEY:  No, it will not impact the trial.  We have a point about expert accountants.  Ernst & Young are working, I can imagine my learned friend's solicitors will have accountants.  There may well be a case which we will need to bring back to the court to say, "Look, the court will be greatly assisted with an accountants' report for some of this material presented in an understandable way."

**C**

MR JUSTICE FLAUX:  Just as well this application is not being heard by the new President of the Queen's Bench Division, Mr Beazley, who, when he was a judge of this court would have said, "I am not having any forensic accountancy expert evidence in my court."

**D**

MR BEAZLEY:  My Lord, (inaudible) experience of plan (several inaudible words) need to explain to you the individual payment circularity and so on ---

MR JUSTICE FLAUX:  I would have thought if ever there was a case of crying out for some assistance for forensic accountants, it is probably this one.

**E**

MR BEAZLEY:  We will try to provide that.  We will make a proper application, my Lord.

MR JUSTICE FLAUX:  Again, that is something we can look at in July.

MR BEAZLEY:  I am very much obliged and I am sorry we ran over our time.

**F**

MR JUSTICE FLAUX:  Do not worry, that is absolutely fine.

MR FOXTON:  Will the costs be …

MR JUSTICE FLAUX:  The costs just reserved for the present I think.

**G**

- - - - - -

**H**

# EXHIBIT H

Attendance Note of Meeting with Alexandra Kogan on June 20, 2011

Prepared by Marina Olevsky, Summer Associate at Quinn Emanuel, New York office

On June 20, 2011, I travelled with Mr. Robert Manchak of Nardello & Co. LLC (private investigators) to the Brighton Beach branch of JP Morgan Chase Bank ("Chase") for the purpose of interviewing Ms. Alexandra Kogan, an employee of Chase at this branch. Ms. Kogan had notarized a Parking Space Unit Deed dated May 26, 2010 and an Affidavit of Compliance with Smoke Detector Requirement also dated May 26, 2010, for Mr. Michael Cherney (spelled "Michael Cherny" on the notarized documents).

Mr. Manchak and I entered the main building of Chase, and were instructed by the person at the reception desk to go into a smaller building across the street where Ms. Kogan worked. At the reception desk in the smaller building, we asked to see Ms. Kogan and we were initially told that she was temporarily unavailable. We waited in the lobby and after a short while, Ms. Kogan returned and greeted us in English, which she spoke with a Russian accent. She asked if we were the people who had called earlier that day to speak to her, and when we said that we were not, she immediately told us that she would not speak to anyone, and that we should contact Chase's legal counsel. At this point, a person who I was thereafter told was Ms. Kogan's branch manager, Mr. Bill Bozza, approached us, and he informed us that any requests for information should go through Chase's legal department. He said we should submit any questions in writing and Chase legal counsel would get back to us. At this point, I took Ms. Kogan aside to try and put her at ease, and I told her in Russian that she had no cause for concern, and that we only had a few questions for her. However, Ms. Kogan continued to be agitated, responding only in English, and she ended by saying that she wasn't "speaking to anyone today."

The meeting ended with Mr. Bozza giving us his card, and Mr. Manchak and I then departed. The whole meeting took no more than 3-4 minutes.

Marina Olevsky

# EXHIBIT I

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7140**

WRITER'S INTERNET ADDRESS
**marcgreenwald@quinnemanuel.com**

June 23, 2011

**By E-MAIL and U.S. MAIL**

Alexandra Kogan
Chase Bank, Brighton Beach Branch
NY1-0246, 722 Brighton Beach Avenue,
Brooklyn, New York 11235

Dear Ms. Kogan,

We are writing to you further to my colleagues' brief conversation with you on Monday, June 20, 2011, at your office at the Brighton Beach branch of Chase Bank.

Our firm, Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel"), represents Mr. Oleg Vladimirovich Deripaska ("Mr. Deripaska") in a lawsuit pending in the United Kingdom, styled *Michael Cherney v. Oleg Deripaska.*

An issue has arisen in the above litigation, regarding a set of documents notarized by you for Mr. Michael Cherney. These documents – a Parking Space Unit Deed ("Parking Space Deed") and an Affidavit of Compliance With Smoke Detector Requirements ("Smoke Detector Affidavit") – are attached to this letter in Appendix I.

Your official Seal appears on both documents, along with what we understand to be your signature. Your notarization of these documents in New York State on May 26, 2010, suggests that Mr. Cherney was present before you in New York on that date. The Parking Space Deed, for example, states that, "*On the 26th day of May, 2010, before me, the undersigned, a Notary Public in and for said State, personally appeared MICHAEL CHERNY personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument . . . .*" Your signature and Seal appear below this text,

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
CHICAGO | 500 West Madison Street, Suite 2450, Chicago, Illinois 60661 | TEL 312-705-7400 FAX 312-705-7401
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 (0) 20 7653-2000 FAX +44 (0) 20 7653-2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7 Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 (0) 3 5510-1711 FAX +81 (0) 3 5510-1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49 (0) 621 43298-6000 FAX +49 (0) 621 43298-6100

confirming that Mr. Cherney appeared before you and that you were satisfied that this was the same individual who signed the documents.

Further, your notarization of the Parking Space Deed and Smoke Detector Affidavit suggests Mr. Cherney's presence in the state of New York on May 26, 2010, because his physical presence before you is required by law. (Please see New York Notary Public License Law Section 135, provided in Appendix II.)

However, the sworn evidence of Mr. Cherney and his nephew Leonid Chernoy before the U.K. Court rejects the claim that Mr. Cherney was in New York before you on May 26, 2010. Mr. Cherney's lawyer in the United Kingdom, Andrew Hearn of Dechert, has served a statement on behalf of Messrs. Cherney and Chernoy claiming that, "*[b]oth [Mr. Cherney] and Leonid have told me [Mr. Cherney] did indeed sign the documents . . . but he did not sign them in New York. He signed them in Israel at the request of Leonid. . . Leonid tells me that he then arranged for his mother to deliver the signed documents to the notary. The notary proceeded to notarise the documents after they had been signed and outside the presence of both [Mr. Cherney] and Leonid Chern[o]y.*" (Please see Appendix III.)


In light of the above, we would be grateful if you would provide answers to a few brief questions and provide the confirmations referred to below.

1. Please confirm your qualifications as a Notary Public for the state of New York. Please provide the date when you were commissioned as a notary.

2. Please confirm that it is your signature and Seal that appear on (1) the Parking Space Deed and (2) the Smoke Detector Affidavit.

3. Do you recall notarizing these particular documents (the Deed and the Smoke Detector Affidavit)?

4. If you do recall notarizing these documents, please state precisely what you recall about notarizing them? Do you recall the individual who appeared before you to have the document notarized? In particular, what, if any, documents were produced by the individual to satisfy you of his identity? If you have any record of this notification, please can you provide us with a copy of this document(s).

5. If you do not recall notarizing these documents, what is your usual and required practice for notarizing documents? What type of identification do you require to ascertain that the individual before you is the signatory on the documents you are asked to notarize? Do you, as a matter of practice, maintain records of such identification?

6. Further, if you do not recall notarizing these documents, please can you confirm that you have no reason to believe that you would not have followed your usual required practice in notarizing these two documents?

2

7.  Please also confirm that you understand that you cannot legally notarize a deed without requiring the individual before you to present identification as proof that the person before you is the signatory on the document.

8.  Please confirm that you did not travel to Israel to notarize the Parking Space Deed or Smoke Detector Affidavit shown in Appendix I.

9.  Please confirm your statements to us on Monday, June 20, 2011, that prior to our meeting with you at your office on Monday, June 20, 2011, a representative at your Chase branch received a call on Monday, June 20, 2011, regarding Mr. Cherney and the documents you notarized for him.  If you are able to, please provide the name of the person who called you and what was said on that call.

Thank you in advance for your response to the above questions.  We would be grateful if you could give us this your urgent attention, as this matter is due to be heard before the U.K. Court in mid July.  Should you wish to speak with us directly regarding this matter, please do not hesitate to contact us at (212) 849-7140 or by email at marcgreenwald@quinnemanuel.com.

Sincerely,

Marc L. Greenwald

cc:    Bill Bozza
       Vice President, Branch Manager
       Chase Bank, Brighton Beach Branch
       NY-1-0246, 722 Brighton Beach Avenue,
       Brooklyn, New York 11235

3

# APPENDIX I

## PARKING SPACE UNIT DEED

THIS INDENTURE, made the 26th day of  May,  2010, between MICHAEL CHERNY, residing at 320 Shore Boulevard, Brooklyn, New York 11235 (the "Grantor") and 501B 5K4K LLC, Limited Liability Company, having its principal place of business at 275 Coleridge Street, Brooklyn, New York 11235 (the "Grantee"), party of the second part,

### WITNESSETH:

That the Grantor, in consideration of Ten and 00/100 ($10.00) Dollars and other good and valuable consideration paid by the Grantee, does hereby grant, release and quitclaim unto the Grantee, the heirs or successors and assigns of the Grantee, forever:

The Parking Space Unit (the "Unit") known as Unit No. 202 in the premises known as 501 Surf Avenue, Brooklyn New York, Parking Unit 202, Borough of Brooklyn, County of Kings, City and State of New York, said Parking Space Unit being designated and described as Unit No. 202 in the Declaration. This Parking Space Unit is also designated as Tax Lot 1204 in Block 7279, of Section 21 of the Borough of Brooklyn on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of the Building, certified by Vincent Stramandinoli & Associates, on January 27, 1992, and filed with the Real Property Assessment Department of the City of New York on April 7, 1992, as Condominium Plan No. 407, together with an undivided 0.00665% interest in common elements.

The Land upon which the Building is situated and within which the Parking Space Unit is located is more particularly described as follows:

ALL that certain lot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of West 8th Street with the northerly side of Surf Avenue;

RUNNING THEHCE easterly along the northerly side of Surf Avenue on an arc whose radius is 8060.00 feet and whose chord line lies south of said arc 800.75 feet to the westerly side of West 5th, as widened

THEHCE northerly along the westerly side of West 5th street, as widened, 200.41 feet to an angle therein:

THEHCE still northerly along the westerly side of West 5th street, as widened, 419.45 feet to the land now or formerly of New York Rapid Transit Corporation:

THENCE southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the westerly side of West 5th street, as widened, of 83 degrees 55 minutes 49 seconds, 33.16 feet to an angle therein:

THENCE still southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein, of 171 degrees 07 minutes 49.7 seconds, 256.89 feet to an angle therein:

THENCE still southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein, of 165 degrees 34 minutes 07 seconds, 57.99 feet to an angle therein:

THENCE still southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein of 173 degrees 18 minutes 01 second, 416.83 feet to an angle therein,

1

THENCE southerly forming an interior angle with the preceding course of premises described herein of 116 degrees 31 minutes 07 seconds 35.69 feet;

THENCE northwesterly forming an interior angle with the preceding course of premises described herein of 315 degrees 20 minutes 54 seconds, 33.60 feet to land now or formerly of New York Rapid Transit Corporation;

THENCE southwesterly along said land now or formerly of New York Rapid Transit Corporation, forming an interior angle with the preceding course of premises described herein, of 108 degrees 07 minutes 59 seconds, 198.69 feet to the easterly side of West 8th street;

THENCE southerly along the easterly side of West 8th street forming an interior angle with the preceding course of premises described herein, of 116 degrees 31 minutes 07 seconds, 167.30 feet to the corner, the point or place of BEGINNING.

TOGETHER WITH AND SUBJECT to the terms, conditions, covenants, easements and provisions of the Declaration and of the By-Laws of the Condominium recorded simultaneously with and as part of the Declaration, as the same may be amended or modified in accordance therewith, from time to time by instruments recorded in the Office of the Register of the City of New York, Kings County, which terms, conditions, covenants, reservations and provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit as though such provisions were recited and stipulated at length herein; and

SUBJECT FURTHER to all exceptions to title set forth in the Offering Plan.
TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost for improvement and will apply the same first to the payment of the cost of improvement before using any part of the total same for any other purpose.

The party of the second part, by accepting delivery of this deed hereby accepts and ratifies the provisions of the Declaration and the By-Laws of the Condominium recorded simultaneously with and as part of the Declaration and agrees to comply with all the terms and provisions thereof as the same may be amended from time to time by instruments recorded in the Kings County Office of the New York City Register, and to comply with the rules and regulations of the Condominium.

The use for which the Parking Space Unit is intended is for parking vehicles as approved by the Board of Managers, subject to applicable governmental regulations and the restrictions contained in the Declaration and the By-Laws.

This conveyance is made in the regular course of business actually conducted by the party of the first part.

The word "party" shall be construed as if it means "parties" whenever the sense of this indenture so requires.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

This conveyance is made in the regular course of business actually conducted by the Grantor.

The terms "Grantor" and "Grantee" shall be read as "Grantors" and "Grantees" whenever the sense of the deed so requires.

2

IN WITNESS WHEREOF, the Grantor and the Grantee have duly executed this deed the day and year first above written.

_____
MICHAEL CHERNY

_____
301B 3K4K LLC, BY LEONID CHERNOY

STATE OF NEW YORK  } SS:
COUNTY OF KINGS

On the 26 day of MAY , 2010, before me, the undersigned, a Notary Public in and for said State, personally appeared MICHAEL CHERNY personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to this within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

ALEXANDRA KOGAN
Notary Public, State of New York
Qualified in Kings County
Reg. No. 01KO6132001
My Comm. Expires Aug. 22, 20 13

_____
NOTARY PUBLIC

STATE OF NEW YORK  } SS:
COUNTY OF KINGS

On the 26 day of MAY , 2010, before me, the undersigned, a Notary Public in and for said State, personally appeared LEONID CHERNOY personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to this within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

ALEXANDRA KOGAN
Notary Public, State of New York
Qualified in Kings County
Reg. No. 01KO6132001
My Comm. Expires Aug. 22, 20 13

_____
NOTARY PUBLIC

3

**PARKING UNIT DEED**
501 Surf Avenue, 202 PK
Brooklyn, New York 11224

County of Kings
Block 7279, Lot 1204

RECORD AND RETURN TO:
Anna Latkovskaia, Esq.
3820 Nostrand Avenue, Suite 101
Brooklyn, New York 11235

4

Affidavit of Compliance with Smoke Detector Requirement for One-and Two-Family Dwellings

**AFFIDAVIT OF COMPLIANCE
WITH SMOKE DETECTOR REQUIREMENT
FOR ONE- AND TWO-FAMILY DWELLINGS**

State of New York } SS.:
County of *Kings*

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

| 501 SURF AVENUE | | | 202 |
|---|---|---|---|
| Street Address | | | Unit/Apt. |

| BROOKLYN | New York, | 7279 | 1204 | (the "Premises"); |
|---|---|---|---|---|
| Borough | | Block | Lot | |

That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

| MICHAEL CHERNY | 501B SKUK LLC |
|---|---|
| Name of Grantor (Type or Print) | Name of Grantee (Type or Print) |
| Signature of Grantor | Signature of Grantee |

Sworn to before me                         Sworn to before me
this ___ day of _____ 16 2010          this 26 day of _____ 16 2010
Notary Public, State of New York          Notary Public, State of New York
Qualified in Kings County                 Qualified in Kings County
Reg. No. 01KO6132001                      Reg. No. 01KO6132001
My Commission Expires Aug. 22, 20 13     My Commission Expires Aug. 22, 20 13

SEAL

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**

2010052800078101

5

# APPENDIX II

# Notary Public
# License Law

(June 2011)

New York State
DEPARTMENT OF STATE
**Division of Licensing Services**
www.dos.state.ny.us

**Andrew M. Cuomo**
*Governor*

.**Cesar A. Perales**
*Secretary of State*

18

## Introduction

Notaries public are commissioned by the Secretary of State. An applicant for a notary public commission must submit to the Division of Licensing Services an original application and $60 fee. The application includes an oath of office, which must be sworn and notarized. In addition to the application form and fee, the applicant must submit a "pass slip" showing that s/he has taken and passed the notary public examination. Examinations are regularly scheduled throughout the state. An individual admitted to practice in NYS as an attorney, may be appointed a notary public without an examination. The term of commission is 4 years.

Notaries public are commissioned in their counties of residence. After receiving and approving an applicant for a notary public commission, the Secretary of State forwards the commission, the original oath of office and the signature of the notary public to the appropriate county clerk. The county clerk maintains a record of the commission and signature. The public may then access this record and verify the "official" signature of the notary at the county clerk's office.

Upon request, county clerks will authenticate the signature of the notary on a document and will attest to the notary's authority to sign. This is normally obtained when the documents will be used outside the State. Notaries who expect to sign documents regularly in counties other than that of their residence may elect to file a certificate of official character with other New York State county clerks.

Out-of-State Residents. Attorneys, residing out of State, who are admitted to practice in the State and who maintain a law office within the State are deemed to be residents of the county where the office is maintained. Nonresidents other than attorneys who have offices or places of business in New York State may also become notaries. The oath of office and signature of the notary must be filed in the office of the county clerk of the county in which the office or place of business is located.

## Notary Public License Law

*Section*

|  | Professional conduct |
| --- | --- |
|  | APPOINTMENT AND QUALIFICATIONS EXECUTIVE LAW |
| 130 | Appointment of notaries public |
| 131 | Procedure of appointment; fees and commissions |
| 132 | Certificates of official character of notaries public |
| 133 | Certification of notarial signatures |
| 140 | Executive Law (14) and (15) |
| 3-200 and 3-400 | Election Law |
|  | PUBLIC OFFICERS LAW |
| 3 | Qualifications for holding office, provides that: |
|  | COUNTY LAW |
| 534 | County clerk; appointment of notaries public |
|  | MISCELLANEOUS |
|  | Member of legislature |
|  | Sheriffs |
|  | Notary public—disqualifications |
|  | POWERS AND DUTIES EXECUTIVE LAW |
| 134 | Signature and seal of county clerk |
| 135 | Powers and duties; in general; of notaries public who are attorneys at law |
| 135-a | Notary public or commissioner of deeds; acting without appointment; fraud in office |
| 136 | Notarial fees |
| 137 | Statement as to authority of notaries public |
| 138 | Powers of notaries public or other officers who are stockholders, directors, officers or employees of a corporation |
| 142-a | Validity of facts of notaries public and commissioners of deeds notwithstanding certain defects |
|  | REAL PROPERTY LAW |
| 290 | Definitions; effect of article |
| 298 | Acknowledgments and proofs within the state |
| 302 | Acknowledgments and proofs by married women |
| 303 | Requisites of acknowledgments |
| 304 | Proof by subscribing witness |
| 306 | Certificate of acknowledgment or proof |
| 309-a | Uniform forms of certificates of acknowledgment or proof within this state |
| 309-b | Uniform forms of certificates of acknowledgment or proof without this state |
| 330 | Officers guilty of malfeasance liable for damages |
| 333 | When conveyances of real property not to be recorded |
|  | SPECIAL NOTE |
| 335 | Banking Law |
| 3113 | Rule—Civil Practice Law and Rules |
| 11 | Domestic Relations Law |
| 10 | Public Officers Law |
|  | RESTRICTIONS AND VIOLATIONS JUDICIARY LAW |
| 484 | None but attorneys to practice in the state |
| 485 | Violation of certain preceding sections a misdemeanor |
| 750 | Power of courts to punish for criminal contempts |
|  | Illegal practice of law by notary public |
|  | Wills |
|  | PUBLIC OFFICERS LAW |
| 67 | Fees of public officers |
| 69 | Fee for administering certain official oaths prohibited |
|  | EXECUTIVE LAW |
|  | Misconduct by a notary and removal from office |
|  | PENAL LAW |
| 70.00 | Sentence of imprisonment for felony |
| 70.15 | Sentences of imprisonment for misdemeanors and violation |
| 170.10 | Forgery in the second degree |
| 175.40 | Issuing a false certificate |
| 195.00 | Official misconduct |
|  | Notary must officiate on request |
|  | Perjury |
|  | DEFINITIONS AND GENERAL TERMS |