## Professional Conduct

Use of the office of notary in other than the specific, step-by-step procedure required is viewed as a serious offense by the Secretary of State. The practice of taking acknowledgments and affidavits over the telephone, or otherwise, without the actual, personal appearance of the individual making the acknowledgment or affidavit before the officiating notary, is illegal.

The attention of all notaries public is called to the following judicial declarations concerning such misconduct:

"The court again wishes to express its condemnation of the acts of notaries taking acknowledgments or affidavits without the presence of the party whose acknowledgment is taken for the affiant, and that it will treat serious professional misconduct the act of any notary thus violating his official duty." (*Matter of Napolis*, 169 App. Div. 469, 472.)

"Upon the faith of these acknowledgments rests the title of real property, and the only security to such titles is the fidelity with which notaries and commissioners of deeds perform their duty in requiring the appearance of parties to such instruments before them and always refusing to execute a certificate unless the parties are actually known to them or the identity the parties executing the instruments is satisfactorily proved." (*Matter of Gottheim*, 153 App. Div. 779, 782.)

Equally unacceptable to the Secretary of State is slipshod administration of oaths. The simplest form in which an oath may be lawfully administered is:

"Do you solemnly swear that the contents of this affidavit subscribed by you is correct and true?" (*Bookman v. City of New York*, 200 N.Y. 53, 56.)

Alternatively, the following affirmation may be used for persons who conscientiously decline taking an oath. This affirmation is legally equivalent to an oath and is just as binding:

"Do you solemnly, sincerely and truly declare and affirm that the statements made by you are true and correct?"

Whatever the form adopted, it must be in the presence of an officer authorized to administer it, and it must be an unequivocal and present act by which the affiant consciously takes upon himself the obligation of an oath. (Idem, citing People ex rel. Kenyon v. Sutherland, 81 N.Y. 1; *O'Reilly v. People*, 86 N.Y. 154, 158, 161.)

Unless a lawyer, the notary public may not engage directly or indirectly in the practice of law which are prohibited, and which subject the notary public to removal from office by the Secretary of State, and possible imprisonment, fine or both. A notary:

**1.** May not give advice on the law. The notary may not draw any kind of legal papers, such as wills, deeds, bills of sale, mortgages, chattel mortgages, contracts, leases, offers, options, incorporation papers, releases, mechanics liens, power of attorney, complaints and all legal pleadings, papers in summary proceedings to evict a tenant, or in bankruptcy, affidavits, or any papers which our courts have said are legal documents or papers.

**2.** May not ask for and get legal business to send to a lawyer or lawyers with whom he has any business connection or from whom he receives any money or other consideration for sending the business.

**3.** May not divide or agree to divide his fees with a lawyer, or accept any part of a lawyer's fee on any legal business.

**4.** May not advertise in, or circulate in any manner, any paper or advertisement, or say to anyone that he has any powers or rights not given to the notary by the laws under which the notary was appointed.

*Page 4 / Notary Public License Law*

A notary public is cautioned not to execute an acknowledgment of the execution of a will. Such acknowledgment cannot be deemed equivalent to an attestation clause accompanying a will.

(*See definition of Attestation Clause*)

## Appointment and Qualifications

### Index

| Law | Sec | Subject |
|---|---|---|
| Executive Law | 130 | Appointment of Notaries Public |
| Executive Law | 131 | Procedure of Appointment; Fees |
| Executive Law | 132 | Certificates of Official Character |
| Executive Law | 133 | Certification of Notarial Signatures |
| Executive Law | 140 | Commissioner of Deeds, NYC |
| Election Law | 3-200 | Commissioner of Elections |
| | 3-400 | |
| Public Officers Law | 3 | Qualifications for Holding Office |
| County Law | 534 | County Clerk; Appointment of Notaries |
| NYS Constitution | Art. II Sec. 7 | Member of Legislature |
| NYS Constitution | Art. XIII Sec. 13a | Sheriff |
| Miscellaneous | | Disqualifications |

## Executive Law

### §130. Appointment of notaries public.

The Secretary of State may appoint and commission as many notaries public for the State of New York as in his or her judgment may be deemed best, whose jurisdiction shall be co-extensive with the boundaries of the state. The appointment of a notary public shall be for a term of 4 years. An application for an appointment as notary public shall be in form and set forth such matters as the Secretary of State shall prescribe. Every person appointed as notary public must, at the time of his or her appointment, be a citizen of the United States and either a resident of the State of New York or have an office or place of business in New York State. A notary public who is a resident of the State and who moves out of the state but still maintains a place of business or an office in New York State does not vacate his or her office as a notary public. A notary public who is a nonresident and who ceases to have an office or place of business in this state, vacates his or her office as a notary public. A notary public who is a resident of New York State and moves out of the state and who does not retain an office or place of business in this State shall vacate his or her office as a notary public. A non-resident who accepts the office of notary public in this State thereby appoints the Secretary of State as the person upon whom process can be served on his or her behalf. Before issuing to any applicant a commission as notary public, unless he or she be an attorney and counselor at law duly admitted to practice in this state or a court clerk of the Unified Court System who has been appointed to such position after taking a Civil Service promotional examination in the court clerk series of titles, the Secretary of State shall satisfy himself or herself that the applicant is of good moral character, has the equivalent of a common school education and is familiar with the duties and responsibilities of a notary public; provided, however, that where a notary public applies, before the expiration of his or her term, for reappointment with the county clerk or where a person whose term as notary public shall have expired applies within 6 months thereafter for reappointment as a notary public with the county clerk, such qualifying requirements may be waived by the Secretary of State, and further, where an application for reappointment is filed with the county clerk after the expiration of the

*NYS Department of State Division of Licensing Services*

aforementioned renewal period by a person who failed or was unable to re-apply by reason of his or her induction or enlistment in the armed forces of the United States, such qualifying requirements may also be waived by the Secretary of State, provided such application for reappointment is made within a period of 1 year after the military discharge of the applicant under conditions other than dishonorable. In any case, the appointment or reappointment of any applicant is in the discretion of the Secretary of State. The Secretary of State may suspend or remove from office, for misconduct, any notary public appointed by him or her but no such removal shall be made unless the person who is sought to be removed shall have been served with a copy of the charges against him or her and have an opportunity of being heard. No person shall be appointed as a notary public under this article who has been convicted, in this State or any other state or territory, of a felony or any of the following offenses, to wit:

(a)    illegally using, carrying or possessing a pistol or other dangerous weapon;

(b)    making or possessing burglar's instruments;

(c)    buying or receiving or criminally possessing stolen property;

(d)    unlawful entry of a building;

(e)    aiding escape from prison;

(f)    unlawfully possessing or distributing habit forming narcotic drugs;

(g)    violating §§270, 270-a, 270-b, 270-c, 271, 275, 276, 550, 551, 551-a and subdivisions 6, 8, 10 or 11 of §722 of the former Penal Law as in force and effect immediately prior to September 1, 1967, or violating §§165.25, 165.30, subdivision 1 of §240.30, subdivision 3 of §240.35 of the Penal Law, or violating §§478, 479, 480, 481, 484, 489 and 491 of the Judiciary Law; or

(h)    vagrancy or prostitution, and who has not subsequent to such conviction received an executive pardon therefor or a certificate of good conduct from the parole board to remove the disability under this section because of such conviction. A person regularly admitted to practice as an attorney and counselor in the courts of record of this state, whose office for the practice of law is within the State, may be appointed a notary public and retain his office as such notary public although he resides in or removes to an adjoining state. For the purpose of this and the following sections of this article such person shall be deemed a resident of the county where he maintains such office.

## §131. Procedure of appointment; fees and commissions.

1. Applicants for a notary public commission shall submit to the Secretary of State with their application the oath of office, duly executed before any person authorized to administer an oath, together with their signature.

2. Upon being satisfied of the competency and good character of applicants for appointment as notaries public, the Secretary of State shall issue a commission to such persons; and the official signature of the applicants and the oath of office filed with such applications shall take effect.

3. The Secretary of State shall receive a non-refundable application fee of $60 from applicants for appointment, which fee shall be submitted together with the application. No further fee shall be paid for the issuance of the commission.

4. A notary public identification card indicating the appointee's name, address, county and commission term shall be transmitted to the appointee.

5. The commission, duly dated, and a certified copy or the original of the oath of office and the official signature, and $20 apportioned from the application fee shall be transmitted by the Secretary of State to the county clerk in which the appointee resides by the 10th day of the following month.

6. The county clerk shall make a proper index of commissions and official signatures transmitted to that office by the Secretary of State pursuant to the provisions of this section.

7. Applicants for reappointment of a notary public commission shall submit to the county clerk with their application the oath of office, duly executed before any person authorized to administer an oath, together with their signature.

8. Upon being satisfied of the completeness of the application for reappointment, the county clerk shall issue a commission to such persons; and the official signature of the applicants and the oath of office filed with such applications shall take effect.

9. The county clerk shall receive a non-refundable application fee of $60 from each applicant for reappointment, which fee shall be submitted together with the application. No further fee shall be paid for the issuance of the commission.

10. The commission, duly dated, and a certified or original copy of the application, and $40 apportioned from the application fee plus interest as may be required by statute shall be transmitted by the county clerk to the Secretary of State by the 10th day of the following month.

11. The Secretary of State shall make a proper record of commissions transmitted to that office by the county clerk pursuant to the provisions of this section.

12. Except for changes made in an application for reappointment, the Secretary of State shall receive a non-refundable fee of $10 for changing the name or address of a notary public.

13. The Secretary of State may issue a duplicate identification card to a notary public for one lost, destroyed or damaged upon application therefor on a form prescribed by the Secretary of State and upon payment of a non-refundable fee of $10. Each such duplicate identification card shall have the word "duplicate" stamped across the face thereof, and shall bear the same number as the one it replaces.

## §132. Certificates of official character of notaries public.

The Secretary of State or the county clerk of the county in which the commission of a notary public is filed may certify to the official character of such notary public and any notary public may file his autograph signature and a certificate of official character in the office of any county clerk of any county in the State and in any register's office in any county having a register and thereafter such county clerk may certify as to the official character of such notary public. The Secretary of State shall collect for each certificate of official character issued by him the sum of $10. The county clerk and register of any county with whom a certificate of official character has been filed shall collect for filing the same the sum of $10. For each certificate of official character issued, with seal attached, by any county clerk, the sum of $5 shall be collected by him.

## §133. Certification of notarial signatures.

The county clerk of a county in whose office any notary public has qualified or has filed his autograph signature and a certificate of his official character, shall, when so requested and upon payment of a fee of $3 affix to any certificate of proof or acknowledgment or oath signed by such notary anywhere in the State of New York, a certificate under his hand and seal, stating that a commission or a certificate of his official

character with his autograph signature has been filed in his office, and that he was at the time of taking such proof or acknowledgment or oath duly authorized to take the same; that he is well acquainted with the handwriting of such notary public or has compared the signature on the certificate of proof or acknowledgment or oath with the autograph signature deposited in his office by such notary public and believes that the signature is genuine. An instrument with such certificate of authentication of the county clerk affixed thereto shall be entitled to be read in evidence or to be recorded in any of the counties of this State in respect to which a certificate of a county clerk may be necessary for either purpose.

### §140. Executive Law.

14. No person who has been removed from office as a commissioner of deeds for the City of New York, as hereinbefore provided, shall thereafter be eligible again to be appointed as such commissioner nor, shall he be eligible thereafter to appoint to the office of notary public.

15. Any person who has been removed from office as aforesaid, who shall, after knowledge of such removal, sign or execute any instrument as a commissioner of deeds or notary public shall be deemed guilty of a misdemeanor.

### §§3-200 and 3-400. Election Law.

A commissioner of elections or inspector of elections is eligible for the office of notary public.

### §3. Public Officers Law.

No person is eligible for the office of notary public who has been convicted of a violation of the selective draft act of the U.S. enacted May 18, 1917, or the acts amendatory or supplemental thereto, or of the federal selective training and service act of 1940 or the acts amendatory thereof or supplemental thereto.

### §534. County Law.

Each county clerk shall designate from among the members of his or her staff at least one notary public to be available to notarize documents for the public in each county clerk's office during normal business hours free of charge. Each individual appointed by the county clerk to be a notary public pursuant to this section shall be exempt from the examination fee and application fee required by §131 of the Executive Law.

## Miscellaneous

### Member of legislature.

"If a member of the legislature be *** appointed to any office, civil *** under the government *** the State of New York *** his or her acceptance thereof shall vacate his or her seat in the legislature, providing, however, that a member of the legislature may be appointed *** to any office in which he or she shall receive no compensation." (§7 of Article III of the Constitution of the State of New York.) A member of the legislature may be appointed a notary public in view of transfer of power of such appointment from the governor and senate to the Secretary of State. (1927, Op. Atty. Gen. 97.)

### Sheriffs.

*** Sheriffs shall hold no other office. *** (§13(a) of Article XIII of the Constitution of the State of New York.)

## Notary public—disqualifications.

Though a person may be eligible to hold the office of notary the person may be disqualified to act in certain cases by reason of having an interest in the case. To state the rule broadly: if the notary is a party to or directly and pecuniarily interested in the transaction, the person is not capable of acting in that case. For example, a notary who is a grantee or mortgagee in a conveyance or mortgage is disqualified to take the acknowledgment of the grantor or mortgagor; likewise a notary who is a trustee in a deed of trust; and, of course, a notary who is the grantor could not take his own acknowledgment. A notary beneficially interested in the conveyance by way of being secured thereby is not competent to take the acknowledgment of the instrument. In New York the courts have held an acknowledgment taken by a person financially or beneficially interested in a party to conveyance or instrument of which it is a part to be a nullity; and that the acknowledgment of an assignment of a mortgage before one of the assignees is a nullity; and that an acknowledgment by one of the incorporators of the other incorporators who signed a certificate was of no legal effect.

## Powers and Duties

### Index

| Law | Sec | Subject |
|---|---|---|
| Executive Law | 134 | Signature and Seal of County Clerk |
| Executive Law | 135 | Powers and Duties |
| Executive Law | 135a | Acting Without Appointment, Fraud in Office |
| Executive Law | 136 | Notarial Fees |
| Executive Law | 137 | Statement as to authority |
| Executive Law | 138 | Powers of Notaries - Corporations |
| Executive Law | 142-a | Validity of Acts |
| Real Property Law | 290 | Definitions |
| Real Property Law | 298 | Acknowledgments and Proofs within the State |
| Real Property Law | 302 | Acknowledgments and Proofs By Married Women |
| Real Property Law | 303 | Requisites of Acknowledgments |
| Real Property Law | 304 | Proof by Subscribing Witness |
| Real Property Law | 306 | Certificate of Acknowledgment or Proof |
| Real Property Law | 309 | Acknowledgment by Corporation |
| Real Property Law | 330 | Officers Guilty of Malfeasance |
| Real Property Law | 333 | When Conveyances Not to Be Recorded |
| Banking Law | 335 | Unpaid Rental of Safe Deposit Box |
| Civil Practice Law and Rules | 3113 | Taking of Deposition by Notary |
| Domestic Relation | §11 | No Authority to Solemnize Marriage |
| Public Officers | 10 | Administering Oath of Public Officer |

## Executive Law

### §134. Signature and seal of county clerk.

The signature and seal of a county clerk, upon a certificate of official character of a notary public or the signature of a county clerk upon a certificate of authentication of the signature and acts of a notary public or commissioner of deeds, may be a facsimile, printed, stamped, photographed or engraved thereon.

### §135. Powers and duties; in general; of notaries public who are attorneys at law.

Every notary public duly qualified is hereby authorized and empowered within and throughout the State to administer oaths and affirmations, to

take affidavits and depositions, to receive and certify acknowledgments or proof of deeds, mortgages and powers of attorney and other instruments in writing; to demand acceptance or payment of foreign and inland bills of exchange, promissory notes and obligations in writing, and to protest the same for non-acceptance or non-payment, as the case may require, and, for use in another jurisdiction, to exercise such other powers and duties as by the laws of nations and according to commercial usage, or by the laws of any other government or country may be exercised and performed by notaries public, provided that when exercising such powers he shall set forth the name of such other jurisdiction.

A notary public who is an attorney at law regularly admitted to practice in this State may, in his discretion, administer an oath or affirmation to or take the affidavit or acknowledgment of his client in respect of any matter, claim, action or proceeding.

For any misconduct by a notary public in the performance of any of his powers such notary public shall be liable to the parties injured for all damages sustained by them. A notary public shall not, directly or indirectly, demand or receive for the protest for the non-payment of any note, or for the non-acceptance or non-payment of any bill of exchange, check or draft and giving the requisite notices and certificates of such protest, including his notarial seal, if affixed thereto, any greater fee or reward than 75 cents for such protest, and 10 cents for each notice, not exceeding five, on any bill or note. Every notary public having a seal shall, except as otherwise provided, and when requested, affix his seal to such protest free of expense.

## §135-a. Notary public or commissioner of deeds; acting without appointment; fraud in office.

1. Any person who holds himself out to the public as being entitled to act as a notary public or commissioner of deeds, or who assumes, uses or advertises the title of notary public or commissioner of deeds, or equivalent terms in any language, in such a manner as to convey the impression that he is a notary public or commissioner of deeds without having first been appointed as notary public or commissioner of deeds, or

2. A notary public or commissioner of deeds, who in the exercise of the powers, or in the performance of the duties of such office shall practice any fraud or deceit, the punishment for which is not otherwise provided for by this act, shall be guilty of a misdemeanor.

## §136. Notarial fees.

A notary public shall be entitled to the following fees:

1. For administering an oath or affirmation, and certifying the same when required, except where another fee is specifically prescribed by statute, $2.

2. For taking and certifying the acknowledgment or proof of execution of a written instrument, by one person, $2, and by each additional person, $2, for swearing such witness thereto, $2.

## §137. Statement as to authority of notaries public.

In exercising his powers pursuant to this article, a notary public, in addition to the venue of his act and his signature, shall print, typewrite, or stamp beneath his signature in black ink, his name, the words "Notary Public State of New York," the name of the county in which he originally qualified, and the date upon which his commission expires and, in addition, wherever required, a notary public shall also include the name of any county in which his certificate of official character is filed, using the words "Certificate filed ................... County." A notary public who is duly licensed as an attorney and counselor at law in this State may in his discretion, substitute the words "Attorney and Counselor at Law" for the words "Notary Public." A notary public who has qualified or who has

*NYS Department of State Division of Licensing Services*

filed a certificate of official character in the office of the clerk in a county or counties within the City of New York must also affix to each instrument his official number or numbers in black ink, as given to him by the clerk or clerks of such county or counties at the time such notary qualified in such county or counties and, if the instrument is to be recorded in an office of the register of the City of New York in any county within such city and the notary has been given a number or numbers by such register or his predecessors in any county or counties, when his autographed signature and certificate are filed in such office or offices pursuant to this chapter, he shall also affix such number or numbers. No official act of such notary public shall be held invalid on account of the failure to comply with these provisions. If any notary public shall wilfully fail to comply with any of the provisions of this section, he shall be subject to disciplinary action by the secretary of state. In all the courts within this State the certificate of a notary public, over his signature, shall be received as presumptive evidence of the facts contained in such certificate; provided, that any person interested as a party to a suit may contradict, by other evidence, the certificate of a notary public.

## §138. Powers of notaries public or other officers who are stockholders, directors, officers or employees of a corporation.

A notary public, justice of the supreme court, a judge, clerk, deputy clerk, or special deputy clerk of a court, an official examiner of title, or the mayor or recorder of a city, a justice of the peace, surrogate, special surrogate, special county judge, or commissioner of deeds, who is a stockholder, director, officer or employee of a corporation may take the acknowledgment or proof of any party to a written instrument executed to or by such corporation, or administer an oath of any other stockholder, director, officer, employee or agent of such corporation, and such notary public may protest for non- acceptance or non-payment, bills of exchange, drafts, checks, notes and other negotiable instruments owned or held for collection by such corporation; but none of the officers above named shall take the acknowledgment or proof of a written instrument by or to a corporation of which he is a stockholder, director, officer or employee, if such officer taking such acknowledgment or proof to be a party executing such instrument, either individually or as representative of such corporation, nor shall a notary public protest any negotiable instruments owned or held for collection by such corporation, if such notary public be individually a party to such instrument, or have a financial interest in the subject of same. All such acknowledgments or proofs of deeds, mortgages or other written instruments, relating to real property heretofore taken before any of the officers aforesaid are confirmed. This act shall not affect any action or legal proceeding now pending.

## §142-a. Validity of acts of notaries public and commissioners of deeds notwithstanding certain defects.

1. Except as provided in subdivision three of this section, the official certificates and other acts heretofore or hereafter made or performed of notaries public and commissioners of deeds heretofore or hereafter and prior to the time of their acts appointed or commissioned as such shall not be deemed invalid, impaired or in any manner defective, so far as they may be affected, impaired or questioned by reason of defects described in subdivision two of this section.

2. This section shall apply to the following defects:

  (a)  ineligibility of the notary public or commissioner of deeds to be appointed or commissioned as such;

  (b)  misnomer or misspelling of name or other error made in his appointment or commission;

*Notary Public License Law / Page 7*

24

(c)  omission of the notary public or commissioner of deeds to take or file his official oath or otherwise qualify;

(d)  expiration of his term, commission or appointment;

(e)  vacating of his office by change of his residence, by acceptance of another public office, or by other action on his part;

(f)  the fact that the action was taken outside the jurisdiction where the notary public or commissioner of deeds was authorized to act.

3. No person shall be entitled to assert the effect of this section to overcome a defect described in subdivision two if he knew of the defect or if the defect was apparent on the face of the certificate of the notary public or commissioner of deeds; provided however, that this subdivision shall not apply after the expiration of six months from the date of the act of the notary public or commissioner of deeds.

4. After the expiration of six months from the date of the official certificate or other act of the commissioner of deeds, subdivision one of this section shall be applicable to a defect consisting in omission of the certificate of a commissioner of deeds to state the date on which and the place in which an act was done, or consisting of an error in such statement.

5. This section does not relieve any notary public or commissioner of deeds from criminal liability imposed by reason of his act, or enlarge the actual authority of any such officer, nor limit any other statute or rule of law by reason of which the act of a notary public or commissioner of deeds, or the record thereof, is valid or is deemed valid in any case.

## Real Property Law

### §290. Definitions; effect of article.

***

3. The term "conveyance" includes every written instrument, by which any estate or interest in real property is created, transferred, mortgaged or assigned, or by which the title to any real property may be affected, including an instrument in execution of power, although the power be one of revocation only, and an instrument postponing or subordinating a mortgage lien; except a will, a lease for a term not exceeding three years, an executory contract for the sale or purchase of lands, and an instrument containing a power to convey real property as the agent or attorney for the owner of such property.

***

### §298. Acknowledgments and proofs within the state.

The acknowledgment or proof, within this state, of a conveyance of real property situate in this State may be made:

1. At any place within the state, before

(a)  a justice of the supreme court;

(b)  an official examiner of title;

(c)  an official referee; or

(d)  a notary public.

2. Within the district wherein such officer is authorized to perform official duties, before

(a)  a judge or clerk of any court of record;

(b)  a commissioner of deeds outside of the City of New York, or a commissioner of deeds of the City of New York within the five counties comprising the City of New York;

(c)  the mayor or recorder of a city;

(d)  a surrogate, special surrogate, or special county judge; or

(e)  the county clerk or other recording officer of a county.

3. Before a justice of the peace, town councilman, village police justice or a judge of any court of inferior local jurisdiction, anywhere within the county containing the town, village or city in which he is authorized to perform official duties.

### §302. Acknowledgments and proofs by married women.

The acknowledgment or proof of a conveyance of real property, within the state, or of any other written instrument, may be made by a married woman the same as if unmarried.

### §303. Requisites of acknowledgments.

An acknowledgment must not be taken by any officer unless he knows or has satisfactory evidence, that the person making it is the person described in and who executed such instrument.

### §304. Proof by subscribing witness.

When the execution of a conveyance is proved by a subscribing witness, such witness must state his own place of residence, and if his place of residence is in a city, the street and street number, if any thereof, and that he knew the person described in and who executed the conveyance. The proof must not be taken unless the officer is personally acquainted with such witness, or has satisfactory evidence that he is the same person, who was a subscribing witness to the conveyance.

### §306. Certificate of acknowledgment or proof.

A person taking the acknowledgment or proof of a conveyance must endorse thereupon or attach thereto, a certificate, signed by himself, stating all the matters required to be done, known, or proved on the taking of such acknowledgment or proof; together with the name and substance of the testimony of each witness examined before him, and if a subscribing witness, his place of residence.

***

### §309-a. Uniform forms of certificates of acknowledgment or proof within this state.

1. The certificate of an acknowledgment, within this State, or a conveyance or other instrument in respect to real property situate in this State, by a person, must conform substantially with the following form, the blanks being properly filled:

State of New York    )
                                 ) ss.:
County of . . . . . . .    )

On the . . . . . . day of . . . . . . in the year . . . . . . before me, the undersigned, personally appeared . . . . . ., personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

*(Signature and office of individual taking acknowledgment.)*

2. The certificate for a proof of execution by a subscribing witness, within this state, of a conveyance or other instrument made by any person in respect to real property situate in this state, must conform substantially with the following form, the blanks being properly filled:

State of New York    )
               ) ss.:
County of . . . . . . .   )

On the . . . . . day of . . . . . . in the year . . . . . . before me, the undersigned, personally appeared . . . . . ., the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she/they reside(s) in . . . . . . (if the place of residence is in a city, include the street and street number, if any, thereof; that he/she/they know(s) . . . . . . to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said . . . . . execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto.

*(Signature and office of individual taking proof.)*

3. A certificate of an acknowledgment or proof taken under §300 of this article shall include the additional information required by that section.

4. For the purposes of this section, the term "person" means any corporation, joint stock company, estate, general partnership (including any registered limited liability partnership or foreign limited liability partnership), limited liability company (including a professional service limited liability company), foreign limited liability company (including a foreign professional service limited liability company), joint venture, limited partnership, natural person, attorney in fact, real estate investment trust, business trust or other trust, custodian, nominee or any other individual or entity in its own or any representative capacity.

## § 309-b. Uniform forms of certificates of acknowledgment or proof without this state.

1. The certificate of an acknowledgment, without this State, of a conveyance or other instrument with respect to real property situate in this State, by a person, may conform substantially with the following form, the blanks being properly filled:

State, District of Columbia,  )
Territory, Possession, or    ) ss.:
Foreign Country         )

On the . . . . . . day of . . . . . . in the year . . . . . . before me, the undersigned, personally appeared . . . . . ., personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

*(Signature and office of individual taking acknowledgment.)*

2. The certificate for a proof of execution by a subscribing witness, without this State, of a conveyance or other instrument made by any person in respect to real property situate in this State, may conform substantially with the following form, the blanks being properly filled:

State, District of Columbia,  )
Territory, Possession, or    ) ss.:
Foreign Country         )

On the . . . . . . day of . . . . . . in the year . . . . . . before me, the undersigned, personally appeared . . . . . ., the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she resides in . . . . . . (if the place of residence is in a city, include the street and street number, if any, thereof); that he/she knows . . . . . . to be the individual described in and

who executed the foregoing instrument; that said subscribing witness was present and saw said . . . . . . execute the same; and that said witness at the same time subscribed his/her name as a witness thereto.

*(Signature and office of individual taking proof.)*

3. No provision of this section shall be construed to:

(a) modify the choice of laws afforded by §§299-a and 301-a of this article pursuant to which an acknowledgment or proof may be taken;

(b) modify any requirement of §307 of this article;

(c) modify any requirement for a seal imposed by subdivision one of §308 of this article;

(d) modify any requirement concerning a certificate of authentication imposed by §§308, 311, 312, 314, or 318 of this article; or

(e) modify any requirement imposed by any provision of this article when the certificate of acknowledgment or proof purports to be taken in the manner prescribed by the laws of another state, the District of Columbia, territory, possession, or foreign country.

4. A certificate of an acknowledgment or proof taken under §300 of this article shall include the additional information required by that section.

5. For the purposes of this section, the term "person" means a person as defined in subdivision 4 of §309-a of this article.

6. The inclusion within the body (other than the jurat) of a certificate of acknowledgment or proof made under this section or the city or other political subdivision and the state or country or other place the acknowledgment was taken shall be deemed. A non-substantial variance from the form of a certificate authorized by this section.

## §330. Officers guilty of malfeasance liable for damages.

An officer authorized to take the acknowledgment or proof of a conveyance or other instrument, or to certify such proof or acknowledgment, or to record the same, who is guilty of malfeasance or fraudulent practice in the execution of any duty prescribed by law in relation thereto, is liable in damages to the person injured.

## §333. When conveyances of real property not to be recorded.

\*\*\*

2. A recording officer shall not record or accept for record any conveyance of real property, unless said conveyance in its entirety and the certificate of acknowledgment or proof and the authentication thereof, other than proper names therein which may be in another language provided they are written in English letters or characters, shall be in the English language, or unless such conveyance, certificate of acknowledgment or proof, and the authentication thereof be accompanied by and have attached thereto a translation in the English language duly executed and acknowledged by the person or persons making such conveyance and proved and authenticated, if need be, in the manner required of conveyances for recording in this state, or, unless such conveyance, certificate of acknowledgment or proof, and the authentication thereof be accompanied by and have attached thereto a translation in the English language made by a person duly designated for such purpose by the county judge of the county where it is desired to record such conveyance or a justice of the supreme court and be duly signed, acknowledged and certified under oath or upon affirmation by

26

such person before such judge, to be a true and accurate translation and contain a certification of the designation of such person by such judge.

## Special Note

*By reason of changes in certain provisions of the Real Property Law, any and all limitations on the authority of a notary public to act as such in any part of the State have been removed; a notary public may now, in addition to administering oaths or taking affidavits anywhere in the State, take acknowledgments and proofs of conveyances anywhere in the State. The need for a certificate of authentication of a county clerk as a prerequisite to recording or use in evidence in this State of the instrument acknowledged or proved has been abolished. The certificate of authentication may possibly be required where the instrument is to be recorded or used in evidence outside the jurisdiction of the State.*

### §335. Banking Law

If the rental fee of any safe deposit box is not paid, or after the termination of the lease for such box, and at least 30 days after giving proper notice to the lessee, the lessor (bank) may, in the presence of a notary public, open the safe deposit box, remove and inventory the contents. The notary public shall then file with the lessor a certificate under seal which states the date of the opening of the safe deposit box, the name of the lessee, and a list of the contents. Within 10 days of the opening of the safe deposit box, a copy of this certificate must be mailed to the lessee at his last known postal address.

### Rule 3113. Civil Practice Law and Rules

This rule authorizes a deposition to be taken before a notary public in a civil proceeding.

### §11. Domestic Relations Law

A notary public has no authority to solemnize marriages; nor may a notary public take the acknowledgment of parties and witnesses to a written contract of marriage.

### §10. Public Officers Law

Official oaths, permits the oath of a public officer to be administered by a notary public.

## Restrictions and Violations

### Index

| Law | Sec | Subject |
|---|---|---|
| Judiciary Law | 484 | None but Attorneys to Practice |
| Judiciary Law | 485 | Misdemeanor Violations |
| Judiciary Law | 750 | Powers of Courts to Punish |
| Public Officers Law | 15 | Notary Must Not Act Before Taking/Filing Oath |
| Public Officers Law | 67 | Fees of Public Officers |
| Public Officers Law | 69 | Fees Prohibited for Administering Certain Oaths |
| Executive Law | 135a | Removal From Office for Misconduct |
| Penal Law | 70.00 | Sentence of Imprisonment for Felony |
| Penal Law | 70.15 | Sentences of Imprisonment for Misdemeanors |
| Penal Law | 170.10 | Forgery in the Second Degree |
| Penal Law | 175.40 | Issuing a False Certificate |
| Penal Law | 195.00 | Official Misconduct |

## Judiciary Law

### §484. None but attorneys to practice in the state.

No natural person shall ask or receive, directly or indirectly, compensation for appearing for a person other than himself as attorney in any court or before any magistrate, or for preparing deeds, mortgages, assignments, discharges, leases or any other instruments affecting real estate, wills, codicils, or any other instrument affecting the disposition of property after death, or decedents' estates, or pleadings of any kind in any action brought before any court of record in this state, or make it a business to practice for another as an attorney in any court or before any magistrate unless he has been regularly admitted to practice, as an attorney or counselor, in the courts of record in the state; but nothing in this section shall apply

(1) to officers of societies for the prevention of cruelty, duly appointed, when exercising the special powers conferred upon such corporations under §1403 of the Not-for-Profit Corporation Law; or

(2) to law students who have completed at least 2 semesters of law school or persons who have graduated from a law school, who have taken the examination for admittance to practice law in the courts of record in the state immediately available after graduation from law school, or the examination immediately available after being notified by the board of law examiners that they failed to pass said exam, and who have not been notified by the board of law examiners that they have failed to pass two such examinations, acting under the supervision of a legal aid organization, when such students and persons are acting under a program approved by the appellate division of the supreme court of the department in which the principal office of such organization is located and specifying the extent to which such students and persons may engage in activities prohibited by this statute; or

(3) to persons who have graduated from a law school approved pursuant to the rules of the court of appeals for the admission of attorneys and counselors-at-law and who have taken the examination for admission to practice as an attorney and counselor-at-law immediately available after graduation from law school or the examination immediately available after being notified by the board of law examiners that they failed to pass said exam, and who have not been notified by the board of law examiners that they have failed to pass two such examinations, when such persons are acting under the supervision of the state or a subdivision thereof or of any officer or agency of the state or a subdivision thereof, pursuant to a program approved by the appellate division of the supreme court of the department within which such activities are taking place and specifying the extent to which they may engage in activities otherwise prohibited by this statute and those powers of the supervising governmental entity or officer in connection with which they may engage in such activities.

### §485. Violation of certain preceding sections a misdemeanor.

Any person violating the provisions of §§478, 479, 480, 481, 482, 483 or 484, shall be guilty of a misdemeanor.

### §750. Power of courts to punish for criminal contempts.

*** B. *** the supreme court has power under this section to punish for a criminal contempt any person who unlawfully practices or assumes to practice law; and a proceeding under this subdivision may be instituted on the court's own motion or on the motion of any officer charged with the duty of investigating or prosecuting unlawful practice of law, or by any bar association incorporated under the laws of this State.

## Illegal practice of law by notary public.

To make it a business to practice as an attorney at law, not being a lawyer, is a crime. "Counsel and advice, the drawing of agreements, the organization of corporations and preparing papers connected therewith, the drafting of legal documents of all kinds, including wills, are activities which have been long classed as law practice." (*People v. Alfani,* 227 NY 334, 339.)

## Wills.

The execution of wills under the supervision of a notary public acting in effect as a lawyer, "cannot be too strongly condemned, not only for the reason that it means an invasion of the legal profession, but for the fact that testators thereby run the risk of frustrating their own solemnly declared intentions and rendering worthless naturally considered plans for the disposition of estates whose creation may have been the fruit of lives of industry and self-denial." (*Matter of Flynn,* 142 Misc. 7.)

## Public Officers Law

Notary must act before taking and filing oath of office. The Public Officers Law (§15) provides that a person who executes any of the functions of a public office without having taken and duly filed the required oath of office, as prescribed by law, is guilty of a misdemeanor. A notary public is a public officer.

### §67. Fees of public officers.

1. Each public officer upon whom a duty is expressly imposed by law, must execute the same without fee or reward, except where a fee or other compensation therefor is expressly allowed by law.

2. An officer or other person, to whom a fee or other compensation is allowed by law, for any service, shall not charge or receive a greater fee or reward, for that service, than is so allowed.

3. An officer, or other person, shall not demand or receive any fee or compensation, allowed to him by law for any service, unless the service was actually rendered by him; except that an officer may demand in advance his fee, where he is, by law, expressly directed or permitted to require payment thereof, before rendering the service.

4. *** An officer or other person, who violates either of the provisions contained in this section, is liable, in addition to the punishment prescribed by law for the criminal offense, to an action in behalf of the person aggrieved, in which the plaintiff is entitled to treble damages.

A notary public subjects himself to criminal prosecution, civil suit and possible removal from office by asking or receiving more than the statutory allowance, for administering the ordinary oath in connect with an affidavit. (Op. Atty. Gen. (1917) 12 St. Dept. Rep. 507.)

### §69. Fee for administering certain official oaths prohibited.

An officer is not entitled to a fee, for administering the oath of office to a member of the legislature, to any military officer, to an inspector of election, clerk of the poll, or to any other public officer or public employee.

## Executive Law

### Misconduct by a notary and removal from office.

A notary public who, in the performance of the duties of such office shall practice any fraud or deceit, is guilty of a misdemeanor (Executive Law, §135-a), and may be removed from office. The notary may be removed

from office if the notary made a misstatement of a material fact in his application for appointment; for preparing and taking an oath of an affiant to a statement that the notary knew to be false or fraudulent.

## Penal Law

### §70.00 Sentence of imprisonment for felony.

***

2. Maximum term of sentence. The maximum term of an indeterminate sentence shall be at least three years and the term shall be fixed as follows:

***

(d)     For a class D felony, the term shall be fixed by the court, and shall not exceed 7 years; and

(e)     For a class E felony, the term shall be fixed by the court, and shall not exceed 4 years.

***

### §70.15 Sentences of imprisonment for misdemeanors and violation.

1. Class A misdemeanor. A sentence of imprisonment for a class A misdemeanor shall be a definite sentence. When such a sentence is imposed the term shall be fixed by the court, and shall not exceed one year; ***

### §170.10 Forgery in the second degree.

A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:

1. A deed, will, codicil, contract, assignment, commercial instrument, or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; or

2. A public record, or an instrument filed or required or authorized by law to be filed in or with a public office or public servant; or

3. A written instrument officially issued or created by a public office, public servant or governmental instrumentality.

***

Forgery in the second degree is a class D felony.

### §175.40 Issuing a false certificate.

A person is guilty of issuing a false certificate, when, being a public servant authorized by law to make or issue official certificates or other official written instruments, and with intent to defraud, deceive or injure another person, he issues such an instrument, or makes the same with intent that it be issued, knowing that it contains a false statement or false information.

Issuing a false certificate is a class E felony.

### §195.00 Official misconduct.

A public servant is guilty of official misconduct when, with intent to obtain a benefit or to injure or deprive another person of a benefit:

1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized; or

2. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

Official misconduct is a class A misdemeanor.

## Notary must officiate on request.

The Penal Law (§195.00) provides that an officer before whom an oath or affidavit may be taken is bound to administer the same when requested, and a refusal to do so is a misdemeanor. (*People v. Brooks*, 1 Den. 457.)

## Perjury.

One is guilty of perjury if he has stated or given testimony on a material matter, under oath or by affirmation, as to the truth thereof, when he knew the statement or testimony to be false and wilfully made.

# Definitions and General Terms

## Acknowledgment

A formal declaration before a duly authorized officer by a person who has executed an instrument that such execution is his act and deed.

Technically, an "acknowledgment" is the declaration of a person described in and who has executed a written instrument, that he executed the same. As commonly used, the term means the certificate of an officer, duly empowered to take an acknowledgment or proof of the conveyance of real property, that on a specified date "before me came ~~~~~~~~~, to me known to be the individual described in and who executed the foregoing instrument and acknowledged that he executed the same." The purposes of the law respecting acknowledgments are not only to promote the security of land titles and to prevent frauds in conveyancing, but to furnish proof of the due execution of conveyances (*Armstrong* v. *Combs*, 15 App. Div. 246) so as to permit the document to be given in evidence, without further proof of its execution, and make it a recordable instrument.

The Real Property Law prescribes:

"§303. Requisites of acknowledgments. An acknowledgment must not be taken by any officer unless he knows or has satisfactory evidence, that the person making it is the person described in and who executed such instrument."

The thing to be known is the identity of the person making the acknowledgment with the person described in the instrument and the person who executed the same. This knowledge must be possessed by the notary (*Gross v. Rowley*, 147 App. Div. 529), and a notary must not take an acknowledgment unless the notary knows or has proof that the person making it is the person described in and who executed the instrument (*People v. Kempner*, 49 App. Div. 121). It is not essential that the person who executed the instrument sign his name in the presence of the notary.

Taking acknowledgments over the telephone is illegal and a notary public is guilty of a misdemeanor in so acting. In the certificate of acknowledgment a notary public declares: "On this ...... day of ........., 20 ......., before me came ............ to me known," etc. Unless the person purporting to have made the acknowledgment actually and personally appeared before the notary on the day specified, the notary's certificate that he so came is palpably false and fraudulent. (*Matter of Brooklyn Bar Assoc.*, 225 App. Div. 680.)

Interest as a disqualification. A notary public should not take an acknowledgment to a legal instrument to which the notary is a party in interest. (*Armstrong* v. *Combs*, 15 App. Div. 246.)

Fraudulent certificates of acknowledgment. A notary public who knowingly makes a false certificate that a deed or other written instrument was acknowledged by a party thereto is guilty of forgery in the second degree, which is punishable by imprisonment for a term of not exceeding 7 years (Penal Law, §§170.10 and 70.00[2(d)]). The essence of the crime is

*Page 12 / Notary Public License Law*

false certification, intention to defraud. (*People v. Abeel*, 182 NY 415.) While the absence of guilty knowledge or criminal intent would absolve the notary from criminal liability, the conveyance, of which the false certification is an essential part, is a forgery and, therefore, invalid. (*Caccioppoli v. Lemmo*, 152 App. Div. 650.)

Damages recoverable from notary for false certificate. Action for damages sustained where notary certified that mortgagor had appeared and acknowledged a mortgage. (*Kainz v. Goldsmith*, 231 App. Div. 171.)

## Administrator

A person appointed by the court to manage the estate of a deceased person who left no will.

## Affiant

The person who makes and subscribes his signature to an affidavit.

## Affidavit

An affidavit is a signed statement, duly sworn to, by the maker thereof, before a notary public or other officer authorized to administer oaths. The venue, or county wherein the affidavit was sworn to should be accurately stated. But it is of far more importance that the affiant, the person making the affidavit, should have personally appeared before the notary and have made oath to the statements contained in the affidavit as required by law. Under the Penal Law (§210.00) the wilful making of a false affidavit is perjury, but to sustain an indictment therefor, there must have been, in some form, in the presence of an officer authorized to administer an oath, an unequivocal and present act by which the affiant consciously took upon himself the obligation of an oath; his silent delivery of a signed affidavit to the notary for his certificate, is not enough. (*People v. O'Reilly*, 86 NY 154; *People ex rel. Greene v. Swasey*, 122 Misc. 388; *People v. Levitas* (1963) 40 Misc. 2d 331.) A notary public will be removed from office for preparing and taking the oath of an affiant to a statement that the notary knew to be false. (*Matter of Senft*, August 8, 1929; *Matter of Trosta*, February 20, 1930; *Matter of Kibbe*, December 24, 1931.)

The distinction between the taking of an acknowledgment and an affidavit must be clearly understood. In the case of an acknowledgment, the notary public certifies as to the identity and execution of a document; the affidavit involves the administration of an oath to the affiant. There are certain acknowledgment forms which are a combination of an acknowledgment and affidavit. It is incumbent on the notary public to scrutinize each document presented to him and to ascertain the exact nature of the notary's duty with relation thereto. An affidavit differs from a deposition in that an affidavit is an ex parte statement. (*See definition of Deposition*.)

## Affirmation

A solemn declaration made by persons who conscientiously decline taking an oath; it is equivalent to an oath and is just as binding; if a person has religious or conscientious scruples against taking an oath, the notary public should have the person affirm. The following is a form of affirmation: "Do you solemnly, sincerely, and truly, declare and affirm that the statements made by you are true and correct."

## Apostile

Department of State authentication attached to a notarized and county-certified document for possible international use.

**Attest**

To witness the execution of a written instrument, at the request of the person who makes it, and subscribe the same as a witness.

**Attestation Clause**

That clause (e.g., at the end of a will) wherein the witnesses certify that the instrument has been executed before them, and the manner of the execution of the same.

**Authentication (Notarial)**

A certificate subjoined by a county clerk to any certificate of proof or acknowledgment or oath signed by a notary; this county clerk's certificate authenticates or verifies the authority of the notary public to act as such. (See §133, Executive Law.)

**Bill of Sale**

A written instrument given to pass title of personal property from vendor to vendee.

**Certified Copy**

A copy of a public record signed and certified as a true copy by the public official having custody of the original. A notary public has no authority to issue certified copies. Notaries must not certify to the authenticity of legal documents and other papers required to be filed with foreign consular officers. Within this prohibition are certificates of the following type:

United States of America  )
State of New York          ) ss.:
County of New York         )

"I ..............., a notary public of the State of New York, in and for the county of .........., duly commissioned, qualified and sworn according to the laws of the State of New York, do hereby certify and declare that I verily believe the annexed instrument executed by ....... and sworn to before .........., a notary public of the State of .........., to be genuine in every respect, and that full faith and credit are and ought to be given thereto.

"In testimony whereof I have hereunto set my hand and seal at the City of ..............., this ............... day of ..............., 20 .........

(Seal)                              (Notarial Signature.)"

**Chattel**

Personal property, such as household goods or fixtures.

**Chattel Paper**

A writing or writings which evidence both an obligation to pay money and a security interest in a lease or specific goods. The agreement which creates or provides for the security interest is known as a security agreement.

**Codicil**

An instrument made subsequent to a will and modifying it in some respects.

**Consideration**

Anything of value given to induce entering into a contract; it may be money, personal services, or even love and affection.

**Contempt of Court**

Behavior disrespectful of the authority of a court which disrupts the execution of court orders.

**Contract**

An agreement between competent parties to do or not to do certain things for a legal consideration, whereby each party acquires a right to what the other possesses.

**Conveyance (Deed)**

Every instrument, in writing, except a will, by which any estate or interest in real property is created, transferred, assigned or surrendered.

**County Clerk's Certificate**

See "Authentication (Notarial)."

**Deponent**

One who makes oath to a written statement. Technically, a person subscribing a deposition but used interchangeably with "Affiant."

**Deposition**

The testimony of a witness taken out of court or other bearing proceeding, under oath or by affirmation, before a notary public or other person, officer or commissioner before whom such testimony is authorized by law to be taken, which is intended to be used at the trial or hearing.

**Duress**

Unlawful constraint exercised upon a person whereby he is forced to do some act against his will.

**Escrow**

The placing of an instrument in the hands of a person as a depository who on the happening of a designated event, is to deliver the instrument to a third person. This agreement, once established, should be unalterable.

**Executor**

One named in a will to carry out the provisions of the will.

**Ex Parte (From One Side Only)**

A hearing or examination in the presence of, or on papers filed by, one party and in the absence of the other.

**Felony**

A crime punishable by death or imprisonment in a state prison.

**Guardian**

A person in charge of a minor's person or property.

**Judgment**

Decree of a court declaring that one individual is indebted to another and fixing the amount of such indebtedness.

**Jurat**

A jurat is that part of an affidavit where the officer (notary public) certifies that it was sworn to before him. It is not the affidavit.

The following is the form of jurat generally employed:

"Sworn to before me this ....... day of ........., 20 ......"

Those words placed directly after the signature in the affidavit stating that the facts therein contained were sworn to or affirmed before the officer (notary public) together with his official signature and such other data as required by § 137 of the Executive Law.

## Laches

The delay or negligence in asserting one's legal rights.

## Lease

A contract whereby, for a consideration, usually termed rent, one who is entitled to the possession of real property transfers such right to another for life, for a term of years or at will.

## Lien

A legal right or claim upon a specific property which attaches to the property until a debt is satisfied.

## Litigation

The act of carrying on a lawsuit.

## Misdemeanor

Any crime other than a felony.

## Mortgage On Real Property

An instrument in writing, duly executed and delivered that creates a lien upon real estate as security for the payment of a specified debt, which is usually in the form of a bond.

## Notary Public

A public officer who executes acknowledgments of deeds or writings in order to render them available as evidence of the facts therein contained; administers oaths and affirmation as to the truth of statements contained in papers or documents requiring the administration of an oath. The notary's general authority is defined in §135 of the Executive Law; the notary has certain other powers which can be found in the various provisions of law set forth earlier in this publication.

## Oath

A verbal pledge given by the person taking it that his statements are made under an immediate sense of this responsibility to God, who will punish the affiant if the statements are false.

Notaries public must administer oaths and affirmations in manner and form as prescribed by the Civil Practice Law and Rules, namely:

§2309(b) Form. An oath or affirmation shall be administered in a form calculated to awaken the conscience and impress the mind of the person taking it in accordance with his religious or ethical beliefs.

An oath must be administered as required by law. The person taking the oath must personally appear before the notary; an oath cannot be administered over the telephone (*Matter of Napolis*, 169 App. Div. 469), and the oath must be administered in the form required by the statute (*Bookman v. City of New York*, 200 NY 53, 56).

When an oath is administered the person taking the oath must express assent to the oath repeated by the notary by the words "I do" or some other words of like meaning.

For an oath or affirmation to be valid, whatever form is adopted, it is necessary that: first, the person swearing or affirming must personally be in the presence of the notary public; secondly, that the person unequivocally swears or affirms that what he states is true; thirdly, that he swears or affirms as of that time; and, lastly, that the person conscientiously takes upon himself the obligation of an oath.

A notary public does not fulfill his duty by merely asking a person whether the signature on a purported affidavit is his. An oath must be administered.

A corporation or a partnership cannot take an oath; an oath must be taken by an individual.

A notary public cannot administer an oath to himself.

The privileges and rights of a notary public are personal and cannot be delegated to anyone.

## Plaintiff

A person who starts a suit or brings an action against another.

## Power of Attorney

A written statement by an individual giving another person the power to act for him.

## Proof

The formal declaration made by a subscribing witness to the execution of an instrument setting forth his place of residence, that he knew the person described in and who executed the instrument and that he saw such person execute such instrument.

## Protest

A formal statement in writing by a notary public, under seal, that a certain bill of exchange or promissory note was on a certain day presented for payment, or acceptance, and that such payment or acceptance was refused.

## Seal

The laws of the State of New York do not require the use of seals by notaries public. If a seal is used, it should sufficiently identify the notary public, his authority and jurisdiction. It is the opinion of the Department of State that the only inscription required is the name of the notary and the words "Notary Public for the State of New York."

## Signature of Notary Public

A notary public must sign the name under which he was appointed and no other. In addition to his signature and venue, the notary public shall print, typewrite or stamp beneath his signature in black ink, his name, the words "Notary Public State of New York," the name of the county in which he is qualified, and the date upon which his commission expires (§137, Executive Law).

When a woman notary marries during the term of office for which she was appointed, she may continue to use her maiden name as notary public. However, if she elects to use her marriage name, then for the balance of her term as a notary public she must continue to use her maiden name in her signature and seal when acting in her notarial capacity, adding after her signature her married name, in parentheses. When renewing her commission as a notary public, she may apply under her married name or

her maiden name. She must then perform all her notarial functions under the name selected.

A member of a religious order, known therein by a name other than his secular cognomen, may be appointed and may officiate as a notary public under the name by which he is known in religious circles. (Op. Atty. Gen., Mar. 20, 1930.)

### Statute

A law established by an act of the Legislature.

### Statute of Frauds

State law which provides that certain contracts must be in writing or partially complied with, in order to be enforceable at law.

### Statute of Limitations

A law that limits the time within which a criminal prosecution or a civil action must be started.

### Subordination Clause

A clause which permits the placing of a mortgage at a later date which takes priority over an existing mortgage.

### Sunday

A notary public may administer an oath or take an affidavit or acknowledgment on Sunday. However, a deposition cannot be taken on Sunday in a civil proceeding.

### Swear

This term includes every mode authorized by law for administering an oath.

### Taking an Acknowledgment

The act of the person named in an instrument telling the notary public that he is the person named in the instrument and acknowledging that he executed such instrument; also includes the act of the notary public in obtaining satisfactory evidence of the identity of the person whose acknowledgment is taken.

The notary public "certifies to the taking of the acknowledgment" when the notary signs his official signature to the form setting forth the fact of the taking of the acknowledgment.

### Venue

The geographical place where a notary public takes an affidavit or acknowledgment. Every affidavit or certificate of acknowledgment should show on its face the venue of the notarial act. The venue is usually set forth at the beginning of the instrument or at the top of the notary's jurat, or official certification, as follows: "State of New York, County of (New York) ss..". Section 137 of the Executive Law imposes the duty on the notary public to include the venue of his act in all certificates of acknowledgments or jurats to affidavits.

### Will

The disposition of one's property to take effect after death.

## Schedule of Fees

| | |
|---|---|
| Appointment as Notary Public – . | |
| Total Commission Fee | $60.00 |
| ($40 appointment and $20 filing of Oath of Office) | |
| Change of Name/Address | 10.00 |
| Duplicate Identification Card | 10.00 |
| Issuance of Certificate of Official Character | 5.00 |
| Filing Certificate of Official Character | 10.00 |
| Authentication Certificate | 3.00 |
| Protest of Note, Commercial Paper, etc. | .75 |
| Each additional Notice of Protest (limit 5) each | .10 |
| Oath or Affirmation | 2.00 |
| Acknowledgment (each person) | 2.00 |
| Proof of Execution (each person) | 2.00 |
| Swearing Witness | 2.00 |

### Note

*Where gender pronouns appear in this booklet, they are meant to refer to both male and female persons.*

# APPENDIX III

|     |              |
| --- | ------------ |
| 1.  | Claimant     |
| 2.  | A.E.T. Hearn |
| 3.  | Seventh      |
| 4.  | "AETH 7"     |
| 5.  | June 2011    |

**IN THE HIGH COURT OF JUSTICE**                    **2006 FOLIO 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N :**

## MICHAEL CHERNEY

**Claimant**

v.

## OLEG DERIPASKA

**Defendant**

---

**SEVENTH WITNESS STATEMENT OF
ANDREW ELLIOT TRACEY HEARN**

---

I, **ANDREW ELLIOT TRACEY HEARN**, Solicitor Advocate (Higher Courts – Civil) of 160

Queen Victoria Street, London EC4V 4QQ say as follows:

1.      I am a partner in the London Office of Dechert LLP, the Claimant's solicitors. I have the

        care and conduct of this action on behalf of the Claimant, Mr. Michael Cherney.

2.      I am authorised to make this witness statement on behalf of the Claimant and do so from

        facts within my own knowledge or derived from my firm's files and records, save where

        otherwise indicated. The matters to which I refer as being within my own knowledge are

true, and those in respect of which I rely on information that is not within my own knowledge are true to the best of my knowledge and belief. As necessary, I describe the sources of such information in the course of this witness statement.

3.    I make this statement in response to paragraphs 6-18 of the first witness statement of Susan Prevezer QC dated 17 June 2011 ("Ms Prevezer's statement") which was sent to my firm by email at 7. 10pm on that date.

4.    The thrust of Ms Prevezer's statement is that, contrary to the evidence provided by the Claimant, he has in fact left Israel on at least one occasion since May 2009; that the document that she exhibits demonstrates, as she would have it, that the Claimant visited the USA on at least one occasion since May 2009; and that this undermines his evidence that he has not left Israel for fear of arrest under the extant arrest warrants. With respect to Ms Prevezer, and based on the instructions which I have received and describe below, her assumptions are simply incorrect and are in fact belied by a document Ms Prevezer's firm has had for some months but which she has chosen to ignore, namely a copy of the Claimant's passport. This was disclosed to the Defendant some time ago (again contrary to the remarks made in the Defendant's skeleton argument at paragraph 14.6 (2)) and an up to date copy of it is now produced as "AETH 7".

5.    As "AETH 7" shows, there is no evidence of the Claimant having travelled to the USA or anywhere else outside Israel since 23 May 2009. Nevertheless, I have sought urgent instructions from both the Claimant and from his nephew, Leonid Chernoy ("Leonid"), on the matters raised in Ms Prevezer's statement (which has been summarised for the Claimant in Russian by Mr Traspov, his Israeli lawyer; Mr Traspov has then relayed to

me the Claimant's instructions). What follows below reflects what I have been told respectively by the Claimant and by Leonid.

6.    The Claimant repeats that he has not left Israel since 23 May 2009 when he returned from a trip to London (as previously described). Contrary to Ms Prevezer's assumption, he did not travel to the USA at any time after May 2009. Indeed he would have needed (but after 23 May 2009 he neither sought nor obtained) a visa to do so. The Claimant's passport of course supports this and was produced to the Defendant some time ago. The Claimant also confirms that he has not had any other passport since May 2009.

7.    Both the Claimant and Leonid have told me the Claimant did indeed sign the documents referred to in Ms Prevezer's statement but he did not sign them in New York. He signed them in Israel at the request of Leonid who explained their general nature and purpose to the Claimant but who did not read the documents to the Claimant (who of course does not read or speak English). The purpose of the documents was to formalise legally a transaction which had been implemented more than 15 years before in the nature of an intra-family transfer of interests in two apartments in which the Claimants held an interest. It had emerged that the parking space for one of the apartments was a separately registered plot of land and that therefore it had not been made the subject of a legally effective transfer when the apartments were transferred.

8.    Leonid and the Claimant have also told me that Leonid visited the Claimant in Israel (Leonid also lives in Israel) to ask the Claimant to sign the documents exhibited by Ms Prevezer in pages 1-5 SRP1. Leonid did not discuss with the Claimant whether and how the documents needed to be witnessed or notarised (and the Claimant in any event had no knowledge of what rules attach to the witnessing or notarisation of signatures in the

USA). Leonid recollects that when the Claimant was asked to sign the documents, Leonid had in fact already signed them himself and that the manuscript within the notarisation sections remained blank. Leonid also confirms that the Claimant was perfectly happy to sign the documents, and did so, since they merely reflected arrangements which had been entered into over 15 years before.

9.      Leonid tells me that he then arranged for his mother to deliver the signed documents to the notary. The notary proceeded to notarise the documents after they had been signed and outside the presence of both the Claimant and Leonid Cherney.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ...............................................................

**Andrew Elliot Tracey Hearn**

Date: ...............................................................

| | |
|---|---|
| 1. | Claimant |
| 2. | A.E.T. Hearn |
| 3. | Seventh |
| 4. | Exhibit "AETH 7" |
| 5. | June 2011 |

**IN THE HIGH COURT OF JUSTICE**                    **2006 FOLIO 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

## MICHAEL CHERNEY

**Claimant**

v.

## OLEG DERIPASKA

**Defendant**

---

### SEVENTH WITNESS STATEMENT OF
### ANDREW ELLIOT TRACEY HEARN

---

**Dechert LLP**
**160 Queen Victoria Street**
**London**
**EC4V 4QQ**

**Tel:020 7184 7000**
**Fax:020 7184 7001**
**Ref:L94/388368**
**Solicitors for the Claimant**

1.  Claimant
2.  A.E.T. Hearn
3.  Seventh
4.  Exhibit "AETH 7"
5.  June 2011

**IN THE HIGH COURT OF JUSTICE**                    **2006 FOLIO 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

## MICHAEL CHERNEY

**Claimant**

v.

## OLEG DERIPASKA

**Defendant**

---

## EXHIBIT "AETH7"

---

This is the exhibit marked "AETH7" referred to in the seventh witness statement of Andrew Elliot Tracey Hearn.


Signed: ………………………………………………………..
        **Andrew Elliot Tracey Hearn**

Date: …………………………………………………….…

1. M Cherney
2. Claimant
3. Fourth
4. 18 June 2011

**IN THE HIGH COURT OF JUSTICE**                    **Claim No. 2006 Folio 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E EN:**

**MICHAEL CHERNEY**

**Claimant**

- and -

**OLEG DERIPASKA**

**Defendant**

---

**FOURTH WITNESS STATEMENT OF
MICHAEL CHERNEY**

---

I, **MICHAEL CHERNEY**, of Hagiva 52, Savyon, Israel will say as follows:

1    I am the Claimant in the above proceedings and make this fourth witness statement from facts and matters within my own knowledge, save where otherwise indicated.

2    Once again, I have provided my evidence via an interpreter (due to the shortness of time Mr Traspov from Dr. J. Weinroth & Co, my Israeli lawyers, playing that role) to my English lawyers who then prepared this witness statement in English.   This witness statement was then translated into Russian for me to approve and sign.

3    I confirm that the following documents have been read to me in Russian by my Israeli lawyer Evgeny Traspov:

1

a.  Paragraphs 6-14 inclusive of the witness statement of Ms Prevezer and the documents signed by me that she exhibits on pages 1-5 of exhibit SRP1; and

b.  An approved draft of the seventh witness statement of Andrew Elliot Tracey Hearn.

4     I confirm that, so far as the facts and matters set out in Mr Hearn's seventh witness statement are within my own knowledge, they are true to the best of my knowledge and belief.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ...............................................................................

**Michael Cherney**

Date:     18 June 2011...............................................................................

2

1. M Cherney
2. Claimant
3. Fourth
4. 18 June 2011

<u>Claim No. 2006 Folio 1218</u>

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

**B E T W E E N:**

**MICHAEL CHERNEY**

<u>Claimant</u>

- and -

**OLEG DERIPASKA**

<u>Defendant</u>

---

**FOURTH WITNESS STATEMENT
OF MICHAEL CHERNEY**

---

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Tel:   020 7184 7000
Fax:   020 7184 7001
Ref:   L94/388368
<u>Solicitors for the Claimant</u>

# EXHIBIT J

| | |
|---|---|
| **From:** | Spiritis, Jenni B [jenni.b.spiritis@jpmchase.com] |
| **Sent:** | Monday, June 27, 2011 8:51 AM |
| **To:** | Marc Greenwald |
| **Cc:** | Marina Olevsky; Peter Calamari; Judd Spray; Gottlieb, Manuel |
| **Subject:** | RE: |

Yes, go through me unless I indicate otherwise. Thank you.

---

**From:** Marc Greenwald [mailto:marcgreenwald@quinnemanuel.com]
**Sent:** Friday, June 24, 2011 3:43 PM
**To:** Spiritis, Jenni B
**Cc:** Marina Olevsky; petercalamari@quinnemanuel.com; Judd Spray; Gottlieb, Manuel
**Subject:** RE:

My understanding is that the branch manager asked us to put our questions in writing and send to him, which is what we did.

I believe we had a question if Ms. Kogan notarized the documents as part of her work for JPMorgan Chase, or outside of her work responsibilities.  If you are telling us that, at least for the time being, JPMC is representing Ms. Kogan in this matter, we will go through you.  As you can see from my letter, we need this information quickly for the matter in London.  Please let us know when you think you can get back to us.


Thanks


**Marc Greenwald**
*Partner,*
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
212.849.7140 Direct
212.849.7000 Main Office Number
212.849.7100 FAX
marcgreenwald@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Spiritis, Jenni B [mailto:jenni.b.spiritis@jpmchase.com]
**Sent:** Friday, June 24, 2011 3:36 PM
**To:** Marc Greenwald
**Cc:** Marina Olevsky; Peter Calamari; Judd Spray; Gottlieb, Manuel
**Subject:** RE:

Marc,  As you likely distilled from my signature line, I'm an-house attorney with JPMorgan Chase.  Please direct all communications (correspondence, inquiries, etc.) concerning this matter to me and do not contact any JPMorgan Chase employees directly.  Please relay same to anyone else at your firm handling this matter. Thank you.

Jenni Spiritis

**From:** Marc Greenwald [mailto:marcgreenwald@quinnemanuel.com]
**Sent:** Friday, June 24, 2011 2:40 PM
**To:** Spiritis, Jenni B
**Cc:** Marina Olevsky; petercalamari@quinnemanuel.com; Judd Spray
**Subject:** RE:

I think that Marina is out today too.  This letter should provide you with information you need.   But if you need more, please call me at 212-849-7140 or my colleague Judd Spray at 212-849-7144.

**From:** Peter Calamari
**Sent:** Friday, June 24, 2011 2:38 PM
**To:** 'jenni.b.spiritis@jpmchase.com'
**Cc:** Marina Olevsky; Marc Greenwald
**Subject:** Re:

Thanks for contacting me - Marina Olevsky - copied above can call you and give additional details.

**From:** Spiritis, Jenni B <jenni.b.spiritis@jpmchase.com>
**To:** Peter Calamari
**Sent:** Fri Jun 24 11:29:16 2011
**Subject:**

Hi Peter:

I believe you spoke to my colleague, Larry Chanen earlier in the week on an affidavit submitted in a litigation in London.  I'm looking to follow up for more information. Your assistant advised that you're traveling.  Please get in touch when you have a chance.  My contact information is below. Thank you.

Jenni B. Spiritis
Vice President and Assistant General Counsel
JPMorgan Chase Bank
One Chase Manhattan Plaza, Floor 26
New York, New York 10005
Tel: 212-552-0978
Fax: 212-552-5766

This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally

privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

# EXHIBIT K

| | |
|---|---|
| **From:** | Spiritis, Jenni B [jenni.b.spiritis@jpmchase.com] |
| **Sent:** | Tuesday, June 28, 2011 6:05 PM |
| **To:** | Marc Greenwald |
| **Cc:** | Gottlieb, Manuel |
| **Subject:** | RE: |

Marc,

In response to the requests you made earlier today, please be advised that we have not yet had the opportunity to speak to Ms. Kogan about this matter and will not and cannot respond to information requests in advance of her return. As for the request for the date on which Ms. Kogan asked to go on vacation, Ms. Kogan's vacation planning and the bank's approval of same is between the bank and its employee and does not concern the parties to any litigation pending in London.

While we realize that we will not be meeting certain of your requested deadlines for supplying information, we remind you that we have not received a subpoena or any court ordered deadline for producing information. Thank you.

Jenni Spiritis

---

**From:** Marc Greenwald [mailto:marcgreenwald@quinnemanuel.com]
**Sent:** Friday, June 24, 2011 2:40 PM
**To:** Spiritis, Jenni B
**Cc:** Marina Olevsky; petercalamari@quinnemanuel.com; Judd Spray
**Subject:** RE:

I think that Marina is out today too. This letter should provide you with information you need. But if you need more, please call me at 212-849-7140 or my colleague Judd Spray at 212-849-7144.

**From:** Peter Calamari
**Sent:** Friday, June 24, 2011 2:38 PM
**To:** 'jenni.b.spiritis@jpmchase.com'
**Cc:** Marina Olevsky; Marc Greenwald
**Subject:** Re:

Thanks for contacting me - Marina Olevsky - copied above can call you and give additional details.

---

**From:** Spiritis, Jenni B <jenni.b.spiritis@jpmchase.com>
**To:** Peter Calamari
**Sent:** Fri Jun 24 11:29:16 2011
**Subject:**

Hi Peter:

I believe you spoke to my colleague, Larry Chanen earlier in the week on an affidavit submitted in a litigation in London. I'm looking to follow up for more information. Your assistant advised that you're traveling. Please get in touch when you have a chance. My contact information is below. Thank you.

Jenni B. Spiritis
Vice President and Assistant General Counsel

1

JPMorgan Chase Bank
One Chase Manhattan Plaza, Floor 26
New York, New York 10005
Tel: 212-552-0978
Fax: 212-552-5766

This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

# EXHIBIT L

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.<br>
(212) 849-7140

WRITER'S INTERNET ADDRESS<br>
marcgreenwald@quinnemanuel.com

July 1, 2011

**By E-MAIL and U.S. MAIL**

Jenni B. Spiritis
Vice President and Assistant General Counsel
JPMorgan Chase Bank
One Chase Manhattan Plaza, Floor 26
New York, New York 10005

Dear Ms. Spiritis,

I write in response to your email of June 28, 2011. As you know, my firm represents the defendant in a lawsuit pending in the United Kingdom, styled *Michael Cherney v. Oleg Deripaska*. The plaintiff in that case claims that he has not left Israel since 2009, but two documents notarized by a JPMorgan Chase Bank ("Chase") employee, Alexandra Kogan, state that the plaintiff appeared before Ms. Kogan in New York on May 26, 2010. We therefore seek to question Ms. Kogan about her notarization of these two documents and whether any documents relating to the notarization are currently within the possession, custody, or control of Ms. Kogan or Chase.

A summer associate from my office and a private investigator attempted to contact Ms. Kogan at Chase's Brighton Beach Branch on Monday, June 20. Ms. Kogan would not speak to them, except to ask whether they were the people who had called her earlier that day with regard to the U.K. lawsuit. We had not called Ms. Kogan earlier that day. Ms. Kogan's supervisor, Bill Bozza, asked us to send any questions we had for Ms. Kogan in writing. Mr. Bozza restated that request when my colleague Judd Spray spoke with him by telephone on June 21. Accordingly, I sent a letter to Ms. Kogan, copying Mr. Bozza, on June 23, 2011. I posed several questions to Ms. Kogan concerning her notarization of the two documents. I did not receive any response from Ms. Kogan or Mr. Bozza, but you contacted my colleague, Peter Calamari, by email on

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
CHICAGO | 500 West Madison Street, Suite 2450, Chicago, Illinois 60661 | TEL 312-705-7400 FAX 312-705-7401
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44 (0) 20 7653-2000 FAX +44 (0) 20 7653-2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7 Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 (0) 3 5510-1711 FAX +81 (0) 3 5510-1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49 (0) 621 43298-6000 FAX +49 (0) 621 43298-6100

June 24, 2011. That same day, I forwarded you my letter to Ms. Kogan, and you subsequently asked me to direct all communications in this matter to you.

On June 27, 2011, you informed me for the first time that Ms. Kogan was on vacation in Spain until July 11. You stated that you did not have contact information for Ms. Kogan and that Chase could not or would not begin to answer the questions I posed in my letter until after Ms. Kogan returned to the United States. You and I then spoke by telephone on June 28, 2011, at which time I asked you two questions: first, I asked you to review Chase's files to determine whether there were any documents relating to Ms. Kogan's notarization of the two documents at issue in the U.K. lawsuit; and second, I asked you when Chase first became aware of Ms. Kogan's vacation plans. In your June 28 email, you declined to answer either of my questions, stating that Chase would not answer information requests prior to Ms. Kogan's return to the U.S., and that Ms. Kogan's vacation plans were a private matter between her and Chase. You also reminded me that Chase has not received a subpoena or any court-ordered deadline for producing information in this matter.

The question of whether the plaintiff in the U.K. lawsuit traveled to New York to have documents notarized by Ms. Kogan is very important to my firm's client. We are disappointed that Chase will not agree to look for documents relating to these notarizations in the absence of a subpoena or court order. We are similarly disappointed that Chase will not simply confirm whether Ms. Kogan had planned her vacation prior to our first contacting her on June 20. The information we are seeking should be relatively easy to obtain.

If we are going to present new evidence in the U.K. lawsuit, we need to serve it on our adversary by July 19. Given your June 28 response, I hereby request that you make Ms. Kogan available to speak with us on the day she returns to work or the day after. Please confirm that you will do so.

Sincerely,

Marc Greenwald /JS.

Marc L. Greenwald

2

# EXHIBIT M

| | |
|---|---|
| From: | Spiritis, Jenni B [jenni.b.spiritis@jpmchase.com] |
| Sent: | Wednesday, July 06, 2011 12:03 PM |
| To: | Marc Greenwald |
| Cc: | Gottlieb, Manuel |
| Subject: | Alexandra Kogan |

Marc:

I write in response to your letter dated July 1, 2011. With respect to the requests that you made by phone on June 28, 2011, e.g., for records concerning Ms. Kogan's alleged notarization of certain documents including any logs Ms. Kogan may have maintained, you are correct that we will not address such inquiries while Ms. Kogan is out of the country on vacation. As for your new request to examine Ms. Kogan on the day she returns from vacation, we will not be producing Ms. Kogan for an examination without a subpoena or court order.

Finally, although your office must know that Chase has a Legal Department, it nevertheless opted to send an investigator and a summer associate to a Chase branch to question a Chase employee without giving the Legal Department any notice. To reiterate, all communications to Chase or its employees should be directed to me. Thank you.

Jenni B. Spiritis
Vice President and Assistant General Counsel
JPMorgan Chase Bank
One Chase Manhattan Plaza, Floor 26
New York, New York 10005
Tel: 212-552-0978
Fax: 212-552-5766

This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

# EXHIBIT N

| | |
|---|---|
| **From:** | Spiritis, Jenni B [jenni.b.spiritis@jpmchase.com] |
| **Sent:** | Wednesday, July 13, 2011 3:01 PM |
| **To:** | Marc Greenwald |
| **Cc:** | Gottlieb, Manuel; Judd Spray |
| **Subject:** | RE: Alexandra Kogan |

I was responding to your email wherein you provide "[p]lease let me know if anything I have written above is not correct."

With respect to anything further, as indicated, we will not be producing additional information via correspondence or otherwise without a subpoena.

**From:** Marc Greenwald [mailto:marcgreenwald@quinnemanuel.com]
**Sent:** Wednesday, July 13, 2011 2:36 PM
**To:** Spiritis, Jenni B
**Cc:** Gottlieb, Manuel; Judd Spray
**Subject:** RE: Alexandra Kogan

Can she recall this one?  Or is your phrasing meant to indicate that you won't inform us of whether she recalls notarizing the documents in question.

**From:** Spiritis, Jenni B [mailto:jenni.b.spiritis@jpmchase.com]
**Sent:** Wednesday, July 13, 2011 2:34 PM
**To:** Marc Greenwald
**Cc:** Gottlieb, Manuel; Judd Spray
**Subject:** RE: Alexandra Kogan

Marc,  To be clear, I indicated that it is Kogan's practice to only notarize documents for persons present before her upon the presentation of photo identification and that she cannot recall every particular prior notarization from over one year ago or otherwise.

Thank you,
Jenni Spiritis

**From:** Marc Greenwald [mailto:marcgreenwald@quinnemanuel.com]
**Sent:** Wednesday, July 13, 2011 12:16 PM
**To:** Spiritis, Jenni B
**Cc:** Gottlieb, Manuel; Judd Spray
**Subject:** RE: Alexandra Kogan

Ms. Spiritis:

As I informed you on the telephone, the English courts want evidence on whether Mr. Cherney was in New York at the time Ms. Kogan notarized documents saying they were signed in front of her in Brooklyn.

To be clear, you informed me on the telephone that Ms. Kogan has informed the bank:  1) That her normal practice is that she only notarizes documents when people present identification.   And 2) that Ms. Kogan cannot remember any particular notarizations that took place more than a year ago.

JPMorgan Chase's position is that it will not provide any additional information, including whether Ms. Kogan knew Mr. Cherney or his family at the time she notarized the documents, whether she had any particular relationship with Mr. Cherney or anyone in his family, and whether Ms. Kogan notarized the documents as part of her work at the JPMorgan Chase branch or outside of work.   Further, JPMorgan Chase will not have Ms. Kogan provide an affidavit that can be submitted to the English courts with the information that she has provided.

Finally, you have informed me that JPMorgan Chase's legal department represents Ms. Kogan related to Ms. Kogan's notarization of the documents in question, and service of any legal papers should be made to you.

Please let me know if anything I have written above is not correct.   I will be in touch if our client chooses to seek to compel testimony and documents from Ms. Kogan and the bank.

**Marc Greenwald**
*Partner,*
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
212.849.7140 Direct
212.849.7000 Main Office Number
212.849.7100 FAX
marcgreenwald@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Spiritis, Jenni B [mailto:jenni.b.spiritis@jpmchase.com]
**Sent:** Wednesday, July 13, 2011 12:02 PM
**To:** Marc Greenwald
**Cc:** Gottlieb, Manuel
**Subject:** Alexandra Kogan

Marc,

I write to follow up on our conversation of earlier today- during which Chase provided certain information from Ms. Kogan.

Please be advised that Chase will not be providing additional information in the absence of a subpoena. Thank you.

Jenni B. Spiritis
Vice President and Assistant General Counsel
JPMorgan Chase Bank
One Chase Manhattan Plaza, Floor 26
New York, New York 10005
Tel: 212-552-0978
Fax: 212-552-5766

This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without

notice. Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates. This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to European legal entities.

# EXHIBIT O

**From**: Hearn, Andrew <andrew.hearn@dechert.com>
**To**: Alex Gerbi
**Cc**: Sue Prevezer; Audrius Zakarauskas; Witham, Julie <Julie.Witham@dechert.com>; Fidler, Sarah <sarah.fidler@dechert.com>; Maclennan, Alex <Alex.Maclennan@dechert.com>
**Sent**: Fri Jul 15 22:13:50 2011
**Subject**: Re: C v D

Thank you for your email of yesterday.

We will be serving our client's evidence on Tuesday pursuant to the directions given by Flaux, J. We consider that the evidence which will be served will render the attempt to depose Ms Kogan wholly unnecessary because it will demonstrate quite clearly that our client was not in the USA when Ms Kogan notarised the documents exhibited by Ms Prevezer.

It follows that our client will not agree to any adjournment of the issue which has been fixed for determination on 26 July and, indeed, an adjournment would serve no useful purpose. This matter needs now to be resolved and that is what our client will be asking the court to do on 26 July.

If though your client still wishes to proceed as described in your letter:

1. Please ensure that any statement prepared for the hearing before Flaux J exhibits this correspondence and provides a full and frank account of communications which you (or anyone else on behalf of your client) have had with Ms Kogan and/or her employer.

2. Please also ensure that the application made to the court in New York exhibits this correspondence and, further, that the evidence which we serve on Tuesday is shown to the New York Judge when the application you describe is made.

As a further matter, you mention in your letter that the 26 July hearing will need to address the timing of your client's response to our client's RFI. Please explain why. If your client is once again going to fail to meet a deadline imposed by

1

the court, our client expects not only to be told immediately when such situation presents itself, but why it has presented itself at all and what (if any) extension of time is required.

--------------------------

Andrew Hearn
Dechert LLP
+44 (0) 20 7184 7466 direct
+44 (0) 20 7184 7001 fax
andrew.hearn@dechert.com
www.dechert.com


Sent from my BlackBerry Wireless Device

---

**From:** Alex Gerbi <alexgerbi@quinnemanuel.com>
**To:** Hearn, Andrew; Witham, Julie
**Cc:** Sue Prevezer <sueprevezer@quinnemanuel.com>; Audrius Zakarauskas <audriuszakarauskas@quinnemanuel.com>
**Sent:** Fri Jul 15 11:49:24 2011
**Subject:** C v D

Please see attached letter, the text of which is also pasted below as you have requested.

---

15 July 2011

Dear Sirs,

**Michael Cherney v Oleg Deripaska**

We write in relation to the adjourned hearing before Flaux J listed for Tuesday 26 July 2011, and in particular to the obtaining of evidence from Ms Alexandra Kogan, the Notary Public in New York.

Following the hearing on 20 June 2011, we have been seeking to obtain evidence from Ms Kogan. It appears that someone, we presume someone acting for your client, had already telephoned her. In any event, she would not then talk to our firm. She then went on holiday, and did not return to work until 11 July 2011. Since her return, we have been seeking to obtain a statement from her voluntarily. Unfortunately, we are advised that Ms. Kogan will not give any evidence voluntarily, but will do so only pursuant to a subpoena.

Accordingly, this firm is now in the process of preparing papers for an application to the New York Court to depose Ms Kogan. That application will be issued early next week. The Court will be asked to expedite the taking of Ms Kogan's deposition. However, (and assuming, for present purposes, the New York Court accedes to the application) we are informed that it is unlikely that Ms Kogan's deposition will be taken before the adjourned hearing before Flaux J on 26 July 2011.

We suggest, therefore. that it would be sensible, saving costs and time, that the outstanding "video link" element of the application before Flaux J, but not the 26 July 2011 hearing as a whole (which will be needed in any event for the Court to consider a direction regarding expert accountancy evidence, and is likely to be needed on the issue the timing of our client's response to your client's RFI), be adjourned until after Ms Kogan's deposition has been taken. There is no pressing urgency for the video link issue to be resolved this

term, and it cannot be properly resolved without Ms Kogan's evidence. The matter could be relisted before Flaux J in the early autumn, by which time the parties will have had the opportunity to take and consider Ms Kogan's evidence, and to prepare properly for the hearing in the light of it.

We look forward to hearing from you on this proposal. In the event that you do not agree to this course, we will file a short statement on 19 July 2011 (the date ordered by Flaux J for the filing of evidence) setting out the above position, and we will apply to Flaux J for an adjournment of that part of the hearing, and the costs wasted.

Yours faithfully,


**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**


Alex Gerbi | **partner** | quinn emanuel urquhart & sullivan uk, llp | 16 Old Bailey | London EC4M 7EG | Direct: +44 (0) 20 7653 2227 | Main: +44 (0) 20 7653 2000 | Fax:  +44 (0) 207 653 2100 | alexgerbi@quinnemanuel.com | www.quinnemanuel.com



The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

The London Office of Quinn Emanuel Urquhart & Sullivan UK LLP operates as a limited liability partnership registered in England and Wales (with registered number OC337278) and is regulated by the Solicitors Regulation Authority. A list of members and their professional qualifications is open to inspection at our registered office, 16 Old Bailey, London EC4M 7EG. We operate in association with the US limited liability partnership of Quinn Emanuel Urquhart & Sullivan, LLP, which is organised under the laws of the State of California, USA.


This e-mail is from Dechert LLP, a law firm, and may contain information that is confidential or privileged. If you are not the intended recipient, please delete the e-mail and any attachments, and notify the sender. Dechert LLP is a limited liability partnership registered in England & Wales (Registered No. OC306029) and is regulated by the Solicitors Regulation Authority. A list of names of the members of Dechert LLP (who are solicitors or registered foreign lawyers) is available for inspection at its registered office, 160 Queen Victoria Street, London EC4V 4QQ.

# EXHIBIT P

1. М. Черной
2. Истец
3. Пятый
4. «МСЗ»
5. 17 июля 2011

В Верховный суд справедливости

Отделение королевской скамьи                      Дело 2006, фолио 1218

Коммерческий суд

Между:

Михаилом Черным

<u>Истцом</u>

И

Олегом Владимировичем Дерипаской

<u>Ответчиком</u>

---

### Пятые свидетельские показания
### Михаила Черного

---

Я, Михаил Черной, проживающий по адресу: а-Гива 52, Савьон, Израиль, заявляю следующее:

1. Я являюсь истцом в указанном выше деле и даю данные пятые свидетельские показания на основании фактов и событий, известных мне лично, кроме случаев, когда указано иное.

2. Я еще раз дал мои показания посредством переводчика (эту роль опять выполнял г-н Траспов) моим английским адвокатам, которые впоследствии подготовили данные свидетельские показания на английском языке. Затем г-жа Елена Семенович, переводчик, подготовила русский перевод этих показаний, который я сейчас подписываю. Эти показания были переведены

для меня на русский язык, чтобы я одобрил и подписал их. Я даю настоящие показания, чтобы подробнее остановиться на доказательствах, которые я ранее предоставил относительно моего местонахождения 26 мая 2010 г.

## Мое возвращение из Лондона в мае 2009 г.

3.  Я подтверждаю, что не выезжал из Израиля с 23 мая 2009 г. после моего возвращения из поездки в Лондон. Из этого следует, что я не был в США 26 мая 2010 г. или в любое другое время после 23 мая 2009 г. Действительно, после возвращения в Израиль из Англии 23 мая 2009 я не получал американской визы, без которой я как израильский гражданин не смог бы посетить США, даже если бы я этого захотел. В последующих параграфах я приведу имеющиеся у меня доказательства в подтверждение того, что я говорил относительно моего местонахождения 26 мая 2010 г.

## Мой израильский паспорт и отсутствие американской визы

4.  Копия моего нынешнего паспорта была приложена к седьмым свидетельским показаниям г-на Херна («АЕТН7»), и я подтверждаю, что приложенная им копия является верной копией моего израильского паспорта. Я полагаю, что суду уже известно, что 9 июня 2011 г. срок действия моего израильского паспорта был продлен Министерством внутренних дел Израиля, но я приведу предысторию этого продления:

    4.1    Продление срока действия моего паспорта было запрошено или получено не потому, что я имел намерение выезжать за границу. Вследствие существующих ордеров на арест я не могу выезжать за границу и не имею такого намерения до тех пор, пока эти ордера не будут отменены и я не смогу безопасно выезжать за границу без опасения подвергнуться аресту.

    4.2    Причина, по которой мой паспорт был продлен, состоит в том, что 9 июня 2011 г. бы достигнут значительный прогресс в споре с израильскими властями по вопросу моего израильского гражданства, который длился очень долго. Я упоминал этот спор в параграфе 49 моих вторых

свидетельских показаний в данном деле. 9 июня 2011 г. израильские власти разрешили продлить срок действия моего израильского паспорта (продление моего паспорта на срок, аналогичный максимальному сроку продления, на которое имеет право любой израильский гражданин).

5.  С 23 мая 2009 г. я не имел никакого другого паспорта и не пользовался никаким другим паспортом, кроме израильского паспорта, копия которого приложена в «AETH7», и не выезжал за пределы Израиля с указанной даты. Поскольку я являюсь обладателем израильского паспорта, я должен был бы получить визу, если бы захотел посетить США. На стр. 1-4 приложения МСЗ прилагается распечатка с сайта посольства США, из которой ясно, что каждому израильскому гражданину необходима виза для въезда в США, поскольку Израиль не принадлежит к числу стран – участниц программы безвизового въезда в США. Как показывает мой паспорт, и как я в любом случае могу подтвердить, с 23 мая 2009 г. у меня не было американской визы и я не подавал ходатайства о ее получении.

6.  Как Г-н Траспов намерен подтвердить в своих свидетельских показаниях, которые он предоставит суду, на 26 мая 2010 г. мой паспорт был фактически вложен на хранение в его фирме (у моих израильских адвокатов).

**Неправдоподобность моей попытки выезда из Израиля и пребывания в США 26 мая 2010 г.**

7.  В случае, если ответчик настаивает на отрицании этих доказательств, я приведу другое доказательство, подтверждающее, что я не выезжал из Израиля и не находился в США 26 мая 2010 г. Прежде чем перейти к этому доказательству, я должен сказать, что это было бы из ряда вон выходящим поступком для меня. Во-первых, я бы сделал это, зная о существовании ордеров на арест (на интернет-сайте Интерпола есть ссылка на ордера на арест, а также упоминание обо мне с фотографией; я полагаю, что эта информация      широко      распространяется      среди      сотрудников иммиграционных служб и подразделений полиции всего мира), что,

очевидно, подвергло бы меня реальному риску ареста, даже если бы я захотел выехать из Израиля и въехать в США с поддельными документами. Во-вторых, насколько я понимаю, при въезде в США меня бы сфотографировали и взяли бы у меня отпечатки пальцев, что, очевидно, повысило бы риск моего обнаружения и ареста. В-третьих, в Израиле я пользуюсь достаточной известностью, и мое имя и фотографии хорошо знакомы (кроме того, что они опубликованы на сайте Интерпола), поэтому вполне вероятно, что меня обнаружили бы еще до того, как я выехал из Израиля, если бы я попытался сделать это, используя фальшивые документы. В качестве примера скажу, что последнее слушание по данному делу освещалось в газете Jerusalem Post. Пойти на подобный риск для меня было бы, как я уже сказал, из ряда вон выходящим поступком.

8.   Мой поступок был бы еще более из ряда вон выходящим, поскольку у меня не было причин находиться в США в мае 2010 г. Транзакция, послужившая поводом к данному спору, и документы, которые я подписал по просьбе Леонида Черного, не принесла бы мне какой бы то ни было выгоды, а предназначалась лишь для оказания помощи Леониду и его семье. Тем не менее, оставляя в стороне доказательства, на которые я уже ссылался, и то, что, по моему мнению, доказывает неправдоподобность попытки моего въезда в США в мае 2010 г., я хочу сейчас остановиться на других существующих доказательствах, подтверждающих, что 26 мая 2010 г. я находился в Израиле.

**Распечатки моих телефонных разговоров**

9.   В течение определенного времени и абсолютно точно в мае и с мая 2010 г., я держу при себе два мобильных телефона. SIM-карта одного из них имеет мобильный номер 0544666601. SIM-карта и аппарат, которыми я пользуюсь, принадлежат мобильному оператору Orange, и далее я буду ссылаться на них как на «мой телефон Orange». SIM-карта второго телефона имеет номер +35988777777. Эта SIM-карта и аппарат, которыми я пользуюсь, принадлежат мобильному оператору Mobiltel, и далее я буду ссылаться на них как на «мой телефон Mtel». Этот телефон зарегистрирован на имя футбольного клуба «Левски», София (почетным

президентом которого я являюсь), и был предоставлен мне клубом для использования. Я всегда пользовался этими двумя телефонами с мая 2010 г. (и фактически за некоторое время до этого), и я никогда не даю пользоваться ими другим лицам, кроме случаев, когда, например, я прошу своих водителей ответить на телефонный звонок, если я, скажем, говорю по другому телефону.

10. На стр. 5 – 15 приложения MC3 приложены отредактированные распечатки счетов за мой телефон Orange и мой телефон Mtel за 26 мая 2010 г. вместе с переводами на английский.

11. Сначала я остановлюсь на счете за мой телефон Orange (стр. 5-9). Я не читаю на иврите, но выдержки из телефонного счета за мой телефон Orange были переведены мне на русский язык. Как мне понятно, они содержат только исходящие звонки, сделанные с моего телефона Orange, но они также показывают, что все звонки, сделанные мной 26 мая 2010 г., были сделаны, когда мой телефон Orange находился в Израиле. Г-н Траспов касается этого в своих свидетельских показаниях, в частности, записей, показывающих, что я звонил ему с моего телефона Orange в этот день на номер 0525257011. Естественно, я не помню подробностей каких-либо моих разговоров с г-ном Трасповым 26 мая 2010 г., но мы разговариваем регулярно и часто, и г-н Траспов пользуется моим номером Orange, когда он звонит мне в Израиле.

12. Сейчас я перехожу к счету за мой телефон Mtel (стр. 10-15). Я не понимаю болгарский язык и не читаю на нем, но выдержки из телефонного счета были переведены мне на русский язык. Насколько я понимаю, выдержки показывают, что 26 мая 2010 г. я звонил на номер +359888306611 два раза и в первом случае продолжительность звонка составляет 10 минут, а во втором - около 6 минут. Этот номер внесен в память моего телефона Mtel как номер телефона г-на Георгиева, болгарского адвоката и коллеги г-на Баткова, с которым я регулярно разговариваю. Далее я понимаю, что счет за телефон показывает, что когда я звонил г-ну Георгиеву 26 мая, мой телефон Mtel находился в Израиле. Насколько я понимаю, г-н Георгиев коснется этого телефонного счета более подробно в своих свидетельских показаниях, которые он предоставит суду от моего имени.

**Предыстория документов, которые г-жа Превезер прилагает на стр. 1-5 приложения SRP1**

13. Сейчас я обращусь к предыстории документов, которые я подписал (копии которых приложены на стр. 1-5 приложения к свидетельским показаниям г-жи Превезер). Как уже объяснял г-н Херн, я подписал эти документы в Израиле по просьбе Леонида. Он объяснил мне их общий характер и цель, но я точно помню, что он не читал мне документы и не объяснял мне их в подробностях. Как я понял, они просто относились к завершению юридических формальностей для окончания операции, которая, насколько мне известно, была выполнена более 15 лет назад и касалась передачи доли в правах собственности на две квартиры среди членов моей семьи.

14. После запросов, сделанных после последнего судебного слушания 20 июня 2011 г., мне показали копии четырех дополнительных документов (стр. 16-26), которые, как я полагаю, я также, должно быть, подписал в Израиле в то же время, что и два документа, приложенные г-жой Превезер, также по причинам, объясненным мне Леонидом, которые я изложил выше. Я говорю «также, должно быть, подписал» только потому, что я не помню сейчас, сколько документов Леонид дал мне и сколько я подписал. Но я абсолютно уверен в том, что все они были подписаны в Израиле.

15. Я понимаю, что все документы, которые я подписал для Леонида, относились к одной и той же операции и, как я уже говорил, предназначались только для завершения юридических формальностей, но я не спрашивал и не получил детального объяснения относительно того, что представлял собой каждый документ. У меня не было финансовой заинтересованности в этой операции, и я всего лишь хотел сделать для моих родственников то, что не было закончено и что необходимо было сделать.

16. Мне известно, что Леонид точно помнит, что когда он показал мне документы, они уже были подписаны им (кроме одного документа, который должен был подписать только я), но что даты "26 мая 2010 г." на страницах, содержащих подписи, не были внесены в то время, когда я подписывал документы. При всем желании я не могу вспомнить, подписал ли Леонид документы ранее и была ли на них уже указана дата. Я не обратил слишком большого внимания на документы и просто подписал те

документы и в тех местах, где Леонид попросил меня подписать. Однако я уверен в том, что Леонид не обсуждал со мной, надо ли заверять мою подпись нотариально или освидетельствовать ее и как это сделать, и я не имею никакого представления о том, какие правила распространяются на нотариальное заверение или освидетельствование подписей на подобных документах.

17. Когда я подписал документы, Леонид забрал их и не сказал мне, а я не спросил, что произойдет с ними дальше. Честно говоря, меня это очень мало интересовало. Сейчас я полагаю, что некоторые из них были затем предъявлены нотариусу по имени г-жа Коган в Нью-Йорке. Я не думаю, что когда-либо слышал о ней, а тем более встречался или разговаривал с г-жой Коган до 26 мая 2010 г. Я никогда не связывался с ней и не просил никого связаться с ней для меня, кроме следующего случая. По моему указанию мои английские адвокаты попросили американского адвоката г-на Мааса, представляющего мои интересы, попытаться установить связь с г-жой Коган 20 июня 2011 г., чтобы договориться о беседе с ней. В этой связи я ссылаюсь на показания г-на Мааса. Кроме этого, мне неизвестно ни о каких контактах, которые я когда-либо просил установить с г-жой Коган, чье имя мне было вообще неизвестно до тех пор, пока мне не прочитали отрывки из свидетельских показаний г-жи Превезер и приложений к нему.

**Вопросы, затрагивающиеся в параграфах 154-158 решения судьи Кристофера Кларка**

18. Г-н Херн из представляющей меня фирмы Dechert LLP сообщил мне, что на последнем заседании юристы г-на Дерипаски обратили внимание суда на параграфы 154-158 решения судьи Кристофера Кларка, относящиеся к моему задержанию за владение фальшивыми паспортами 17 лет назад. Я ответил на эти утверждения в моих вторых свидетельских показаниях, поданных в ходе слушаний по вопросу юрисдикции, правдивость которых я подтверждаю. Я повторяю, что единственный паспорт, который был у меня в мае 2010 г., — это мой израильский паспорт. По причинам, которые я уже изложил, предположение о том, что я мог приехать в Соединенные Штаты в мае 2010 г. и подписать эти документы, невероятно и неверно.

**Ситуация, в которой я оказался**

19. Наконец, я хотел бы разъяснить, насколько я удивлен и обескуражен событиями, произошедшими в Испании. Как г-н Буркхалтер объяснит в своих свидетельских показаниях, которые, как я понял, он представит суду, ордера на арест были выданы против меня без предупреждения и, насколько мне известно, без каких-либо попыток со стороны испанских властей связаться со мной. Если бы испанские власти связались со мной перед тем, как выдать ордера на арест, я бы почти наверняка приехал в Испанию, чтобы дать показания властям. Ордера на арест были выданы и действуют в связи с расследованием, в ходе которого мне не были предъявлены какие-либо обвинения и я не был признан виновным в совершении какого-либо правонарушения и в котором до сегодняшнего дня у меня не было возможности изложить мою версию, не приехав для этого в Испанию, что я не готов сделать до тех пор, пока ордера на арест существуют. Хотя я понимаю, что здесь не место поднимать данные вопросы, моя подавленность усиливается осознанием того, что вполне возможно найти способ дать мне возможность рассказать мою версию и провести расследование, не заставляя меня приезжать в Испанию и подвергаться аресту. Это однозначно подтверждается тем фактом, что ответчику и г-ну Махмудову была предоставлена возможность рассказать свою версию без необходимости приезжать в Испанию.

20. Когда мне впервые стало известно об ордерах на арест в июне 2009 г., я был настроен очень оптимистично и считал, что мне будет предоставлена возможность дать показания испанскому судье, ведущему судебное следствие, что ордера на арест будут отменены и что все это произойдет задолго до судебного разбирательства по данному делу, которое, совершенно очевидно, должно было начаться еще очень не скоро; действительно, дата суда еще не была назначена, потому что процесс был приостановлен для подачи апелляции со стороны ответчика и из-за его последующей попытки обратиться с апелляцией по вопросам юрисдикции в Верховный суд. Только несколько месяцев назад я начал ощущать, что мой оптимизм неуместен. Я не считаю, что он был необоснованным и (никоим образом не умаляя моих прав на сохранение конфиденциальности моих контактов с адвокатом на более широкой основе) г-н Буркхалтер (партнер в

испанской юридической фирме Cuatrecasas, который консультирует меня в связи с испанским процессом) представит суду свои собственные показания относительно событий в испанском расследовании.

21. Г-н Буркхалтер также разъяснит, как с гражданском процессе, проходившем тогда между мной и г-ном Ньюманом в суде Denia в Испании, утверждение г-на Ньюмана о том, что подпись на договоре о займе принадлежит не ему, было передано для расследования в уголовный суд Denia; и как 6 июня 2011 г. уголовный суд Denia издал приказ о вызове в суд, предписывающий мне явиться к судье уголовного суда Denia 30 сентября 2011 г. для ответа на вопросы, касающиеся данного дела.

22. Наличие ордеров на арест означает, что я не могу выезжать за границу в течение более двух лет. Кроме ограничений, которые означенное обстоятельство налагает на мою свободу, это приводит к крайним неудобствам при ведении данного процесса (в смысле легкости доступа к моим английским адвокатам) и в личном плане не дает мне возможности видеться с моей женой Анной и двумя из моих дочерей, Элиной и Стефани, находящимися в Лондоне.

23. Возможность приехать в Лондон и "очно" дать показания в суде для меня более чем желательна, но, как я уже объяснил, если ордера на арест не будут отменены и до тех пор, пока этого не произойдет, я не выеду за пределы Израиля.

**Подтверждение правдивости**

Я полагаю, что факты, изложенные в данных свидетельских показаниях, правдивы.

Подпись: _____

Михаил Черной

Дата: _17, 7, 2011_

1. М.Черной
2. Истец
3. Пятый
4. «МС3»
5. 17 июля 2011

**В Верховный суд справедливости**

**Отделение королевской скамьи**                    Дело 2006, фолио 1218

**Коммерческий суд**

**Между:**

Михаилом Черным

<u>Истцом</u>

И

Олегом Владимировичем Дерипаской

<u>Ответчиком</u>

---

### Пятые свидетельские показания
### Михаила Черного

---

Dechert LLP

160 Queen Victoria Street

London

EC4V 4QQ

Solicitors for the Claimant

Ref: 960094/388368

1. M Cherney
2. Claimant
3. Fifth
4. "MC 3"
4. 17 July 2011

**IN THE HIGH COURT OF JUSTICE**                    **CLAIM NO. 2006 FOLIO 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**BETWEEN**

**MICHAEL CHERNEY**

**Claimant**

-and-

**OLEG VLADIMIROVICH DERIPASKA**

**Defendant**

---

**FIFTH WITNESS STATEMENT OF MICHAEL CHERNEY**

---

I, **MICHAEL CHERNEY** of Hagiva 52, Savyon, Israel will say as follows:

1        I am the Claimant in the above proceedings and make this fifth witness statement from facts and matters within my own knowledge, save where otherwise indicated.

2        Once again, I have provided my evidence via an interpreter (again Mr Traspov playing that role) to my English lawyers who then prepared this statement in English. Ms Elena Semenovich, a translator, then prepared the Russian translation of the statement which I am now signing. This witness statement was then translated into Russian for me to approve and sign. I make this statement in order to expand upon the evidence which I have previously given as to my whereabouts on 26 May 2010.

11388337

### My return from London in May 2009

3   I confirm that I have not left Israel since 23 May 2009 when I returned from a trip to London. It follows that I was not in the USA on 26 May 2010 nor at any time after 23 May 2009. Indeed, after returning to Israel on 23 May 2009 from England, I neither had nor obtained a US visa, without which as an Israeli citizen I would not have been able to travel to the United States even had I wished to do so. In the paragraphs that follow I will set out the evidence that I have to support what I have said as to my whereabouts on 26 May 2010.

### My Israeli passport and the lack of a US visa

4   A copy of the up to date version of my passport was exhibited to Mr Hearn's seventh statement ("AETH7") and I confirm that the document which he exhibited is an up to date copy of my Israeli passport. As I believe the Court is already aware on 9 June 2011 the currency of my Israeli passport was extended by the Israeli Ministry of the Interior but I should make the background to this extension:

4.1   The extension to my passport was not sought or obtained because I had any present intention to travel. As a consequence of the existing arrest warrants I am unable to travel and have no intention of doing so until those warrants have been withdrawn and it becomes safe for me to do so without fear of arrest.

4.2   The reason why my passport was extended is that on 9 June 2011 there was a significant development in a dispute which had been proceeding for a considerable time with the Israeli authorities as to my Israeli citizenship. That dispute was something I mentioned in paragraph 49 of my 2nd witness statement in these proceedings. On 9 June 2011 the Israeli authorities granted an extension to my Israeli passport (the extension extending my passport for a total duration equivalent to the maximum length as any other Israeli citizen is entitled to).

11388337

5        Since 23 May 2009 I have neither had nor used any passport other than the Israeli passport a copy of which is exhibited at "AETH7" and I have not travelled outside Israel since that date.   As an Israeli passport holder, it is also the case that if I had wanted to travel to the United States, I would have needed a visa.  At pages 1 to 4 of exhibit "MC 3" is an extract from the website of the United States Embassy which makes it clear that every Israeli citizen needs a visa to travel to the United States, Israel not being one of those countries which participates in a visa waiver programme with the United States.  As my passport indicates, and I can in any event confirm, since 23 May 2009 I have neither had nor applied for a US visa.

6        As Mr Traspov is intending to confirm in a witness statement which he is providing to the court, his firm (my Israeli lawyers) in fact had custody of my passport on 26 May 2010.

**The implausibility of my having attempted to leave Israel and being in the United States on 26 May 2010**

7        In case the Defendant persists in challenging this evidence, I now deal with other evidence which demonstrates that I did not leave Israel to be in the United States on 26 May 2010. Before turning to that evidence, I should say that it would have been an extraordinary thing for me to have done so.  First, I would have been doing so in the knowledge of the arrest warrants (the Interpol website refers to the arrest warrants and lists me with my photograph; I assume that this is widely circulated to immigration staff and police around the world) which would obviously have presented me with a real risk of arrest even if I had sought to leave Israel and enter the United States under a false identity. Secondly, my understanding is that on entering the United States I would have been photographed and fingerprinted, which would have presumably increased the risk of my detection and arrest. Thirdly, in Israel a great deal of publicity has followed me around and my name and my

11388337

photograph are quite well-known (apart from their appearance on the Interpol website) with the result that I may well have been detected even before I had left Israel if I had tried to leave Israel under a false identity. By way of example, the last hearing in this case was reported in the Jerusalem Post.  For me to have taken all of these risks would, as I say, have been an extraordinary thing to do.

8        What would make it all the more extraordinary is that I had no reason to be in the United States in May 2010.  The transaction which has given rise to this debate, and the documents which I signed at Leonid Chernoy's request, was not a transaction from which I stood to benefit at all other than by assisting Leonid and his family. Nevertheless, leaving aside the evidence which I have already referred to and what I suggest is the implausibility of my having attempted to travel to the United States in May 2010, I now deal with the other evidence which exists to demonstrate that I was in Israel on 26 May 2010.

**My telephone records**

9        For some time, and certainly on and since May 2010, I have carried with me two mobile telephones.  The SIM card for one has the following mobile telephone number 0544666601.  That SIM card and the phone which I use it in is on the Orange network and I will refer to it as "my Orange phone."  The SIM card for the second phone has the following mobile telephone number: +359887777777.  That SIM card and the phone which I use it in is on the Mobiltel network and I will refer to it as "my Mtel phone".  It is a phone which is registered in the name of the Levski Sofia Football Club (of which I am the Honorary President) but which I have been given by the Club to use.  Those two phones have always been used by me since May 2010 (and in fact to some time before) and I never give them to others for use other than for example asking my drivers to answer my phone if, for example, I am on my other phone.

10        At pages 5 to 15 of "MC 3" are redacted extracts from my telephone bills for my Orange phone and my Mtel phone for 26 May 2010 together with English translations.

11        I deal first with the bill for my Orange phone (pages 5-9). I do not read Hebrew but the extracts of the phone bill for the Orange phone have been translated for me into Russian and I gather they show only outgoing calls that were made from my phone but that they demonstrate that all of the calls which are shown as being made on 26 May 2010 were made when my Orange phone was within Israel.  Mr Traspov deals with this further in his witness statement and in particular with the entries that show that I called him from my Orange phone on that date on the number 0525257011. Naturally I have no particular recollection of any discussions with Mr Traspov on 26 May 2010 but we speak on a very regular basis and Mr Traspov uses my Orange phone number as the number that he uses to contact me when I am in Israel.

12        I now turn to the Mtel phone bill (pages 10-15).  I do not read or understand Bulgarian but the extracts of the bill have been translated for me into Russian. I understand the extracts to show that on 26 May 2010 I telephoned +359888306611 on two occasions, on one occasion having a call lasting about 10 minutes and on the other occasion having a call lasting about 6 minutes. That is a number which I have stored in my Mtel phone as the mobile telephone number of Mr Georgiev, who is a Bulgarian lawyer and a colleague of Mr Batkov, with whom I speak regularly. I further understand that the phone bill demonstrates that when I telephoned Mr Georgiev on 26 May, my Mtel phone was in Israel. Mr Georgiev will I understand be dealing with this phone bill in more detail in a witness statement which he is to provide to the court on my behalf.

### The background to the documents Ms Prevezer exhibits at pages 1-5 of "SRP 1"

11388337

13        I now turn to the background to the documents which I signed (copies of which are at pages 1-5 of the exhibit to Ms Prevezer's statement). As Mr Hearn has already explained, I signed those documents in Israel at the request of Leonid. He explained their general nature and purpose to me but he certainly did not read the documents to me or explain them in any detail. My understanding was simply that they related to completing the legal formalities to effect a transaction which as far as I was concerned had been implemented more than 15 years before in the nature of a transfer between members of my family relating to an interest in two apartments.

14        Following enquiries that have been made since the last court hearing on 20 June 2011, I have been shown copies of four further documents (pages 16 to 26) which I am satisfied that I must also have signed in Israel at the same time as the two documents exhibited by Ms Prevezer, again for the reasons explained by Leonid to me which I have described above. I say "must also have signed" only because I have no recollection now of how many documents Leonid presented to me or how many I signed. What I am completely sure about is that whatever I did sign, they were signed in Israel.

15        I understood that all of the documents that I signed for Leonid related to the same transaction and as I say were just to complete legal formalities but I neither asked for, nor was given, a detailed understanding of what each document was. I had no financial interest in this transaction and just wanted to do for my relatives that which remained outstanding and needed to be done.

16        I am aware that Leonid's firm recollection is that when he presented the documents to me, he had already signed them (other than the one document that only I had to sign) but that references to 26 May 2010 on the signature pages of the documents had not been inserted at the time I signed the documents. In all fairness, I cannot recall whether Leonid had already signed the documents nor can I recall whether there was

11388337

a date on them already; I did not pay much attention to the documents and just signed what, and where on the documents, Leonid asked me to sign. What I am certain about is that Leonid did not discuss with me whether and how my signatures would need to be witnessed or notarised and I have no knowledge at all of what rules apply to the witnessing or notarising of signatures on documents such as these.

17     Once I had signed the documents, Leonid took them from me and I was not told, and did not ask, what would happen to them thereafter. I frankly had little interest in that. I now gather that some of them were subsequently presented to a notary in New York called Ms Kogan. I do not believe that I had ever heard of, let alone met or spoken with, Ms Kogan before 26 May 2010. I have never contacted or asked anyone to contact her for me save for the following. On my instructions, my English solicitors arranged for a US attorney who acts for me, Mr Maas, to try to contact Ms Kogan on 20 June 2011 to seek an interview with her. I refer to Mr Maas' statement in that regard. That apart, I am aware of no contact which I have ever asked to be made with Ms Kogan whose name was not even known to me before parts of Ms Prevezer's witness statement, and its exhibit, were read to me.

## The matters raised in paragraphs 154 to 158 of Mr. Justice Christopher Clarke's judgment

18     I have been told by Mr. Hearn of Dechert LLP, my solicitors, that at the last hearing, Mr. Deripaska's legal team referred the Court to paragraphs 154 to 158 of Mr. Justice Christopher Clarke's judgment, which relate to my detention for having false passports 17 years ago. I responded to these allegations in my second witness statement served in the jurisdiction hearing, the truth of which I confirm. I repeat that in May 2010 the only passport that I had was my Israeli passport. For reasons I have already set out, the suggestion that I may have travelled to the United States in May 2010 and signed these documents is an extraordinary suggestion, and is untrue.

11388337

**The position in which I find myself**

19          Finally I would like to make clear how surprised and frustrated I am by the events which have taken place in Spain.  As Mr Burkhalter will explain in a witness statement which I understand he is to provide to the court, arrest warrants were issued against me without warning and without (so far as I am aware) any attempt having been made by the Spanish authorities to contact me. Had the Spanish authorities contacted me before issuing arrest warrants, I would almost certainly have attended in Spain to provide my account to the authorities.   The arrest warrants persist and arise in relation to an investigation where I have neither been charged nor convicted of any offence; and where I have so far been prevented from telling my side of the story unless I travel to Spain to do so which, whilst arrest warrants exist, I am not prepared to do. Although I understand that this is not the forum in which to raise these issues, my frustration is compounded by the knowledge that it is perfectly possible for means to have been found to allow me to tell my side of the story and deal with the investigation without my being forced to travel to Spain to be arrested. This is amply demonstrated by the fact that the Defendant, and Mr Mahkmudov have been extended the opportunity to tell their side of the story without being forced to travel to Spain.

20          When I first learned of the arrest warrants in June 2009, I was very optimistic that I would be given the chance to give my account to the Spanish Investigating Judge and that the arrest warrants would be lifted and that all this would happen well before the trial of this action which was clearly going to be a long way off; indeed the trial date had not yet been fixed because the proceedings remained on hold whilst the Defendant pursued an appeal, and then a further attempt to appeal to the Supreme Court, on the jurisdictional issues.   It was only a few months ago that I began to feel that my optimism had been misplaced.  I do not believe that my optimism was unjustified and (without in any way waiving privilege on a wider basis), Mr

11388337

Burkhalter (a partner in Cuatrecasas, the Spanish law firm, who has been advising me in relation to the Spanish proceedings) is to provide this Court with his own account of the events in the Spanish investigation.

21      Mr Burkhalter will also explain how, in civil proceedings then taking place between me and Mr. Neuman in the Denia Court in Spain, an allegation by Mr. Neuman that a signature on a loan agreement was not his signature was referred to the Denia criminal court for investigation; and that on 6 June 2011 the criminal Court in Denia issued a summons requiring me to attend before the Denia Criminal Court Judge on 30 September 2011 to answer questions concerning this matter.

22      The existence of the arrest warrants has meant that I had not been able to travel for over two years. Quite apart from the inhibition that this places on my freedom, it has obviously lead to extreme inconvenience in conducting this litigation (in terms of easy access to my English lawyers) and from a personal point of view has prevented me from seeing my wife Anna and two of my daughters, Elina and Stephanie, who are in London.

23      I would like nothing more than to come to London to give evidence "in person" at the trial but, as I have explained, unless and until the arrest warrants are discharged, I will not leave Israel.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed..................................................

       **Michael Cherney**

Dated    17 July 2011

11388337

1. M Cherney
2. Claimant
3. Fifth
4 "MC 3"
4. 17 July 2011

CLAIM NO. 2006 FOLIO 1218

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN

**MICHAEL CHERNEY**

**Claimant**

-and-

**OLEG VLADIMIROVICH DERIPASKA**

**Defendant**

---

**FIFTH WITNESS STATEMENT OF**

**MICHAEL CHERNEY**

---

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Solicitors for the Claimant
Ref: 960094/388368
Tel: 0 207184 7000

# EXHIBIT Q

1.  Claimant
2.  E. Traspov
3.  First
4.  "ET1"
5.  17 July 2011

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E EN:

Claim No.  2006 Folio 1218

MICHAEL CHERNEY

Claimant

- and -

OLEG DERIPASKA

Defendant

_____

WITNESS STATEMENT OF
EVGENY TRASPOV

_____

I, **EVGENY TRASPOV**, of Weizman 14 Street, 16th Floor, Tel Aviv 64239 Israel will say as follows:

1       I am an Israeli lawyer.  I work for the firm of Dr J Weinroth & Co at Weizman 14 Street, 16th Floor, Tel Aviv 64239 Israel. I speak Russian, English and Hebrew.

2       Since 2005 I have acted for Michael Cherney in various legal matters.

3       I am authorised to make this witness statement on behalf of the Claimant and do so from facts within my own knowledge or derived from my firm's files and records and personal files and records, save where otherwise indicated. The matters to which I refer as being within my own knowledge are true, and those in respect of which I rely on information that is not within my

1

own knowledge are true to the best of my knowledge and belief. As necessary, I describe the sources of such information in the course of this witness statement. Nothing contained herein is intended to waive such privilege as the Claimant is entitled to assert in communications between us.

4    I make this statement in response to paragraphs 6-18 of the first witness statement of Susan Prevezer QC dated 17 June 2011 ("Ms Prevezer's statement"), which I have read, and to expand upon the evidence already provided by the Claimant as to his whereabouts on 26 May 2010.

5    There is now produced and shown to me a paginated bundle marked "ET1" which contains copies of the documents to which I refer in the course of this witness statement. Page references in brackets are to page numbers in "ET1".

**The Claimant's citizenship and passport**

6    I am aware from my firm's files that the Claimant has been an Israeli citizen since 1994. As far as I am aware, he holds no other passport, and had no other passport available to him on or immediately before 26 May 2010, beyond his Israeli "blue" passport. On 9 June 2011, the term of that passport was extended by the Israeli Ministry of the Interior, as shown by the Ministry's letter at page 1 (with an English translation at page 2). The extension which was then granted achieved the purpose of extending the unexpired life of the Claimant's passport up to the 10 year maximum which is permissible when a passport is issued to any Israeli citizen.

7    According to my firm's records, on 26 May 2010 the Claimant's passport was in my firm's custody and so the Claimant cannot have been using it on that date (although of course the passport itself reveals no evidence of travel since the Claimant last entered Israel on 23 May 2009).

2

**Telephone contacts between me and the Claimant on 26 May 2010**

8      The Claimant and I speak to each other frequently on the phone, almost on a daily basis and usually more than once a day. Sometimes those calls last a long time and sometimes a short time. My own mobile phone that I use, and did use on 26 May 2010, bears number 0525257011. My phone uses the Cellcom network and I will refer to my phone as "my Cellcom phone." When I telephone the Claimant I use his mobile phone number 0544666601. This, I have learnt from the Claimant, is a number provided to him by the Israeli mobile provider Orange ("Orange phone").   Although I am aware of the fact that the Claimant also uses another mobile phone (his "Mtel phone"), when he is in Israel, I do not call him on that phone nor do I recall the Claimant calling me from a phone other than his Orange phone

9      At pages 3 to 5 is a redacted copy of the Claimant's phone bill for his Orange phone showing all entries indicating calls between My Cellcom phone and his Orange phone for 26 May 2010.   At page 6 is an English translation of the relevant portions of pages 3 and 4, showing the entries at lines 301, 302 and 310 of the bill. At page 7 is an English translation of the relevant portions of page 5. Having reviewed these extracts, they appeared to me to demonstrate that all the calls listed for 26 May 2010 (that is to say the calls with My Cellcom phone and the other calls on that date, details of which are redacted in ET1) were made while Claimant's Orange phone, or perhaps more accurately the SIM card which it contains, was in Israel. My conclusion has since been confirmed to me by Orange on 27 June 2011, as demonstrated by the exchange of correspondence between me and Orange which, together with translations of the same, are at pages 8 to 13 of exhibit ET1. As is apparent from the exchange, Orange has confirmed that there were a total of 19 outgoing calls made from the Orange phone on 26 May 2010, listed under the same general title "Calls in Israel" and charged under the same tariff of 0.350 new shekels (the tariff which is applicable to calls made by the Orange phone whilst in Israel to other telephone numbers in Israel). As is also

3

apparent from that exchange, Orange has confirmed that the bill which it sent to the Claimant for his Orange phone covering the entire period from 7 May 2010 to 6 October 2010 (a) does not itemise calls made to the Orange phone but only calls made by it and (b) contains no indication that the Orange phone was ever used outside Israel during that period. I have not exhibited a copy of the full bill for the period in question (although I did send it to Orange with my letter of 23 June 2011 which is at pages 8 to 11) because (i) the details of who the Claimant was speaking to throughout this period do not appear to him or to me to be relevant to this application and (ii) the Claimant instructs me that, unless the court requires it, he would wish to preserve confidentiality in relation to those matters and would object to producing an unredacted copy of the entire bill (although the Claimant has of course waived that objection in relation to the calls between him and me for 26 May 2010 in light of the issue before the court).

10      The Claimant's phone bill for his Orange phone for 26 May 2010 shows that there were a total of 3 outgoing calls made from the Orange phone to my Cellcom phone on that date. As is clear from that phone bill (pages 3 to 4 and 6) the first call was made by the Orange phone to my Cellcom phone at 10:51:03am and lasted for 1 min. 16 sec.; the second call was made by the Orange phone to my Cellcom phone at 11:05:35am and lasted for 6 min. 59 sec.; and the third call was made by the Orange phone to my Cellcom phone at 2:05:56pm and lasted for 10 min. 36 sec. As already explained, Orange has confirmed that when these calls took place the Orange phone was in Israel (pages 12-13).

11      Perhaps unsurprisingly in view of the number of times I speak with the Claimant, and the passage of time, I have no particular recollection of these calls but, in the circumstances which I have explained, I have little doubt that the person to whom I spoke on those occasions

was the Claimant.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ............................................................................

Evgeny Traspov

Date: .................... 17 July 2011 ........................

5

1. Claimant
2. E. Traspov
3. First
4. 17 July 2011

Claim No. 2006 Folio 1218

## IN THE HIGH COURT OF JUSTICE

## QUEEN'S BENCH DIVISION

## COMMERCIAL COURT

B E T W E E N:

MICHAEL CHERNEY

Claimant

- and -

OLEG DERIPASKA

Defendant

---

WITNESS STATEMENT
OF EVGENY TRASPOV

---

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Tel:   020 7184 7000
Fax:   020 7184 7001
Ref:   L94/388368
Solicitors for the Claimant

# EXHIBIT R

1. Claimant
2. G. Georgiev
3. First
4 "GG1"
5.  5 July 2011

IN THE HIGH COURT OF JUSTICE                          Claim No. 2006 Folio 1218

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E EN:

MICHAEL CHERNEY

Claimant

- and -

OLEG DERIPASKA

Defendant

---

WITNESS STATEMENT OF
GEORGI GEORGIEV

---

I, **GEORGI GEORGIEV**, of 48 Alabin St., Sofia 1000, Bulgaria will say as follows:

1       I am a Bulgarian lawyer.  I am a partner at the law firm Batkov & Associates (which is the successor of Batkov Stoev Botev & Associates as to matters involving the Claimant) at 48 Alabin St., Sofia 1000, Bulgaria. I speak and read English and am able to provide this statement in English

2       I make this statement with the authority of the Claimant in support of his application for permission to give his evidence at trial by video link and specifically in response to paragraphs 6-18 of the first witness statement of Susan Prevezer QC dated 17 June 2011 and to expand upon the evidence already provided by the Claimant as to his whereabouts on 26 May 2010 (and since). I do so from facts within my own knowledge or derived from my

firm's and personal files and records, save where otherwise indicated. The matters to which I refer as being within my own knowledge are true, and those in respect of which I rely on information that is not within my own knowledge are true to the best of my knowledge and belief. As necessary, I describe the sources of such information in the course of this witness statement. Nothing contained in this statement is intended to waive such privilege as the Claimant is entitled to assert in communications between him and me.

3    Since about 1998 I have acted for the Clamant and/or for his businesses on various legal matters although I may not have met the Claimant until about 2000. It is fair to say that since 2007 at the latest I have communicated with the Claimant on a very regular basis using our respective mobile phones.

4    There is now produced and shown to me a paginated bundle marked "GG1" which contains copies of the documents to which I refer in the course of this witness statement. Page references in brackets are to page numbers in "GG1".

5    When I telephone the Claimant I do so to his mobile phone number +359887777777 and so far as I am aware this is the number from which the Claimant invariably makes his calls to me. This phone number is a Bulgarian mobile phone number operated by Mobiltel (a Bulgarian mobile telecommunications operator which operates under the brand Mtel) ("Mtel") and registered in the name of Professional Football Club Levski AD ("Levski"). I will refer to this phone number as the "Mtel Phone". The Claimant is an Honorary President of Levski (I am aware of this because my firm acts for Levski – indeed we also undertake some work for Mtel – and my partner Mr Batkov is Levski's President). I have no recollection of ever calling the Mtel Phone and speaking to anyone other than the Claimant except on the odd occasion when one of the Claimant's drivers might have answered it to say that the Claimant was on his other phone.

6    I know that the Claimant also uses an Israeli mobile phone number (the "Israeli Phone"), but I do not remember calling him on the Israeli Phone since 2007.

7    I use a mobile phone operated by Mtel, namely +359888306611, to which I will refer as "**My Phone**".

8    At pages 1 to 111 are redacted copies of telephone bills, with English translations, for the Claimant's Mtel Phone which cover the period 21 May 2010 to 20 October 2010. Details of each phone number with which the Mtel Phone connected during the period have been redacted save for the entries which show connections with My Phone.  What is revealed is that during that period there were over 100 telephone calls between me and the Claimant. These include 2 calls made from the Claimant's Mtel Phone on 26 May 2010.  In all cases the bill demonstrates that throughout the period the Mtel Phone was in Israel. This fact was confirmed to me by Mtel on 28 June 2011, as demonstrated by the exchange of correspondence between me and  Mtel between 21 and 28 June 2011 ( pages 112 - 119 ). I have not included within the exhibit the full version of the Claimant's Mtel Phone bill for the period 21 May 2010 to 20 October 2010 although that is what I sent to Mtel.  The Claimant objects to producing the entirety of this bill to the Defendant because neither he nor I consider it to be relevant to the issues before the court for the Defendant to see details of those to whom the Claimant was speaking save as is necessary to demonstrate that he was in Israel on 26 May 2010 and indeed throughout the entire period covered by the bill.

9    Although I naturally do not have any specific recollection of any of these calls, including the ones on 26 May 2010, having regard to what I have said above I have no doubt that I must have been speaking with the Claimant and no one else on each occasion when My Phone is shown to have been connected with the  Mtel Phone except possibly on those occasions where the call was made from or to My Phone and was of extremely short duration.  Where the call is shown to be just a few seconds I believe that to indicate either that the call was never completed for some reason or that, whilst the call was answered, either I or the Claimant was

unable at that moment to speak.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ..................................................................................................
                                    Georgi Georgiev

Date:    5 July 2011

1. Claimant
2. G. Georgiev
3. First
4. 5 July 2011

Claim No. 2006 Folio 1218

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N:

MICHAEL CHERNEY

Claimant

- and -

OLEG DERIPASKA

Defendant

WITNESS STATEMENT
OF GEORGI GEORGIEV

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Tel:   020 7184 7000
Fax:   020 7184 7001
Ref:   L94/388368
Solicitors for the Claimant

# EXHIBIT S

1.  А. Черной
2.  Истец
3.  Первый
4.  14 июль 2011

**В Верховный суд справедливости**

**Отделение королевской скамьи**          Дело 2006, фолио 1218

**Коммерческий суд**

**Между:**

**Михаилом Черным**

<u>Истцом</u>

И

**Олегом Владимировичем Дерипаской**

<u>Ответчиком</u>

---

**Свидетельские показания**
**Аделлы Черной**

---

Я, Аделла Черной, проживающая по адресу: 275 Coleridge Street, Brooklyn, New York 11235, заявляю следующее:

1.  Я являюсь свояченицей (женой брата) Михаила Черного - истца в указанном выше деле. Я даю данные свидетельские от его имени и с его согласия. Я даю данные показания на основании фактов и событий, известных мне лично, кроме случаев, когда указано иное.

2.  Я дала мои показания посредством моего сына Леонида, выступавшего в качестве переводчика для английских адвокатов истца (поскольку его английский лучше моего). Английские адвокаты истца впоследствии подготовили данные свидетельские показания на английском. После этого

эти показания были переведены для меня на русский язык, чтобы я смогла одобрить и подписать их. Во избежание сомнений, я немного говорю на английском, но он не является моим первым языком, и мне гораздо удобнее говорить и писать по-русски.

3.  Я помню, что летом 2010 г. я посетила отделение банка Chase Bank, расположенное по адресу: 722 Brighton Beach Avenue, Бруклин, Нью-Йорк. Я знакома с этим отделением, поскольку члены моей семьи поддерживают с ним банковские отношения примерно с 1994 г., и ранее я посещала это отделение с целью нотариального заверения подписей (в этом отделении есть несколько нотариусов).

4.  В тот раз я помню, что получила с курьером пакет документов от Леонида, который в то время находился в Израиле. Я не помню точно, когда я получила их от Леонида, но это точно было летом 2010 г.

5.  Я не помню точно, какие именно документы прислал мне Леонид, но я помню следующее: они включали в себя один или несколько документов, которые уже были подписаны истцом; различные документы, которые уже были подписаны Леонидом и моим мужем Давидом (оба они в то время находились в Израиле. Там же, как сообщил мне тогда Леонид, находился и истец, который проживает в Израиле). Я помню, что я должна была подписать некоторые из них, и что – по крайней мере, как сообщил мне Леонид – целью этих документов был перевод различной семейной собственности в наши семейные компании, и в процессе этого урегулирование некоторого юридического недостатка, обнаружившегося в связи с парковочным местом на 501 Surf Avenue в Бруклине.

6.  Я помню, что Леонид разговаривал со мной и сказал мне, что когда я получу документы, мне надо будет сделать нотариальное заверение различных подписей, включая мою собственную. Хотя это означало, что большая часть подписей будет нотариально заверена в отсутствие тех, кто подписал документы, я не считала это проблемой. Ранее мне уже приходилось нотариально заверять подписи в Нью-Йорке, в том числе нотариусами в банке Chase Bank, в отсутствие лиц, поставивших свои подписи.

7.  Получив пакет документов, я пошла в отделение банка Chase Bank, которое я уже упомянула, и попросила встретиться с одним из нотариусов. Я не помню дату моего визита, но это было через день или через несколько дней

после получения документов от Леонида. Я не просила встретиться с г-жой Коган (нотариусом, которая фактически заверила документы) – скорее, меня направили к ней. В этом отделении банка работают по меньшей мере три нотариуса, с которыми я сталкивалась раньше, одним из которых является г-жа Коган. Я могу сказать, что я и г-жа Коган знали друг друга в лицо и обменивались любезностями, но я не думаю, что она когда-либо ранее нотариально заверяла принесенные мной документы.

8. Я не помню, сколько документов я принесла г-же Коган, но среди них точно были документы, уже подписанные истцом, моим мужем Давидом и моим сыном Леонидом. Я просмотрела копии двух документов с подписями истца на стр. 1-5 приложения SRP1 к показаниям г-жи Превизер. Я полагаю, однако было бы справедливо сказать, что я не полностью уверена в том, что эти документы были среди документов, переданных мной г-же Коган, которые она нотариально заверила во время моего визита к ней летом 2010 г.

9. Когда я явилась к г-же Коган в тот раз, я была одна. Я должна сказать, что я находилась у нее не более пяти минут максимум, пока она нотариально заверяла многочисленные документы, представленные мной (которые включали документы, которые истец не должен был подписывать). Как я уже объясняла, все подписи на документах, подписанных истцом, включая собственную подпись истца, были сделаны еще до моего визита к г-же Коган. Я помню, что г-жа Коган просмотрела документы, которые она должна была нотариально заверить, очень быстро, и спросила, может ли она поговорить с моим мужем и сыном, чтобы подтвердить их подписи. Я помню, что тогда она поговорила по телефону и с моим мужем, и с моим сыном (оба они находились в Израиле), либо с одного из банковских телефонов, либо с моего мобильного телефона. Хотя г-жа Коган попросила поговорить с моим мужем и сыном, чтобы подтвердить их подписи, она не попросила ничего подобного в отношении подписи истца, и не задавала никаких вопросов по поводу его подписи. Возможно, она не заметила, что в документах была еще одна подпись, которую нужно было нотариально заверить, поскольку, как я помню, она не рассматривала документы подробно. В любом случае, она нотариально заверила подписи на всех

документах, которые я принесла ей, включая мою подпись на тех документах, которые я должна была подписать, не задавая вопросов.

10. Мое внимание привлекли к тому факту, что на страницах документов, содержащих подписи, которые я прилагаю (на стр. 3 и 5), не только указано, что Михаил и Леонид явились к г-же Коган в Нью-Йорке, но и сказано, что они сделали это 26 мая 2010 г. Я лично не помню даты, когда я пришла к г-же Коган, чтобы нотариально заверить эти документы, но я абсолютно уверена, что когда я явилась к г-же Коган, я была одна, и что документы, которые я представила ей, уже были подписаны моим мужем, моим сыном и истцом. Я не могу вспомнить, была ли написанная от руки дата в документах (26 мая 2010 г.) проставлена в документах до того, как я явилась к г-же Коган.

11. После того, как документы были нотариально заверены, я лично отнесла их в офис Анны Латковской, американского адвоката, которая представляет интересы Леонида и моей семьи (но не интересы истца). И в этом случае я не знаю, какого числа я посетила ее офис, но я уверена, что принесла и передала ей все документы.

**Подтверждение подлинности**

Я полагаю, что факты, изложенные в данных свидетельских показаниях, являются подлинными.

Подпись: _____

Аделла Черной

Дата: _07/14/2011_____

1. A Chernoy
2. Claimant
3. First
4. 14 July 2011

IN THE HIGH COURT OF JUSTICE                    CLAIM NO. 2006 FOLIO 1218

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN

MICHAEL CHERNEY

Claimant

-and-

OLEG VLADIMIROVICH DERIPASKA

Defendant

---

WITNESS STATEMENT OF ADELLA CHERNOY

---

I, **ADELLA CHERNOY** of 275 Coleridge Street, Brooklyn, New York 11235 will say as follows:

1        I am the sister-in-law of the Claimant in the above proceedings, Michael Cherney, and make this statement on his behalf and with his authority. I do so from facts and matters within my own knowledge, save where otherwise indicated.

2        I have provided my evidence via my son, Leonid, acting as an interpreter (because his English is better than mine) to the Claimant's English lawyers who then prepared this witness statement in English. This statement was then translated into Russian for me to approve and sign. For the avoidance of doubt, I do speak some English but it is not my first language and I am more comfortable speaking and writing in Russian.

11388334

3          I recall that in the summer of 2010 I attended at a branch of Chase Bank which is located at 722 Brighton Beach Avenue in Brooklyn, New York.  I am familiar with this branch because my family has had a banking relationship there since about 1994 and, on previous occasions, I have in fact attended that branch to have signatures notarised (they have several notaries who are based at that branch).

4          On this occasion I recall that I had received a package of documents by courier from Leonid who was then in Israel.  I cannot recall precisely when I received them from Leonid but it was certainly in the summer of 2010.

5          I do not have a detailed recollection of what documents Leonid sent me but I do have the following recollections about them: they included one or more documents which had already been signed by the Claimant; various of the documents had already been signed by Leonid and by my husband David (both of whom were in Israel at the time as was, according to what Leonid told me at the time, the Claimant, who lives in Israel); that I had to sign some of them; and that, at least as Leonid had told me,  the purpose of the documents was to transfer various family properties to our family companies and, in the process, to regularise some sort of legal defect which had emerged relating to a parking space at 501 Surf Avenue in Brooklyn.

6          I recall that Leonid had spoken to me and had told me that when I received the package, I needed to get the various signatures notarised, including my own.  Although this meant that most of the signatures would be notarised without those who had signed the document being present, I did not regard this to be a problem.  I had on previous occasions had signatures notarised in New York, including by notaries based at Chase Bank, without the signatories being present.

7          After receiving the packages of documents, I visited the Chase Bank branch that I have already mentioned and asked to see one of the notaries.  I cannot recall the date of my visit but it would have been within a day or so of my receiving the documents

11388334

from Leonid. I did not ask to see Ms Kogan (the notary who in fact notarised the documents) but, rather, was just directed to her. There are at least 3 notaries at that branch who I have come across before, one of whom is Ms Kogan. I would say that Ms Kogan and I knew each other by sight and to exchange pleasantries but I do not believe that she had ever notarised documents which I had brought into her before.

8       I have no personal recollection of the number of documents that I brought to Ms Kogan but they certainly included documents that already bore signatures of variously, the Claimant, my husband David and my son Leonid. I have looked at the copies of two documents bearing the Claimant's signature which appear between pages 1-5 of exhibit "SRP 1" to the statement of Ms Prevezer. I believe, although it is fair to say that I cannot be completely sure about this, that these were amongst the documents that I presented to Ms Kogan, and which she notarised, when I visited her on this occasion in the summer of 2010.

9       When I was present before Ms Kogan on that occasion I was alone. I would say that I was with her for no more than five minutes at the most whilst she notarised the numerous documents that I produced to her (which included documents that the Claimant had not needed to sign). As I have explained, all of the signatures on the documents which the Claimant had signed, that is to say including the Claimant's own signature, were already there before I visited Ms Kogan. I recall that Ms Kogan looked at the documents which needed to be notarised only very briefly and asked if she could speak to my husband and my son in order to verify their signatures. I recall that she then spoke with both my husband and my son by telephone (they were both in Israel) either using one of the bank's phones or my mobile phone. Although Ms Kogan asked to speak with my husband and son to verify their signatures she never made a similar request in relation to the Claimant's signature or raised any queries about his signature. It is possible that she did not notice in the documents another one of the signatures which needed to be notarised because she did not look at the

11388334

documents in any detail from what I can recall. In any event she notarised all of the signatures on the documents which I had produced to her, including my signature on those documents which I had needed to sign, without question.

10      It has been drawn to my attention that the signature pages of the documents which I exhibit (at pages 3 and 5) not only indicate that Michael and Leonid appeared before Ms Kogan in New York but that they did so on 26 May 2010. I have no personal recollection of the date when I attended in front of Ms Kogan to get these documents notarised but I am absolutely certain that when I attended before Ms Kogan, I did so alone and that the documents I presented to her had already been signed by variously my husband, my son and the Claimant. I cannot recall whether the handwritten date on the documents (26 May 2010) was there before I attended in front of Ms Kogan..

11      After getting the documents notarised. I personally took them to the offices of Anna Latkovskaia, the US attorney who was representing Leonid and my family's (but not the Claimant's) interests. Again, I do not know on what date I visited her office but I am sure that I took the documents to her and handed her all of them.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed..................................................

     Adella Chernoy

Dated   14 July 2011

11388334

1. A Chernoy
2. Claimant
3. First
4. 14 July 2011

**CLAIM NO. 2006 FOLIO 1218**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**BETWEEN**

**MICHAEL CHERNEY**

**Claimant**

-and-

**OLEG VLADIMIROVICH DERIPASKA**

**Defendant**

---

**WITNESS STATEMENT OF**

**ADELLA CHERNOY**

---

Dechert LLP

160 Queen Victoria Street

London

EC4V 4QQ

Solicitors for the Claimant

Ref: 960094/388368

11388334

# EXHIBIT T

1. Д. Черной
2. Истец
3. Первый
4. «ДС1»
5. 6 июль 2011

**В Верховный суд справедливости**

**Отделение королевской скамьи**                              Дело 2006, фолио 1218

**Коммерческий суд**

Между:

Михаилом Черным

<u>Истцом</u>

И

Олегом Владимировичем Дерипаской

<u>Ответчиком</u>

---

### Свидетельские показания
### Давида Черного

---

Я, Давид Черной, проживающий по адресу: а-Цедеф 3, Герцлия Питуах, Израиль, заявляю следующее:

1. Я являюсь братом Михаила Черного - истца в указанном выше деле, и даю данные свидетельские показания от его имени и с его согласия. Я делаю это на основании фактов и событий, известных мне лично, кроме случаев, когда указано иное.

2. Я дал мои показания посредством г-на Траспова, израильского адвоката истца, который также выступал в качестве переводчика (поскольку я не говорю на английском) для английских адвокатов истца, которые впоследствии подготовили данные свидетельские показания на

английском. Затем эти показания были переведены для меня на русский язык, чтобы я одобрил и подписал их.

3.  Несмотря на то, что я являюсь гражданином США, я живу в Израиле в течение последних пяти лет или около того, и сейчас редко посещаю США.

4.  Я помню некоторые операции, имевшие место летом 2010 г., и относившиеся к некоторой семейной собственности, находящейся в США. Я помню, что мой сын Леонид, который координировал документацию, связанную с операциями, сообщил мне, что по крайней мере некоторые из них относятся к стоянке. Я помню, кто координацией этих операцией занимался Леонид. Я помню, что подписывал различные документы, относящиеся к этим операциям, но не помню подробностей этих документов, а также того, когда я их подписывал, но во время подписания я находился в Израиле. Леонид объяснил мне общую цель и значение документов, однако сейчас я мало помню, что он говорил мне, и он попросил меня подписать документы. Я не изучал их подробно, поскольку я не читаю на английском, и понял, что это всего лишь формальность. Я также полагался на объяснения, данные мне Леонидом, которому я полностью доверяю.

5.  Я не знаю, что я делал 26 мая 2010 г., но я несомненно находился в Израиле. На стр. 1-6 приложения ДС1 находится копия моего нынешнего паспорта, из которой видно (на стр. 7), что я въехал в Израиль 25 мая 2010 г. На стр. 17 приложена сокращенная копия счета за мою кредитную карту, в котором указана одна операция, совершенная мной 26 мая 2010 г. На стр. 18 приложен документ, который, как мне объяснили, является английским переводом соответствующей части этого документа. Перевод был сделан для меня израильским переводчиком Еленой Семенович. Выполненная операция касалась приобретения бензина для моего автомобиля, и имела место в Израиле. На стр. 19-20 приложена сокращенная копия счета за мой мобильный телефон, содержащая разговоры за 26 мая 2010 г., вместе с документом, который, как мне объяснили, является английским переводом соответствующего отрывка на стр. 21-22 (перевод был также сделан для меня г-жой Семенович). Счет за телефон показывает, что звонки, сделанные мной в тот день по мобильному телефону, были сделаны мной из Израиля.

6. После того, как я подписал документы, указанные в параграфе 4 выше, я узнал, что они были представлены в Chase Bank. Я узнал об этом, потому что мне позвонила женщина из Chase bank по поводу документов. Я полагаю, что Леонид говорил мне, что мне могут позвонить по этому вопросу. Я не помню имени человека, с которым я разговаривал, или даты разговора, но я помню, что мы говорили на русском, и она задала мне несколько формальных вопросов по поводу документов, которые я подписал - полагаю, для того, чтобы убедиться, что я дал свое согласие на эту операцию (и я подтвердил, что я дал).

7. Меня спросили, известно ли мне имя Александры Коган, но это имя мне ничего не говорит.

**Подтверждение подлинности**

Я полагаю, что факты, изложенные в данных свидетельских показаниях, являются подлинными.

Подпись: _____

Давид Черной

Дата: _6_ июля 2011 г.

1. Д.Черной
2. Истец
3. Первый
4. «DC1»
5. 6 июль 2011

**В Верховный суд справедливости**

**Отделение королевской скамьи**          Дело 2006, фолио 1218

**Коммерческий суд**

Между:

Михаилом Черным

<u>**Истцом**</u>

И

Олегом Владимировичем Дерипаской

<u>**Ответчиком**</u>

---

### Свидетельские показания
### Давида Черного

---

Dechert LLP

160 Queen Victoria Street

London

EC4V 4QQ

Solicitors for the Claimant

Ref: 960094/388368

1. D Chernoy
2. Claimant
3. First
4. "DC1"
5. 6 July 2011

IN THE HIGH COURT OF JUSTICE                    CLAIM NO. 2006 FOLIO 1218

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN

MICHAEL CHERNEY

Claimant

-and-

OLEG VLADIMIROVICH DERIPASKA

Defendant

---

WITNESS STATEMENT OF DAVID CHERNOY

---

I, **DAVID CHERNOY** of Hatzedef 3, Herzeliah Pituah, Israel will say as follows:

1        I am a brother of the Claimant in the above proceedings, Michael Cherney, and make this statement on his behalf and with his authority.  I do so from facts and matters within my own knowledge, save where otherwise indicated.

2        I have provided my evidence via Mr Traspov, the Claimant's Israeli lawyer, acting as an interpreter (because I do not speak English) for the Claimant's English lawyers who then prepared this witness statement in English.  This statement was then translated into Russian for me to approve and sign.

3           Although I am a citizen of the United States, I have lived in Israel for the last five years or so and rarely visit the United States now.

4           I have a recollection of some transactions which took place in the summer of 2010 relating to some family properties located in the United States. I recollect being told by my son Leonid, who coordinated the documentation for the transactions, that at least some of them related to a parking spot. I recollect that the transactions were coordinated by Leonid. I recall signing various documents relating to these transactions but I cannot remember the detail of the documents or when I signed them but I was in Israel when I did so. Leonid explained to me the general purpose and meaning of the documents, although I cannot remember much of what he told me now, and he asked me to sign the documents. I would not have looked at them in detail because I do not read English and understood them to be just a formality. I also relied on the explanations given to me by Leonid, whom I trust completely.

5           I do not know what I was doing on 26 May 2010 but I was certainly in Israel. At pages 1-16 of "DC1" is a copy of my current passport which shows (on page 7) that I entered Israel on 25 May 2010. At page 17 is a redacted copy of my credit card bill which shows one transaction which I entered into on 26 May 2010. At page 18 is what I am told is an English translation of the relevant portion of it, the translation having been produced for me by an Israeli-based translator, Ms Elena Semenovich. That transaction involved the purchase of petrol for my car and took place in Israel. At pages 19-20 is a redacted copy of the telephone bill for my mobile telephone showing entries for 26 May 2010, with what I am told is an English translation of the relevant portion at pages 21-22 (the translation again having been produced for me by Ms Semenovich). The telephone bill shows that when the calls which I made from my mobile phone on that day took place I was making the calls from Israel.

6             After I signed the documents mentioned in paragraph 4 above I learned that they had been presented to Chase bank.    I learned that because I recall that I received a telephone call from a lady from Chase bank about the documents.  I believe Leonid had told me that I might receive such a call.   I do not recollect the name of the person I spoke to or the date of the conversation but I do recall that we spoke in Russian and she asked me some formal questions about the documents that I had signed, I think to ascertain that I agreed to the transactions in question (and I confirmed that I did).

7             I have been asked if I know the name Alexandra Kogan but the name means nothing to me.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed...................................................

       David Chernoy

Dated      6   July 2011

1. D Chernoy
2. Claimant
3. First
4. "DC 1"
5. 6 July 2011

**CLAIM NO. 2006 FOLIO 1218**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**BETWEEN**

**MICHAEL CHERNEY**

**Claimant**

-and-

**OLEG VLADIMIROVICH DERIPASKA**

**Defendant**

---

**WITNESS STATEMENT OF**

**DAVID CHERNOY**

---

Dechert LLP

160 Queen Victoria Street

London

EC4V 4QQ

Solicitors for the Claimant

Ref: 960094/388368

# EXHIBIT U

1.  L Chernoy
2.  Claimant
3.  Second
4.  LC1
5.  July 2011

**IN THE HIGH COURT OF JUSTICE**                    **Claim No. 2006 Folio 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E EN:**

## MICHAEL CHERNEY

**Claimant**

- and -

## OLEG DERIPASKA

**Defendant**

---

### SECOND WITNESS STATEMENT OF LEONID CHERNOY

---

I, **LEONID CHERNOY**, of Sharon Arie 6/16 Tel Aviv, Israel will say as follows:

1       I refer to my first witness statement herein and once again make this statement on the Claimant's behalf and with his authority and do so from facts and matters within my own knowledge or derived from reading documents which passed between me and Anna Latkovskaia, Anna having acted as the US attorney for me and members of my family (not including the Claimant) in relation to various real estate transactions in 2010. Nothing in this statement is intended to waive such privilege as I and members of my family are entitled to assert in relation to communications which passed between us and Anna.

2       The purpose of this witness statement is to provide a more detailed account of the events leading to the Claimant signing various documents that I presented to him in Israel in order to

1

effect the transfer from him in 2010 of 501B Surf Avenue Parking Lot 202 (the "Parking Lot").

3     In April 2010, I contacted Anna Latkovskaia and engaged her on behalf of myself and my immediate family to prepare documents for us in order to effect the transfer of certain properties (I may even have discussed this assignment with Anna before April), and associated parking spaces, between various members of my family and two LLC's which were ultimately beneficially owned by us. Amongst the properties and parking spaces involved was the Parking Lot.

4     At the time I provided instructions to Anna, I thought that the Parking Lot was registered under my father's name. It was Anna who drew my attention to the fact that it remained registered under the Claimant's name on 6 May 2010. My immediate reaction on discovering this news was that the transfer from the Claimant to my father must have been neglected and I therefore instructed Anna to proceed with the transfer of the Parking Lot to the LLC known as "501B 5K4K LLC". I told Anna that the Claimant would sign whatever was needed to effect this transfer as I was very confident that would be the case. The reason for my confidence was that I had already had a conversation with the Claimant by that point and he had told me that he would sign what transfer documents were needed to effect the transfer of the Parking Lot. Although, as I have said, there were other transactions that Anna was working on, the only transaction which was going to necessitate obtaining signatures from the Claimant was that relating to the Parking Lot.

5     As I believe Anna will confirm, I was not sent by her all of the documents (and information that I needed so as to download completed forms) for execution in order to transfer the Parking Lot until after 26 May 2010. For example, it was not until 7 June that I was sent the final version of the Parking Space Unit Deed and it was only on 3 June 2010 that I was given the relevant details to enable me to access and download forms needed from ACRIS.

2

6     Following the review of Anna's files which has taken place since my first witness statement, I now gather that there were in fact 6 documents which the Claimant needed to sign, and which Anna produced for me to get him to sign, in order to achieve the transfer of the Parking Lot to the LLC. Those documents are copied within exhibit "LC 1" for ease of reference. Although I had, and frankly still have, little recollection of how many documents I took to the Claimant to sign, I have no reason at all to doubt and do not doubt that I took all of the documents that Anna asked me to have the Claimant sign to him and that he signed them in my presence in Israel when I went to see him. On that occasion, although I cannot remember the date when it took place, I explained to the Claimant the general nature and purpose of asking him to sign the various documents but I certainly did not translate the documents for him nor did I explain in detail what each document was (I would not necessarily have fully understood them myself).

7     I recall that the Claimant was entirely happy to proceed on the basis that what I was asking him to do was only to sign documents which would carry into effect a transaction that we had both thought had been achieved some considerable time before. I did not discuss with the Claimant whether and how the various documents needed to be notarised. I recall that I had in fact already signed those documents that required my signature myself before I asked the Claimant to do so but that the manuscript within the notarisation sections remained blank when I asked the Claimant to sign the documents.

8     After the Claimant had signed the documents, I inserted the date 26 May 2010 on them in my own handwriting. I am not legally qualified and, looking back on it now, I realise that putting the date where I did was not appropriate. What was in my mind at the time was that I had already told the LLC's tenants of the properties (they are all rental properties) that as of 1 June 2010 they should provide their rental cheques in the name of the LLC and so I thought it important to date the signatures before that date. In any event, I can confirm that the date was applied by me in my handwriting but only after both my and the Claimant's signatures had been placed on the various documents as appropriate.

3

9       After that took place, I arranged for the documents to be delivered by courier to my mother, who was in New York. I asked her to arrange for the signatures to be notarised in New York. I did not regard this as a problem because I was aware that, in the past, signatures had been notarised for us by notaries in New York, including I believe by notaries at the Chase Bank branch to which my mother went.

10      The sequence of events which I have described above is supported by the appearance of one of the copy documents within exhibit "LC 1." One of the pages within that exhibit has been reproduced in colour, this being the Smoke Detector Affidavit (page 6 of "LC 1"). As will be seen from page 6, the affidavit was signed both by me and by the Claimant in blue ink, with the manuscript date of 26 May 2010 also being in that ink. By contrast, Ms Kogan's signature on the Affidavit appears in black ink.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ..................................................................................

**Leonid Chernoy**

Date: ............. *July 8, 2011* .............

4

1.   L Chernoy
2.   Claimant
3.   Second
4.   LC1
5.       July 2011

**Claim No. 2006 Folio 1218**

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

**MICHAEL CHERNEY**

**Claimant**

- and -

**OLEG DERIPASKA**

**Defendant**

---

**SECOND WITNESS STATEMENT
OF LEONID CHERNOY**

---

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Tel:   020 7184 7000
Fax:   020 7184 7001
Ref:   960094/388368
**Solicitors for the Claimant**

# EXHIBIT V

1.  A Latkovskaia
2.  Claimant
3.  Second
4   "AL1"
4.    July 2011

Claim No.  2006 Folio 1218

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

B E T W E E N:

MICHAEL CHERNEY                                    <u>Claimant</u>

- and -

OLEG DERIPASKA                                     <u>Defendant</u>

_____

SECOND
WITNESS STATEMENT OF
ANNA LATKOVSKAIA

_____


I, **ANNA LATKOVSKAIA**, of 3820 Nostrand Avenue, Suite 101, Brooklyn, NY 11220, United

States of America will say as follows:

1       I make this second witness statement to expand upon the matters which I dealt with in

        something of a hurry over the weekend of 18/19 June 2011 in my previous statement. Once

        again I make this statement on behalf of and with the authority of the Claimant and I do so

        from facts and matters within my own knowledge, or derived from my files. In addition, I am

        making this statement with the permission of Leonid Chernoy ("Leonid") and the members of

        his family for whom I was acting in relation to the transactions described in this statement but

        nothing which I say in this statement is to be taken as a waiver of privilege in

1

communications between me and Leonid/my other clients. (For the avoidance of doubt I was not acting at any stage for the Claimant in relation to these matters).

2    There is now produced and shown to me a paginated bundle marked "AL1" which contains copies of the documents to which I refer in the course of this witness statement. Page references in brackets are to page numbers in "AL1". One of the pages within "AL1" has been reproduced in colour, this being the Smoke Detector Affidavit [9].

**The assignments I was working on in and after May 2010 for Leonid and his family**

3    I have now had a chance to review my files in some detail and, having done so, can provide a fuller account of the work I was doing for Leonid and his family in 2010. The origin of the assignment was in April 2010 when I was contacted by Leonid and asked to assist in the preparation of documents to effect the transfer of certain properties, and associated parking spaces, between Leonid and other members of his immediate family and between them and two LLC's (ultimately beneficially owned by those Chernoy family members). The properties/parking spaces concerned were:

3.1    2805 Ocean Parkway Unit 9A and Parking Lot 22;

3.2    2805 Ocean Parkway Unit 9B and Parking Lot 8;

3.3    501B Surf Avenue 4K; and

3.4    501B Surf Avenue 5K and Parking Lot 202 ("Parking Lot 202").

4    The initial instructions provided by Leonid required some clarification because he had in some respects proceeded under misapprehensions as to who was registered as the owner of some of these properties. One of his misapprehensions related to the then ownership of Parking Lot 202 which he had thought was registered under his father David's name but, as I discovered, in fact remained registered under the name of the Claimant. I told Leonid about this misapprehension on 6 May 2010.

11392283

2

5       On the same day, Leonid informed me that the Claimant was his uncle and said that when the apartment 501B Surf Avenue 5K had been transferred from the Claimant to David, the transfer of Parking Lot 202 must have been neglected. Leonid instructed me to proceed now with the transfer of Parking Lot 202 to one of the LLC's namely "501B 5K4K LLC." He also told me that the Claimant would sign whatever was needed to effect this transfer. For the avoidance of doubt, there was never any suggestion that the Claimant's signature would be needed to effect any other transaction beyond the transfer of Parking Lot 202 and, indeed, it was only documents that I prepared to effect that particular transfer that were produced for the Claimant's signature.

6       On 25 May 2010, I informed Leonid that the drafting of all the documents that were needed to effect the various transactions were 80% ready. On 27 May 2010 I informed Leonid that I would send him all the documents and the access password into the Automated City Register Information System ("ACRIS") so that he could find and print the ACRIS forms. It may assist if I now outline how real estate transactions in New York City proceed to help explain how the ACRIS system works.

**Recording a New York City ("NYC") real estate transaction**

7       In NYC, the Department of Finance is responsible for the collection of real property taxes and other property-related charges after a real estate transaction has taken place. The main system in NYC for preparing and recording real estate transfer documentation is the ACRIS system.

8       Prior to the ACRIS system, attorneys had to manually prepare each transfer tax form and related documents. Under the ACRIS system, the attorneys (or the title company) log onto the NYC ACRIS system and input the necessary information once and the ACRIS system generates the forms. The generated forms are accessible to anyone with the proper transaction ID and authorization code.

3

11392283

9       Prior to the closing of a real estate transaction, the grantor's counsel will prepare the deed and transfer tax forms ("Transfer Tax Forms") portion of the ACRIS forms to be executed at closing. The Transfer Tax Forms to be completed are:

9.1    Affidavit of Compliance with Smoke Detector Requirement ("Smoke Detector Affidavit").

9.2    Customer Registration Form for Water and Sewer Billing ("Water Billing Form").

9.3    New York City's Real Property Transfer Tax Return ("NYC-RPT").

9.4    New York State Real Property Transfer Report for New York City ("RP-5217 NYC").

9.5    New York State Real Estate Transfer Tax Return ("NYS RETT" or "TP-584").

9.6    An Affidavit in Lieu of Registration, which is required when a property is not a multiple dwelling ("Affidavit in Lieu of Registration").

10     NYC requires cover pages ("Cover Pages") to be submitted with each document to be recorded/filed and for each supporting document to be recorded/filed. The document being recorded (i.e., the deed), must be accompanied by an ACRIS Recording and Endorsement Cover Page. If the document is accompanied by supporting documents (Smoke Detector Affidavit, Water Billing Form), a Supporting Document Cover Page must be submitted. If the document is accompanied by a NYS RETT, an ACRIS NYS Real Estate Transfer Tax Return Cover Page must precede the return. If the document is accompanied by a NYC RPT, an ACRIS NYC Real Property Transfer Tax Return Cover Page must precede the return. If the document is subject to recording fees and/or taxes, an ACRIS Payment Cover Page must accompany the payment.

11     When Transfer Tax Forms are prepared, ACRIS assigns a "Document ID" to the forms, which can be found on the bottom right of the Transfer Tax Forms. The Document ID is made up of the following: the first 8 digits which refer to the year, month and day that the Transfer Tax Forms were prepared; then 5 digits that, together with the first 8 digits, make up the

11392283

Transaction Number; followed by "Worksheet Numbers," which identify the particular document within the Transaction. To support my conclusion that the first eight digits of the Document ID refer to the year, month and day that the Transfer Tax Forms were prepared, I refer to an exchange of e-mails which passed between the New York City Department of Finance and Frankfurt Kurnit Klein & Selz PC, the Claimant's US attorneys [1].

12      When preparing for a closing, attorneys can either prepare the Transfer Tax portion of the ACRIS Forms themselves or engage a title company to prepare the forms. Later, after the deed and Transfer Tax Forms have been executed and are ready for recording, the attorney, or the title company, will prepare the appropriate Cover Pages. The documents, and payment for any recording fees and taxes, may be mailed or presented in person at the City Register's Office where the property is located.

13      When the transaction documents are ultimately recorded, a City Register File Number ("CRFN") is assigned. The CRFN is a permanent, unique number assigned by ACRIS to a document at the time of recording. The CRFN is printed in the City Register endorsement area at the bottom right of the Recording and Endorsement Cover Page.

**How matters progressed in and after May 2010**

14      I now revert to how matters proceeded in May 2010. On 29 May 2010 I told Leonid that he should receive some of the required documents by the following Wednesday at the latest but that the deed for the Claimant to execute would not be ready by then as I needed confirmation as to whether the Claimant had a social security number. I sent the Affidavit in Lieu of Registration [6] to Leonid on 4 June 2010 and it was not until 7 June that I sent the final version of the Parking Space Unit Deed [2-5] to Leonid. For the balance of the documents that were needed for that transaction, I told Leonid to download them from the ACRIS website. I had generated these ACRIS forms on 28 May 2010 and on 3 June 2010 I had given Leonid the relevant details that he would need in order to be able to access the site for that purpose. By 7 June 2010, as far as I was concerned I had sent Leonid all of the documents

5

needed to effect the various transactions including, but not limited to, the transfer of Parking Lot 202.

15    Having checked my records, I see that it was on 19 June 2010 that Adella Chernoy visited my office and delivered to me (amongst other things) the executed documents that were necessary to effect the transfer of Parking Lot 202 which had been, where appropriate, notarised already. I have no knowledge as to the actual date when the notarisation took place but from the chronology which I have described, it cannot have been on 26 May 2010. Having received the documents from Adella, my records show that I submitted the necessary documents for filing at the City Register's Office and that these documents were recorded by that office on 22 September 2010.

**The filing of the documents relating to the transfer of Parking Lot 202 on the ACRIS system**

16    The timing of what I have described above relating to the transfer of Parking Lot 202 can be illustrated by reference to the ACRIS filings. In the table below, I describe and comment so far as relevant upon some of the documents which appears on the ACRIS system relating to this transaction:

| Document (page number in "AL 1") | Commentary |
|---|---|
| Water Billing Form [7] | This is a form directing the City to issue a future water bill to the Purchaser. The Water Billing Form was signed and dated "05-26-2010" i.e. 26 May 2010 but the Document ID number on the bottom right of this document is "2010052800078101," which means that this document was only generated on 28 May 2010 and so plainly could not have been signed two days earlier. |
| RP-5217 NYC [8] | This a new York State Real Property Transfer Report and is a form used to document the information associated with all real property transfers within New York State. This document was again generated on 28 May 2010 as indicated by the Document ID and so could not have been signed two days earlier. |
| Smoke Detector Affidavit [9] | This verifies that there was a working smoke detector at the Unit. This document was apparently notarized on 26 May 2010, but was in fact only generated two days after that as indicated by the Document ID. As already mentioned [9] is |

6

|  | a colour copy of this document, this being because the original document was on my file (I do not have the originals of the other documents that the Claimant signed). |
|---|---|
| NYC RPT [10-13] | This is a New York City Transfer Tax Return which identifies the parties, the subject property, the attorneys and the consideration and applicable tax, if any.  This document bears the Document ID number "2010052800078101," once again showing that it was also generated on 28 May 2010 and so could not have been signed two days earlier. |
| NYS RETT (TP-584) [14-18] | This document was again generated on 28 May 2010 as indicated by the Document ID. |
| Letter from the NYC Department of Finance [19] | This letter, dated 22 September 2010 is a confirmation letter sent to the individual listed in the "Return To" section on the Cover Pages.  The letter indicates that the deed, and supporting documents, was successfully recorded in the City's Register's Office (I attended to the process of recording the documents gradually so as to lessen the risk of the City Register's Office making mistakes with the documents, a problem that I had experienced in the past). |

17    I should just add that some of the documents described above, such as the Smoke Detector Affidavit and the Water Billing Form, may seem rather curious and rather unnecessary documents for the purpose of transferring a parking space. The reason they were prepared is that, had they not been, the filings which I was making at the City Register's Office would have been rejected as these forms are in my experience considered essential whatever the nature of the property being transferred.

18    To summarise the position, both my records from my file described above and the ACRIS forms show that the notarising of the documents relating to the transfer of Parking Lot 202 did not take place, and could not have taken place, on 26 May 2010.  The Document ID number    on    the    Transfer    Tax    Forms    indicates    that    the    forms    were

not generated (hence, did not exist), until 28 May 2010.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ...........................................................................

Anna Latkovskaia

Date: 11th July 2011

8

11392283

1.  A Latkovskaia
2.  Claimant
3.  Second
4   "AL 1"
4.    July 2011

Claim No. 2006 Folio 1218

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N:

MICHAEL CHERNEY

Claimant

- and -

OLEG DERIPASKA

Defendant

---

SECOND WITNESS STATEMENT
OF ANNA LATKOVSKAIA

---

Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ

Tel:   020 7184 7000
Fax:  020 7184 7001
Ref:  L94/388368
Solicitors for the Claimant

11392283

# EXHIBIT W

|     |            |
| --- | ---------- |
| 1.  | Claimant   |
| 2.  | B.E. Maas  |
| 3.  | First      |
| 4   | "BEM 1"    |
| 4.  | July 2011  |

**IN THE HIGH COURT OF JUSTICE**                    **Claim No.  2006 Folio 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E EN:**

**MICHAEL CHERNEY**

                                                                                **Claimant**

- and -

**OLEG DERIPASKA**

                                                                                **Defendant**

**WITNESS STATEMENT OF
BRIAN EDWARD MAAS**

I, **BRIAN EDWARD MAAS**, 488 Madison Avenue, 10th Floor, New York, New York 10022, will say as follows:

1.  I am a shareholder and director of Frankfurt Kurnit Klein & Selz, P.C. ("FKKS"), a law firm with its office at 488 Madison Avenue, New York, New York 10022.  I am a member of the New York State Bar as well as the bar of the United States Supreme Court and several of the Federal Appellate Circuits Courts and District Courts.

2.  FKKS represents the Claimant in a lawsuit pending in the Supreme Court of the State of New York, County of New York entitled Alexander Gliklad v. Michael Cherney and in which I am lead counsel.

11391232

3.   I am authorised to make this witness statement on behalf of the Claimant and do so from facts within my own knowledge or derived from my firm's files and records and personal files and records, save where otherwise indicated. The matters to which I refer as being within my own knowledge are true, and those in respect of which I rely on information that is not within my own knowledge are true to the best of my knowledge and belief. As necessary, I describe the sources of such information in the course of this witness statement. Nothing contained herein is intended to waive such privilege as the Claimant is entitled to assert in communications between us.

4.   I make this statement to record and explain the efforts that I have made on behalf of the Claimant to interview Alexandra Kogan since June 20, 2011 and also to provide evidence about the procedures that existed in May 2010 when foreign nationals sought to enter the United States.  The information being provided on the latter issue and my conclusions set forth below are based on research of publicly available information conducted by me and my colleagues.

5.   There is now produced and shown to me a paginated group of documents marked "BEM1" which contains copies of the documents to which I refer in the course of this witness statement. Page references in brackets are to page numbers in "BEM1".

6.   I understand from Andrew Hearn of Dechert LLP, solicitors for the Claimant in these proceedings, that an issue has arisen as to whether Mr. Cherney was present in New York on May 26, 2010 when certain documents were allegedly notarised by an individual named Alexandra Kogan.  On 20 June 2011 Mr. Hearn asked me and my firm to assist in gathering information and in particular to locate and try to interview Ms Kogan.

7.   I reviewed the documents exhibited to Ms Prevezer's statement showing that Ms. Kogan had signed and affixed her notary stamp thereon beneath an attestation stating that the Claimant had appeared before her in Kings County (Brooklyn) New York on May 26, 2010 to sign the documents in question.  I have no personal knowledge as to whether the

11391232

Claimant actually appeared in Brooklyn, New York on May 26, 2010 to sign these documents before Ms. Kogan.

8. At Mr. Hearn's request, I located and spoke to Ms. Kogan. I had been told that the documents had been notarised when Adella Cherney, the Claimant's sister-in-law and Leonid Chernoy's mother, took the documents to a Chase Manhattan Bank branch in Brooklyn, New York. I determined that there was a Chase branch at 722 Brighton Beach Avenue, Brooklyn, New York, which is in the general neighborhood in which I understood Ms. Chernoy lives. On June 20, 2011, I called the general number for the branch and asked to speak to Ms. Kogan and was connected to her. After being put on hold for a period of time, a voice came on the line and said "This is Alex." I then identified myself as an attorney for Michael Cherney and told Ms. Kogan that I was calling to see if I could meet with her to discuss the circumstances surrounding the execution of documents signed by Mr. Cherney and notarised by her. Ms. Kogan's immediate reaction was to tell me that Chase maintained a legal department for inquiries like this and that I should contact the Chase legal department.

9. I then explained to Ms. Kogan that I only wanted to show her documents that she had notarised so that I could understand how she came to notarise them. I told her that it would not take much time. She responded by saying that she notarises many documents and was unlikely to remember the circumstances of a particular document. She also told me that she needed to talk to her manager before speaking to me further.

10. When Ms. Kogan came back on the line, she told me that I should send the documents at issue to the branch so that she and her manager could review them and then forward them to the legal department to determine the proper way to respond. The conversation then terminated.

11. On June 23, I sent the letter attached at page 1 to the Chase legal department. I have not received a response to my letter to date.

11391232

12. Notaries in New York are not required to be attorneys and, in my experience, many notaries are not attorneys. I am also aware from my own personal knowledge that bank officers that deal with the public are frequently notaries and that banks offer notarization services to their customers. I therefore caused enquiries to be made about Ms. Kogan in order to determine whether she was an attorney and whether she was admitted to the New York State bar. We found no indication that Ms. Kogan was an attorney and Ms. Kogan's name is not listed on the New York State Unified Court System website listing of all admitted New York attorneys.

13. Mr.Hearn also asked me to investigate the rules that governed travel to the United States by Israeli citizens in May 2010 as well as the entry procedures for foreign nationals entering the United States at that time. The following information was gleaned from publicly available information from the Unites States Department of State:

    a. In May 2010, all individuals traveling under an Israeli passport would have needed a visa issued by the United States State Department to enter the United States.

    b. Had the Claimant tried to enter the United States on May 26, 2010 whether by land, sea or air, he would have been subject to the US-VISIT biometric data collection procedures, which included the scan of multiple fingers and photograph of all visitors except for limited categories of exempt visitors (which categories would not have included the Claimant).

    c. Had the Claimant's photograph and finger scan been taken, they would have been compared to a watch list of known or suspected terrorists, criminals and immigration violators to protect against persons traveling using an alias or with fraudulent identification. This search is also intended to include a database into which the names and other identifying information about all persons against

11391232

whom an Interpol notice of the issuance of a foreign arrest warrant have been entered.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: ................................................................

**Brian Edward Maas**

Date: 15 July 2011

11391232

# EXHIBIT X

1. Claimant
2. J. Burkhalter
3. 1st
4. "JB1"
5. $\varrho^{\mathsf{h}}$ July 2011

**IN THE HIGH COURT OF JUSTICE**                    **Claim No.  2006 Folio 1218**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**

MICHAEL CHERNEY

                                                                                                **Claimant**

- and -

OLEG DERIPASKA

                                                                                                **Defendant**

---

**WITNESS STATEMENT OF
JOAQUIN MATÍAS BURKHALTER THIÉBAUT**

---

I, Joaquín Matías Burkhalter Thiebaut, of Velázquez 63, 28001 Madrid, Spain, **WILL SAY AS FOLLOWS:**

Introduction

1.    I am a Spanish lawyer and a partner in the law firm Cuatrecasas, Gonçalves Pereira, of Velázquez 63, 28001 Madrid, Spain. I speak English fluently. I make this statement with the authority of the Claimant in support of his application for permission to give his evidence at trial by video link.

2.    I do so from facts within my own knowledge or derived from my firm's files and records, save where otherwise indicated. The matters to which I refer as being within my own

1

11393360

knowledge are true, and those in respect of which I rely on information that is not within my own knowledge are true to the best of my knowledge and belief. As necessary, I describe the sources of such information in the course of this witness statement. Nothing contained in this statement is intended to waive such privilege as the Claimant is entitled to assert in communications between him and me.

3.    There is now produced and shown to me marked **"JMBT1"** a paginated bundle of true copy documents to which I make reference in this statement. Page references in brackets are to page numbers in **"JMBT1"**. I should say that the translations of the documents within JMBT1 have been produced by more than one translator and I note that different translators appear to have translated the Spanish term for (a) Examining Court as either "Magistrates' Court" or "Investigating Magistrates' Court" and (b) Public Prosecutor as "District Attorney". I should make clear to avoid confusion that these are all alternative translations of the same Spanish word.

**The Spanish Criminal Proceedings**

4.    From a review of the Court's file I was able to ascertain that, on 14 June 2005, representatives of the Spanish Criminal Court together with the Spanish police made a search of the residences of two individuals: Oleg Tchoubine and Natalia Tchernobrovkina. During the course of the search documents were seized relating to a company called Vera Metallurgica SA. I understand that this company, which was registered in Spain on 18 September 2001, traded in metals.

5.    Subsequently, on 10 April 2007 the Spanish Prosecutor, Jose Grinda, filed a complaint **[1 - 60 JMBT1]** with the Central Examining Court No.4 in Madrid requesting that the Examining Court commence a judicial investigation concerning the activities within the Spanish territory of the alleged criminal organization named *"Izmailovskaya"*. In that complaint the Prosecutor alleged that these activities were *"consistent with an offence of money laundering perpetrated by an organization and an offence of illegal association whose heads at the time the acts were committed [were] Michael Cherney, Iskander Makhmudov and Oleg Deripaska..."*.  The Public Prosecutor also alleged that the parties had been engaged in tax evasion.

2

11393360

6.    The complaint alleged that Vera Metallurgica SA was used to launder the proceeds of the criminal activities of "Izmailovskaya" [1 – 60 JMBT1] and that the following persons were suspected of involvement in the illegal activity: Eugene Aschenbrenner, Oleg Deripaska, Iskander Makhmudov, Michael Cherney, Lada Lebedeva, Josef Karman, Vitali Korotich, Sardor Mirzazhanov, Vladimir Tiurine, Jose María Pérez-Hickamn, Marin Marinov, Denis Ivanov and Todor Batkov.

7.    Between 11 and 23 April 2007 the Examining Judge, Fernando Andreu Merelles (the "Examining Judge") [61-101JMBT1] ordered the following measures:

    7.1    the wire tapping of Jose Maria Perez-Hickman Munoz, Oxana Tchernobrovkina and Eugeni Aschenbrenner [61-64 JMBT1];

    7.2    the provision by the Commercial Registrar of information relating to various companies mentioned in the complaint [65-67 JMBT1]; and

    7.3    the issue of letters rogatory to the United States, Germany, Switzerland, Austria and Israel [68-101 JMBT1].

The investigation continued throughout the remainder of 2007, 2008 and into 2009.

8.    On 20 April 2009, the Public Prosecutor made a series of applications to the Examining Judge and obtained a series of orders. In particular, the Examining Judge made an order as follows[102 – 138 JMBT1]:

'... *in order to notify Eugen Aschenbrenner, Oleg Deripaska, Iskander Majmudov (or "Makhmudov"), Mikhail Chernoi (aka "Michael Cherney", "Cherny", "Chernoy", among others), Lada Lebedeva, Josef Karman, Vitali Korotich, Sardor Mirzazhanov, Vladimir Tiurine (aka "Tiourin", "Tiourine"), Jose Maria Perez Hickamn, Marin Marinov, Denis Uvanov and Todor Kostadinov Batkov of the existence of these proceedings pursuant to Section 118 of the Criminal Proceedings Act, send an order to the Police Authorities in the case so that as a matter of urgency they carry out all necessary measures to inform this Court of the addresses and present whereabouts of the*

3

*aforementioned as well as their full personal details*'. [Emphasis added] **[103/118 JMBT1]**

In the usual course, where the subject of a criminal investigation is resident in Spain, the police would notify the Spanish Court of the relevant person's address and the Court would then send an official notice to their residential address notifying him/her of the existence of the investigation and summoning him/her to attend court on a specified date to be examined in relation to the matters identified in the investigation. In the case of persons not resident in Spain the Court's usual practice is to issue a letter of request to the relevant authorities of the state in which the individual is domiciled requesting that that authority notify the person in question of the investigation. The subject of the investigation would not have been aware of the investigation prior to these steps being taken by the Court since, as I explain in paragraphs 14 and 15 below, criminal investigations are not public investigations. Having checked the court file, I can confirm that no letter of request was sent to Mr Cherney.

9.      Further, the Examining Judge ordered that requests be sent to the Spanish Inland Revenue and to Europol seeking all information from such sources about a list of natural and legal persons, including the Claimant, the Defendant and Iskander Makhmudov and that a letter of request be sent to the English authorities requesting copies of all documents filed in the civil proceedings between Mr Cherney and Oleg Deripaska. Further, the Examining Judge made orders preventing the sale of or dealing with certain real property owned in Spain by the Claimant **[115 – 117 and 122 -129 JMBT1]**.

10.     On 3 May 2009 the Spanish police, in response to the Examining Judge's order of 20 April 2009, submitted a letter to the Court which stated the addresses of the "imputados" **[188-191 JMBT1]**. That letter stated that Mr Cherney had different domiciles in London, Russia, Paris, New York and Israel and gave corresponding addresses for each location **[188 & 190 JMBT1]**.

11.     Subsequently, on 20 May 2009, the Public Prosecutor sought and obtained from the Examining Judge an order for the search, arrest and detention of Mr Cherney (the "Arrest & Detention Order") **[139 – 150 JMBT1]**. In his request, the Public Prosecutor represented to

4

the Court that Mr Cherney's *"address was unknown because it was variable"* and that he had *"a history of evading Justice, as in the case of the Russian Federation"* [151 – 191 JMBT1].

12.  Although Mr Cherney does not have an address in Spain, it is clear that the Spanish Court had at least some addresses for him as these were provided in the letter of 3 May 2009 [188-191 JMBT1]. Further, I do not think that the Public Prosecutor or the Spanish Police would have found it very difficult to cross check Mr Cherney's address in Israel as it is my understanding that this information can be obtained from the Claim Form which Mr Cherney filed in the High Court in London in connection with these proceedings.

13.  The Arrest & Detention Order directed that the necessary International and European arrest warrants (which would have been produced by the Examining Court staff on the same day on which the order was made) should be sent to the Spanish Police and to INTERPOL (collectively the "Warrants") [192 – 223 JMBT1]. As it happened, at the end of the International Arrest Warrant INTERPOL was informed that Mr Cherney would be present at 12:00 noon in the lobby of the Hotel Millennium in Knightsbridge (London) [223 JMBT1]. I understand from my discussions with Mr Cherney that this is precisely the place and time at which Mr Cherney planned to have a meeting with Frank Neuman, a person whom he was suing in civil proceedings in Denia and Valencia Civil Courts in Spain and in the High Court in London. I believe, based on my own knowledge of how and why such orders are normally granted, that the fact of knowing that Mr Cherney would be in England in a specific place at a specific date and time is likely to have been a determining factor for the Court to order his arrest at the request of the Public Prosecutor on 20 May 2009.

14.  On the same day the Court issued a summons or Requisitoria [224 – 225 JMBT1]. This is a court order which requires a person to appear before the Court in Spain within a specific time period – ten days in the case of Mr Cherney – with the provision that if he does not do so he will be declared an outlaw ("en rebeldía"). The Requisitoria is notified to the Police and made public by posting it on the Court's notice board. It is standard practice in Spain for a court to issue a Requisitoria when the court does not have an address for an imputado that it wants to interview or if it believes that the person cannot be located. Mr Cherney did not attend before the Examining Judge on 30 May, as the Requisitoria required. I note that the term "rebeldía"

5

has on some occasions been translated as "contempt of court" by English translators. I do not agree that this is correct. It should be translated as rebel or outlaw. The Spanish expression for contempt of court is "desacato" or "desobediencia". This is not a situation where Mr Cherney had notice of and deliberately breached a court order -- rather the Requisitoria is judicial practice followed in Spain where an imputado's address is unknown or he cannot be located at a known address. It is not equivalent to an English contempt of court but is more akin to a judgment in default of appearance and allows for the proceedings to continue in the absence of the imputado.

15.    For completeness, I should also mention that in the civil proceedings between Mr Neuman and Mr Cherney which were taking place in the Denia Court, Mr Neuman denied that the signature on a loan agreement between Fairnet Services Ltd and Acacia Mediterránea SA was in fact his signature. As required by Spanish law, this allegation was referred to the Denia criminal courts for investigation. On June 6, 2011 the criminal Court in Denia issued a summons requiring Mr Cherney to attend before the Denia Criminal Court Judge on 30 September 2011 to answer questions concerning this matter [226 – 227 JMBT1]. This was sent to my firm's Alicante office.

**Spanish Criminal Procedure**

16.    Before explaining the steps which have been taken by my firm to represent Mr Cherney in the Spanish Criminal Proceedings, it may assist the Court if I explain in broad terms certain procedural aspects of the proceedings. The investigatory stage of criminal proceedings in Spain is not public. It is not possible for an "imputado" or criminal suspect to gain access to the documents on the Court's file unless he has entered an appearance in the proceedings.

17.    In order for an imputado to enter an appearance in criminal proceedings it is necessary for that person to make a request in writing to the Examining Judge to be included in the proceedings and to appoint a lawyer to represent him/her. It is then up to the Examining Judge to determine whether or not that person should be admitted to the proceedings. Only after the judge has admitted a person to the proceedings may that person and his legal representatives access the documents on the Court's file. A person who is not admitted has no right to access

6

11393360